Samuel W. Plauché, WSBA #25476
Plauché & Carr LLP
1218 3rd Avenue, Suite 2000
Seattle, WA 98101
Phone: 206.588.4188
Email: billy@plauchecarr.com

Jesse DeNike, WSBA #39526
Plauché & Carr LLP
1218 3rd Avenue, Suite 2000
Seattle, WA 98101
Phone: 206.588.4188
Email: jesse@plauchecarr.com

*Attorneys for Plaintiff Steven D. Bang*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| STEVEN D. BANG, an individual,<br><br>Plaintiff,<br><br>v.<br><br>LACAMAS SHORES HOMEOWNERS ASSOCIATION, a Washington nonprofit corporation,<br><br>Defendant. | No.<br><br>COMPLAINT |

## I.  INTRODUCTION

1.     This action is a citizen suit brought under Section 505 of the Clean Water Act ("Act"), 33 U.S.C. § 1365. Defendant Lacamas Shores Homeowners Association ("HOA") owns and operates a biofilter stormwater treatment facility ("Biofilter") located on Clark County Tax Lot 84839000. The Biofilter was developed and designed to treat stormwater from the adjoining

Lacamas Shores residential development as required by a 1988 development permit issued by the City of Camas and the Washington State Department of Ecology ("Ecology").

2.      Initially, the Biofilter was properly maintained and effectively removed nutrients and solids from stormwater runoff. However, it subsequently fell into disrepair. Specifically, the "filter" component of the biofilter—namely, the grasses and aquatic plants that sequester pollutants—has not been maintained because the HOA has not conducted the required management and harvesting of vegetation. High-filtering, tightly knit, and easily removable grasses have been crowded out by tree shadow, which prevents vegetation and contaminant removal. Leaves and dead plants in the Biofilter litter the ground continuously, discharging pollutants including phosphorus, suspended solids, and dissolved inorganic chemicals, into the adjacent, natural wetlands and Lacamas Lake through two concrete outfalls.

3.      Plaintiff Steven D. Bang alleges these discharges are illegal and in violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), because Defendant does not have a National Pollutant Discharge Elimination System ("NPDES") permit or other approval under the Act authorizing discharges of pollutants from the Biofilter. Plaintiff seeks declaratory and injunctive relief, the imposition of civil penalties, and an award of costs, including attorneys' and expert witness fees, for Defendant's repeated and ongoing violations of the Act.

## II.  JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 33 U.S.C. § 1365 (citizen suit provision of the Act) and 28 U.S.C. § 1331 (federal question). Defendant is in violation of an "effluent standard or limitation" as defined by Section 505 of the Act, 33 U.S.C. § 1365(a)(1). The requested relief is proper under 28 U.S.C. §§ 2201 and 2202 and 33 U.S.C. §§ 1319(d) and 1365.

5.      Plaintiff has satisfied the jurisdictional requirements for bringing this suit. Under Section 505(b)(1)(A) of the Act, 33 U.S.C. § 1365(b)(1)(A), by certified letter dated and postmarked August 12, 2021, Plaintiff notified Defendant of Defendant's alleged violations of

Plauché & Carr LLP
1218 3rd Avenue, Suite 2000
Seattle, WA 98101
Phone: 206.588.4188

the Act and of Plaintiff's intent to sue for those violations pursuant to a notice letter, with attachments ("Notice Letter"). On August 17, 2021, Plaintiff sent Defendant a revised version of Attachment 5 to the Notice Letter. A copy of the Notice Letter is attached to this complaint as Exhibit 1, and a copy of the revised version of Attachment 5 to the Notice Letter is attached as Exhibit 2. The allegations contained in Exhibits 1 and 2 are hereby incorporated by reference.

6.      More than sixty days have passed since Plaintiff mailed the Notice Letter and the revised version of Attachment 5, and the violations complained of are continuing or reasonably likely to continue to occur. Neither the Environmental Protection Agency ("EPA") nor Ecology has commenced any action constituting diligent prosecution to redress these violations. Defendant is in violation of the Clean Water Act.

7.      Venue is appropriate in this District under Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations complained of is located in this District, in Camas, Clark County, Washington.

8.      A copy of this Complaint will be served on the Attorney General of the United States, the Administrator of the EPA, and the Administrator of EPA Region 10, as required by 33 U.S.C. § 1365(c)(3) and 40 C.F.R. § 135.4.

### III.  PARTIES

9.      Plaintiff Steven D. Bang, an individual, owns Clark County Tax Lot 92232678, address 2701 NW Lacamas Dr., Camas, Washington, 98607. Mr. Bang's property is directly adjacent to the property on which the Biofilter is located. Mr. Bang's use and enjoyment of Lacamas Lake is directly and adversely affected by the Biofilter, as the Biofilter is discharging pollutants to the lake and likely contributing to harmful algal blooms and resulting in use restrictions.

10.     Defendant Lacamas Shores Homeowners Association is a Washington nonprofit corporation. The HOA owns the Biofilter and the property on which it is located. The HOA is responsible for properly maintaining the Biofilter. The HOA is failing to properly maintain the

COMPLAINT-3

1
2

Biofilter, and the Biofilter is discharging pollutants to Lacamas Lake and the natural wetlands that adjoin the Biofilter.

## IV.  LEGAL BACKGROUND

3
4
5

11.     Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

6
7
8
9

12.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits "the discharge of any pollutant by any person" unless such discharge is authorized by an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. §1342, or another approval listed in Section 301(a).

10
11
12

13.     The Act defines "discharge of a pollutant" to mean, in part, "any addition of any pollutant to navigable waters from any point source…." 33 U.S.C. § 1362(12). *See also* 40 C.F.R. § 122.2.

13
14
15
16
17

14.     The Act defines "pollutant" to mean, in part, "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water" 33 U.S.C. § 1362(6). *See also* 40 C.F.R. § 122.2.

18
19
20
21
22

15.     The Act defines "point source" to mean, in part, "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). *See also* 40 C.F.R. § 122.2.

23
24
25
26

16.     The Act's prohibition on discharging pollutants from point sources applies broadly. The Act defines "navigable waters" to mean "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). And the Act defines "person" to mean "an individual,

COMPLAINT-4

Plauché & Carr LLP
1218 3rd Avenue, Suite 2000
Seattle, WA 98101
Phone: 206.588.4188

corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

17.    The Act does not exempt biofilter stormwater treatment facilities from the NPDES permit requirement. Point-source discharges of pollutants from biofilter stormwater treatment facilities are illegal unless authorized by an NPDES permit. 33 U.S.C. § 1311(a).

18.    EPA may delegate administration of the NPDES permit program to states with regulatory programs meeting applicable criteria. 33 U.S.C. § 1342(b); 40 C.F.R. Part 123. The State of Washington has established a federally approved state NPDES program administered by Ecology, and Ecology may issue NPDES permits authorizing discharges of pollutants.

19.    Federal regulations require any person who discharges or proposes to discharge pollutants to waters of the United States to apply for an NPDES permit. 40 C.F.R. § 122.21(a).

20.    Compliance with the terms and conditions of an NPDES permit is deemed compliance with the general discharge prohibition in Section 301(a). 33 U.S.C. § 1342(k). Discharging pollutants without the required NPDES permit is grounds for a citizen enforcement action. 33 U.S.C. §§ 1365(a)(1), (f)(1).

21.    EPA adopted regulations implementing the NPDES permit program, 40 C.F.R. Part 122, which do not exempt point-source discharges of pollutants from biofilter stormwater treatment facilities. Ecology's NPDES regulations similarly do not exempt such discharges. Chapter 173-220 Wash. Admin. Code.

## V.  FACTS

22.    The Lacamas Shores residential development was planned and permitted in the mid to late 1980's on undeveloped property adjacent to Lacamas Lake. The Biofilter was developed as a specific condition for the approval of the combined shoreline substantial development permit and conditional use permit ("Shoreline Permit") for the Lacamas Shores residential development in Camas, Washington.

COMPLAINT-5

23.    In June 1988, the City of Camas originally granted the Shoreline Permit to Vanport Manufacturing, Inc., authorizing a new residential development along the southwest shore of Lacamas Lake under the Shoreline Management Act of 1971, chapter 90.58 RCW. A major concern during the permitting and environmental review process for the Lacamas Shores development related to water quality impacts associated with erosion and stormwater runoff from the development, in particular phosphorus loading into the lake.

24.    Because of the topography of the property, it was infeasible to develop sedimentation ponds for the runoff. Instead, the original development plan called for stormwater to be routed through french drains, or "bubblers," and discharged into an existing, natural wetland adjoining Lacamas Lake. The wetlands would then filter the inflowing stormwater before it enters Lacamas Lake. Exhibit 1, Attachment 1 at 8, 15-16.

25.    As stated in the project's draft environmental impact statement ("DEIS") the biological consulting firm Shapiro & Associates, experienced in wetland boundary delineation, was retained to identify and flag the wetland boundary on the site as it was deemed "necessary to determine a definitive wetland boundary prior to developing the site plan." Exhibit 1, Attachment 1 at 34, Figure 6, Appendix B. Shapiro and Associates' delineation included forested, scrub/shrub, and emergent wetlands. *Id*. Conditions attached to the original Shoreline Permit stated the existing forested wetlands adjacent to the shoreline should be retained intact as a functioning natural wetland, required the forested wetlands to be separately delineated from the surrounding biofiltration wetland areas, and required the developer to implement a wetland biofilter monitoring program. Another condition required that the area below the 200-foot elevation adjoining the wetland area be held in reserve for future wetland/detention area, should monitoring demonstrate such a need to enhance its filtering capacity.

26.    The original Shoreline Permit was appealed to the Washington State Shorelines Hearings Board ("SHB") by Citizens to Save Lacamas Lake. In response to a mutual request by

COMPLAINT-6

the parties, including the City and Ecology, the SHB entered an agreed order remanding the

Shoreline Permit to the City for reissuance with the following instructions, among others:

> 4. The Developer agrees to commit a portion of the property now reserved for potential wetland use to be developed immediately as part of the man-made wetlands created as part of the biofilter storm drainage system on the project. This additional property is depicted as the "newly-created wetlands" on the site plan attached as Exhibit A. These newly-created wetlands and all other wetlands and land reserved for potential future wetlands shall continue to be governed by the conditions and monitoring program set forth in the existing permit conditions.

> 5. In consideration for the additional acreage contributed to the man-made wetlands, the Developer shall have the right to reconfigure the lots in the existing site plan to obtain up to 218 residential lots in the development.

> 6. The water quality monitoring and contingency program contained within the existing permit conditions shall continue for the longer of five years commencing the date of the reissuance of the Substantial Development Permit and Conditional Use Permit or until such time that 75% of the lots depicted as "lots within the biofilter drainage" on Exhibit A are developed.

Exhibit 1, Attachment 2.

27.    Exhibit A of the SHB's order contains a figure depicting the naturally-occurring

wetlands along with the "newly created wetlands" required to be developed in Condition 4 of the

SHB's order. The naturally-occurring wetlands in Exhibit A are noted as being defined by

Shapiro & Associates and coincide with the wetlands delineated by Shapiro & Associates in the

DEIS. The naturally occurring wetlands are directly adjacent to Lacamas Lake, and the "newly

created wetlands" are located landward and in between the naturally occurring wetlands and the

Lacamas Shores development.

28.    The revised Shoreline Permit was subsequently issued consistent with the SHB's

agreed order of remand. Exhibit 1, Attachment 3. Monitoring occurred for the next five years as

required by the Shoreline Permit, and the results were reported in a fifth-year monitoring report

sent to Ecology and a July 1993 Water Environment & Technology article. The report notes that

the first two years of the study focused on obtaining baseline information, and the third through

fifth years were used to assess the effectiveness of the Biofilter. The report states that primary

COMPLAINT-7

parameters (total phosphorus, soluble phosphorus, and nitrate+nitrite-nitrogen) and total suspended solids measured at the outflows were typically less than the inflowing concentrations, indicating the wetlands were effective at removing nutrients and solids from stormwater runoff.

29.    After 1993, an adjacent but separate swale/pond system was added to address re-routed stormwater from another 38.0 acres of HOA properties southeast of the swale.

30.    Responsibility for maintaining the Biofilter was initially vested in the developer, but a condition of the Shoreline Permit transferred that responsibility to the HOA, stating:

> Creation of a homeowners association which will be responsible for monitoring and maintaining the storm drainage system when the developer's responsibility has been completed. These water quality safeguards will be imposed either through a homeowners association charter or deed restriction before conveying title to Lacamas Shores lot buyers.

Exhibit 1, Attachment 3, Condition 12.

31.    Maintenance for a stormwater treatment facility requires the regular removal of vegetation. EPA warns as follows in its Stormwater Wet Pond and Wetland Management Guidebook [p. 5]:

> Without proper maintenance, excess pollutants in ponds and wetlands may actually become sources of water quality issues such as poor water color/clarity/odor, low dissolved oxygen leading to plant die off, and prevalence of algal blooms. When these stormwater BMPs are "flushed" during a large rain event, the excess nutrients causing these problems may be transferred to the receiving waterbody.

32.    Vegetation management is a critical maintenance activity. Grasses are recognized as a common and effective choice for vegetation, and regular cutting/trimming and removal of those trimmings will "help prevent diseases, pests, and the intrusion of weeds." Stormwater Wet Pond and Wetland Management Guidebook at 12. Wetland plants promote biological uptake of pollutants, and may require harvesting (i.e., removal from the wetland area on a routine basis and applying it in an upland location) "before winter die-off to prevent nutrients from reentering the water column and being flushed downstream." *Id*. at 12 n.3. Ecology's stormwater treatment manual similarly recognizes that stormwater treatment wetlands are used to capture pollutants in

COMPLAINT-8

Plauché & Carr LLP
1218 3rd Avenue, Suite 2000
Seattle, WA 98101
Phone: 206.588.4188

a managed environment so that they will not reach natural wetlands and other ecologically important habitats, and vegetation must occasionally be harvested. Department of Ecology Stormwater Management Manual for Western Washington, July 2019, at 902.

33.    The City developed guidelines for maintaining the Biofilter and storm water systems, trails, and open space specifically for the Lacamas Shores development. The storm water system section states "[s]ince decomposing vegetation can release pollutants captured in the wet pond, especially nutrients, it may be necessary to harvest dead vegetation annually prior to the wet season. Otherwise, the decaying vegetation can export pollutants out of the pond and also can cause nuisance conditions to occur." City of Camas, Lacamas Shores Homeowners Association Interim Trail, Open Space, Wetland and Storm Drainage Maintenance Manual at 1-1. Guidance from the City for maintaining stormwater facilities includes recommendations to mow grasses, control weeds, and remove blackberries and unplanned tree seedlings at the bottom and on side slopes. If routine maintenance is not conducted, more extensive activities may need to be undertaken, including removing established trees. City of Camas, Stormwater Facility Maintenance Tips, 2018. *See also* Clark County Stormwater Manual 2015, Book 4, at 67 (stating stormwater treatment wetlands perform well to remove sediment, metals, and pollutants that bind to humic or organic acids, and vegetation in treatment wetlands must occasionally be harvested).

34.    While the Biofilter was initially properly maintained and effectively removed nutrients and solids from stormwater runoff, as documented in the fifth-year monitoring report discussed above, it subsequently fell into disrepair. Specifically, the "filter" component of the biofilter—namely, the grasses and aquatic plants that sequester pollutants—has not been maintained because the HOA has not conducted the required management and harvesting of vegetation. High-filtering, tightly knit, and easily removable grasses have been crowded out by tree shadow, which prevents vegetation and contaminant removal. Leaves and dead plants in the Biofilter litter the ground every year, discharging pollutants including phosphorus, suspended solids, and dissolved inorganic chemicals into the natural forested wetlands and Lacamas Lake.

COMPLAINT-9

35.    Acknowledging the deteriorating state of the Biofilter and concomitant impacts to the water quality of Lake Lacamas and its adjacent, natural wetlands, the HOA notified the City Administrator in 2016 that it intended to maintain the Biofilter. The Administrator responded that permits or approvals would be needed for maintenance activities.

36.    Given the Biofilter was required to be developed as a condition of the Shoreline Permit and is a permitted treatment facility, additional permits from the City are not required to conduct routine maintenance. Camas Municipal Code Sections 16.51.100.A.3 and 16.53.010.C.2.b; Camas Shoreline Master Program Section 1.9.5 and Chapter 7, Definition #190.

37.    The HOA prepared some preliminary materials in support of a permit application and attended a pre-application meeting with the City, but the HOA did not submit an application to maintain the Biofilter, nor did it seek or obtain a definitive determination of the City's code provisions that clearly indicate that a permit is not required to maintain the Biofilter. The HOA also did not proceed with maintenance activities, other than cleaning pipes. Meanwhile, the Biofilter continued deteriorating.

38.    In 2018, a wastewater expert collected water samples at the inlets and outlets of the Biofilter and had them tested for chemical oxygen demand. These tests demonstrated that the outlets of the Biofilter had lower water quality compared to the inlets. Exhibit 2 at 5-6. In December 2019 and May 2020, the City tested the stormwater runoff from the Biofilter, selecting two locations downstream of the Biofilter's two outlets for sampling. These tests demonstrated water exiting the Biofilter had elevated levels of phosphorus, total suspended solids, and dissolved inorganic chemicals (as measured by conductivity). *Id.* at 5-7. One sampling location had severely high total phosphorus and total suspended sediment levels for the December, 2019 test, and conductivity was extremely high for both locations in the May 2020 test. Total phosphorus was higher for all tests (from 62-270 micrograms/L) than the EPA standard (50).

39.    On September 23, 2020, a member of the HOA teamed with a retired botanist and university professor to collect samples of water flowing into the Biofilter and then discharging

COMPLAINT-10

Plauché & Carr LLP
1218 3rd Avenue, Suite 2000
Seattle, WA 98101
Phone: 206.588.4188

into Lacamas Lake via two outlets. The samples were delivered to Columbia Laboratories for

analysis according to the three parameters that were non-compliant in testing from 2019 and

earlier in 2020: total phosphorus (TP), total suspended solids (TSS), and dissolved inorganic

chemicals. *Id*. at 7. Results are provided in Figure 3 of the report, showing higher levels for the

three parameters in the outlets (L1, L2, S2, and S4) compared to the inlets (B1 and B2).

### Table 3. Sample Information and Results (listed chronologically)

| | Sample Collection Taken From | Time Taken | pH | Water Temperature | TP µg/L | CC TP [Max] | TSS mg/L 25 | CC TSS [Max] | Conductivity uS/cm | CC Cond. [Max] |
|---|---|---|---|---|---|---|---|---|---|---|
| **B1 Inlet** | Waterflow outside the manhole cover near athletic field (west edge of cover) | ~~13:55~~ 14.02 | 6.5 | 17°C | 145 | | 14 | | 83.5 | |
| **B2 Inlet** | Water overflowing the top of the manhole by the SW Corner | 14:22 | 6.0 | 18°C | 225 | | 98 | | 71.8 | |
| **S2 Outlet** | Channel coming out of the lakeside (N) of west bridge COMPLIANCE POINT | After B2 | 6.5 | 18°C | 555* | 110 [251] | 260* | 25.8 [72] | 115 | 87 [135] |
| **L1 Outlet** | Channel downstream of S2 before reaching the Lake - City sample location for Dec 2019 and May 2020 | After S2 | - | - | 319 | | 140 | | 90.5 | |
| **S4 Outlet** | Channel before entering east bridge[6] (S) COMPLIANCE POINT | 14:44 | 6.0 | 18°C | 976* | 118 [223] | 184* | 19.4 [51.6] | 105 | 63 [97] |
| **L2 Outlet** | Channel downstream of S4 and the sediment pond outlets before reaching the Lake - City sample location for Dec 2019 and May 2020 | 14:50 | - | - | 135 | | 82 | | 84.8 | |

*Indicates that the reading is higher than any reading taken at that location, including since 1988.

Exhibit 2 at 11. As further discussed and demonstrated in the report, this contrasts with earlier

analyses of the Biofilter from the 1990s, where the water quality had fewer pollutants at the

Biofilter's outlets compared to its inlets. *Id*. at 14.

COMPLAINT-11

Plauché & Carr LLP
1218 3rd Avenue, Suite 2000
Seattle, WA 98101
Phone: 206.588.4188

40.     These results demonstrate that the HOA's lack of maintenance of the Biofilter has transformed the Biofilter from a system that removes pollutants into a system that actually adds pollutants—including phosphorus, suspended solids, and dissolved inorganic chemicals—to Lacamas Lake and the naturally occurring forested wetlands that abut it.

41.     The Biofilter is further degrading a system that is already stressed, and it is likely contributing to human health concerns associated with Lacamas Lake and impairing the beneficial uses of this important resource. In 2020, public health officials were forced to pose danger signs at public access points to Lacamas Lake and advise against recreational use of the lake after water samples revealed cyanotoxins above the threshold levels recommended by the Washington Department of Health.[1] Health officials were forced to issue warnings of elevated cyanotoxins again in August 2021, recommending the public not swim or water ski in the lake, drink lake water, or allow animals to contact the water.[2] Blooms of cyanobacteria, also known as blue-green algae, can pose a significant health risk if the cyanobacteria or toxins are ingested, inhaled or come into contact with skin. Algae blooms are frequently caused by excess nutrients, including phosphorus and other biological materials, that are loaded into the aquatic environment from anthropogenic sources.

42.     Plaintiff owns property that is adjacent to the Biofilter and resides at this property for much of the year, including the summer. Plaintiff has strong interests in protecting the quality of the natural wetlands that abut the Biofilter and Lacamas Lake and ensuring the lake remains open for all appropriate and beneficial uses. Defendant's unpermitted discharges of pollutants degrade the environment and the water quality of Lacamas Lake and the natural wetlands that abut the Biofilter, likely contributing to harmful algal blooms and resulting in use restrictions.

---

[1] https://www.clarkcountytoday.com/community_news/clark-county-public-health-closes-lacamas-lake-and-round-lake-due-to-elevated-toxin-levels/
[2] https://www.clarkcountytoday.com/news/public-health-issues-warning-for-lacamas-round-lakes-due-to-elevated-toxin-levels/

COMPLAINT-12

Plauché & Carr LLP
1218 3rd Avenue, Suite 2000
Seattle, WA 98101
Phone: 206.588.4188

1    These unpermitted discharges and environmental degradation adversely affect Plaintiff's

2    interests.

3        43.    Defendant's unpermitted discharges of pollutants were avoidable had Defendant

4    properly maintained the Biofilter.

5        44.    On August 12, 2021, Plaintiff sent the Notice Letter to Defendant, along with the

6    Administrator of the EPA, the Acting Administrator for Region 10 of the EPA, and the Director

7    of Ecology, notifying Defendant of the aforementioned alleged violations of the Act and of

8    Plaintiff's intent to sue for those violations under Section 505(b)(1)(A) of the Act. On August 17,

9    2021, Plaintiff sent the same parties a revised version of Attachment 5 to the Notice Letter.

10        45.    On August 20, 2021, Plaintiff submitted a code interpretation request to the City

11    of Camas, requesting the City's formal interpretation that additional permits or approvals are not

12    required to conduct routine and necessary maintenance activities within the Biofilter to ensure it

13    functions properly. The City issued a decision refusing to process Plaintiff's code interpretation

14    request, stating previously that only the HOA could submit a code interpretation with respect to

15    the Biofilter. Plaintiff has appealed the City's decision refusing to process Plaintiff's code

16    interpretation request. That appeal is currently pending in Clark County Superior Court (Case

17    No. 21-2-01790-06).

18        46.    The HOA has not submitted a code interpretation requesting the City's formal

19    interpretation as to whether additional permits or approvals are required to conduct routine and

20    necessary maintenance activities within the Biofilter to ensure it functions properly.

21        47.    More than sixty days have passed since Plaintiff mailed the Notice Letter and the

22    revised version of Attachment 5, and the violations complained of are continuing or reasonably

23    likely to continue to occur. Neither the EPA nor Ecology has commenced any action constituting

24    diligent prosecution to redress these violations. Defendant is in violation of the Clean Water Act.

25        48.    Any and all additional violations of the Clean Water Act by Defendant that occur

26

COMPLAINT-13                                    Plauché & Carr LLP
                                               1218 3rd Avenue, Suite 2000
                                               Seattle, WA 98101
                                               Phone: 206.588.4188

or are discovered after those described in the Notice Letter but before a final decision in this action are continuing violations subject to this complaint.

49.    Without the imposition of appropriate civil penalties and/or the issuance of an injunction and other relief, Defendant is likely to continue to violate the Clean Water Act to the further injury of Plaintiff.

## VI.  CAUSE OF ACTION

50.    Plaintiff hereby alleges and incorporates by reference all of the preceding paragraphs.

51.    Section 301 of the Clean Water Act is violated when a person (1) discharges a pollutant (2) into navigable waters (3) from a point source (4) without a discharge permit. *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 309 (9th Cir. 1993); 33 U.S.C. § 1311(a).

52.    Defendant Lacamas Shores HOA is a "person" within the meaning of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and is subject to suit under the Act's citizen suit provision, 33 U.S.C. § 1365. *See also* 33 U.S.C. § 1362(5) (defining "person" to include, among other things, a corporation or association).

53.    Defendant Lacamas Shores HOA has violated and is violating Sections 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and an "effluent standard or limitation" as that term is defined by Section 505 of the Act, 33 U.S.C. § 1365, by discharging pollutants from the Biofilter to the natural wetlands that abut the Biofilter and to Lacamas Lake without an NPDES permit or other authorization.

54.    The Biofilter is a private, artificially-created stormwater facility that was designed and developed to treat stormwater from the surrounding residential development. While a small portion of the area that comprises the Biofilter originally contained natural wetlands, the wetland treatment facility that comprises the Biofilter includes a much larger area that was not previously classified as wetlands. These "man-made" or "newly-created" wetlands were required to be

COMPLAINT-14

constructed as a condition of the shoreline permit for the Lacamas Shores residential development. Exhibit 1, Attachment 2. The Biofilter is intended to remove pollutants from the incoming stormwater prior to discharging water to the abutting, natural wetlands through two outfalls. As such, the Biofilter as a whole is a point source, and each discrete outfall is a separate point source. 33 U.S.C. § 1362(14) (defining "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged").

55.      The Biofilter is discharging, or adding, pollutants to the abutting natural wetlands and Lacamas Lake. As set forth above, the Biofilter initially functioned properly, removing pollutants from stormwater associated with the residential development. But the Biofilter subsequently fell into disrepair and is now discharging pollutants in the form of biological materials and chemical wastes, including phosphorus, suspended solids, and dissolved inorganic chemicals, into abutting, natural wetlands and Lacamas Lake. Exhibit 2; 33 U.S.C. § 1362(6) (defining "pollutant"), (12)  (defining "discharge of a pollutant" and "discharge of pollutants").

56.      Lacamas Lake and the natural wetlands that abut the Biofilter are navigable waters. 33 U.S.C. § 1362(7) (defining "navigable waters").

57.      The aforementioned discharges are not authorized by a NPDES or other type of approval listed in Section 301(a) of the Act, nor are they exempt from such permitting requirements. While the City of Camas has NPDES coverage under the Western Washington Phase II Municipal Stormwater Permit, issued by Ecology, the coverage of this permit only extends to specific, identified facilities owned or operated by the City that do not include the Biofilter.

58.      The HOA is liable for these discharge violations. The HOA owns the property on which the Biofilter is located, Clark County Tax Lot 84839000, and it is responsible for

Plauché & Carr LLP
1218 3rd Avenue, Suite 2000
Seattle, WA 98101
Phone: 206.588.4188

1  monitoring and maintaining the storm drainage system and the Biofilter under the Shoreline

2  Permit.

3      59.    The aforementioned violations have occurred each and every day since at least

4  September 23, 2020, and likely much earlier, and they are described in the Notice Letter, which

5  is incorporated by reference as if fully set forth herein. Exhibits 1 and 2. These violations result

6  from the unmaintained and failed state of the Biofilter. Given the Biofilter remains in an

7  unmaintained and failed state, and the HOA is not restoring and/or maintaining the Biofilter,

8  these illegal discharges are ongoing and continuing. The ongoing violations will continue to

9  occur unless and until the Biofilter is restored and properly maintained and/or a NPDES permit is

10  issued authorizing the discharges.

## VII.  RELIEF REQUESTED

11      WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

12      A. Declare that Defendant has violated and continues to be in violation of the Clean

13  Water Act, as alleged herein;

14      B. Issue injunctive relief requiring Defendant to comply with the Act and to cease

15  making such discharges;

16      C. Issue injunctive relief requiring Defendant to remediate the environmental damage and

17  ongoing impacts resulting from its illegal discharges of pollutants to Lacamas Lake and the

18  natural, forested wetlands that adjoin the Biofilter;

19      D. Order Defendant to develop and comply with appropriate quality assurance procedures

20  to ensure future compliance with the Clean Water Act;

21      E. Assess civil penalties against Defendant, as authorized by Section 309(d) of the Act,

22  33 U.S.C. § 1319(d);

23      F. Award Plaintiff its litigation expenses, including costs and reasonable attorneys' and

24  expert witness fees, as authorized by Section 505(d) of the Act, 33 U.S.C. § 1365(d); and

25      G. Award such other relief as this Court deems just and appropriate.

COMPLAINT-16

1    DATED this 12th day of November, 2021.

2                                        PLAUCHÉ & CARR LLP

3                                        By: _s/Samuel W. Plauché_
4                                        Samuel W. Plauché, WSBA #25476
                                         Plauché & Carr LLP
5                                        1218 3rd Avenue, Suite 2000
                                         Seattle, WA 98101
6                                        Phone: 206.588.4188
                                         Email: billy@plauchecarr.com
7

8                                        By: _s/Jesse DeNike_
                                         Jesse DeNike, WSBA #39526
9                                        Plauché & Carr LLP
                                         1218 3rd Avenue, Suite 2000
10                                       Seattle, WA 98101
                                         Phone: 206.588.4188
11                                       Email: jesse@plauchecarr.com

12                                       _Attorneys for Plaintiff Steven D. Bang_

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT-17                                        Plauché & Carr LLP
                                                    1218 3rd Avenue, Suite 2000
                                                    Seattle, WA 98101
                                                    Phone: 206.588.4188

# COMPLAINT -EXHIBIT 1





## PLAUCHÉ & CARR
### LLP

**Pacific Northwest Office**
1218 3rd Ave., Suite 2000
Seattle, WA 98101-3235
Tel: (206) 588-4188
Fax: (206) 588-4255

**www.plauchecarr.com**

**Gulf Coast Office**
1110 S River Rd., Suite 200
Baton Rouge, LA 70802
Tel: (225) 256-4028
Fax: (206) 588-4255

August 12, 2021

*Via Certified Mail*

Managing Agent
Lacamas Shores Homeowners Association
12503 SE Mill Plain Blvd., Suite 260
Vancouver, WA 98684-4008

Donald Trost, President
Lacamas Shores Homeowners Association
2421 NW Lacamas Drive
Camas, WA 98607

Lacamas Shores Homeowners Association
P.O. BOX 751
Camas, WA 98607

Registered Agent
Lacamas Shores Homeowners Association
12503 SE Mill Plain Blvd., Suite 260
Vancouver, WA 98684-4008

Ellen Burton, Mayor
Office of the Mayor
City Hall
616 NE 4th Avenue
Camas, WA 98607

**Re:    Notice of Intent to File Suit under the Clean Water Act**

Dear Lacamas Shores Homeowners Association and City of Camas,

This letter provides the Lacamas Shores Homeowners Association ("HOA") and the City of Camas ("City") with sixty days' notice that Steven D. Bang intends to file a citizen lawsuit against the HOA and City under Section 505 of the Clean Water Act, 33 U.S.C. §1365, for the Clean Water Act violations alleged in this letter. Plauché & Carr LLP represents Steven D. Bang in this matter and any response to this notice of intent to sue should be directed to us at the address below.

## I.    CLEAN WATER ACT VIOLATIONS

Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 301 of the Clean Water Act implements that objective by prohibiting the discharge of any pollutant except as in compliance with sections 1312, 1316, 1317, 1328, 1342, and 1344 of the Act. 33 U.S.C. § 1311(a). Accordingly, Section 301 of the Clean Water Act is violated when a person (1)

Lacamas Shores Homeowners Association
City of Camas                    -2-                    August 12, 2021

discharges a pollutant (2) into navigable waters (3) from a point source (4) without a discharge
permit. *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 309 (9th Cir.
1993).

The HOA and City have violated and are violating 33 U.S.C. § 1311 and 33 U.S.C. §
1342 by discharging pollutants from the Lacamas Shores biofilter treatment facility ("Biofilter"),
located on Clark County Tax Lot 84839000, into Lacamas Lake and its adjoining wetlands
without a discharge permit. These violations have occurred since at least September 23, 2020 and
are ongoing.[1]

### A. The Biofilter

The Biofilter was developed pursuant to a combined shoreline substantial development
permit and conditional use permit ("Shoreline Permit") for the Lacamas Shores residential
development in Camas, Washington. In June 1988, the City of Camas originally granted the
Shoreline Permit to Vanport Manufacturing, Inc., authorizing a new residential development
along the southwest shore of Lacamas Lake under the Shoreline Management Act of 1971,
chapter 90.58 RCW. A major concern during the permitting and environmental review process
for the Lacamas Shores development related to water quality impacts associated with erosion and
stormwater runoff, in particular phosphorus loading into the lake.

Because of the topography of the property, it was infeasible to develop sedimentation
ponds for the runoff. Instead, stormwater was designed to be routed through french drains, or
"bubblers," and discharged into an existing, natural wetland adjoining Lacamas Lake. The
wetlands would then treat the inflowing stormwater before it enters Lacamas Lake. Attachment 1
at 8, 15-16. As stated in the project's draft environmental impact statement ("DEIS") the
biological consulting firm Shapiro & Associates, experienced in wetland boundary delineation,
was retained to identify and flag the wetland boundary on the site as it was deemed "necessary to
determine a definitive wetland boundary prior to developing the site plan." *Id.* at 34, Figure 6,
Appendix B. Shapiro and Associates' delineation included forested, scrub/shrub, and emergent
wetlands. *Id.* Conditions attached to the original Shoreline Permit stated the existing forested
wetlands adjacent to the shoreline should be retained intact as a functioning natural wetland,
required the forested wetlands to be separately delineated from the surrounding wetland areas,
and required the developer to implement a wetlands biofilter monitoring program. Another
condition required that an area below the 200-foot elevation adjoining the wetland area must be
held in reserve for future wetland/detention area, should monitoring demonstrate such a need.

The original Shoreline Permit was appealed to the Washington State Shorelines Hearings
Board ("SHB") by Citizens to Save Lacamas Lake. In response to a mutual request by the
parties, including the City and the Washington State Department of Ecology, the SHB entered an

---

[1] As discussed below, this is the date that samples were taken demonstrating Clean Water Act violations were
occurring. Given the Biofilter had fallen into disrepair prior to this date, and earlier water quality samples indicated
the Biofilter was previously discharging pollutants, the violations likely started far in advance of September 23,
2020.

Lacamas Shores Homeowners Association
City of Camas                                    -3-                        August 12, 2021

agreed order remanding the Shoreline Permit to the City for reissuance with the following instructions, among others:

4. The Developer agrees to commit a portion of the property now reserved for potential wetland use to be developed immediately as part of the man-made wetlands created as part of the biofilter storm drainage system on the project. This additional property is depicted as the "newly-created wetlands" on the site plan attached as Exhibit A. These newly-created wetlands and all other wetlands and land reserved for potential future wetlands shall continue to be governed by the conditions and monitoring program set forth in the existing permit conditions.

5. In consideration for the additional acreage contributed to the man-made wetlands, the Developer shall have the right to reconfigure the lots in the existing site plan to obtain up to 218 residential lots in the development.

6. The water quality monitoring and contingency program contained within the existing permit conditions shall continue for the longer of five years commencing the date of the reissuance of the Substantial Development Permit and Conditional Use Permit or until such time that 75% of the lots depicted as "lots within the biofilter drainage" on Exhibit A are developed.

Attachment 2.

Exhibit A of the SHB's order contains a figure depicting the naturally-occurring wetlands along with the "newly created wetlands" required to be developed in Condition 4 of the SHB's order. The naturally-occurring wetlands in Exhibit A are noted as being defined by Shapiro & Associates and coincide with the wetlands delineated by Shapiro & Associates in the DEIS. The naturally occurring wetlands are directly adjacent to Lacamas Lake, and the "newly created wetlands" are located landward and in between the naturally occurring wetlands and the Lacamas Shores development.

The revised Shoreline Permit was subsequently issued consistent with the SHB's agreed order of remand. Attachment 3. Monitoring occurred for the next five years as required by the Shoreline Permit, and the results were reported in a fifth-year monitoring report and a July 1993 Water Environment & Technology article. The report notes that the first two years of the study focused on obtaining baseline information, and the third through fifth years were used to assess the effectiveness of the Biofilter. The report states primary parameters (total phosphorus, soluble phosphorus, and nitrate+nitrite-nitrogen) and total suspended solids measured at the outflows were typically less than the inflowing concentrations, indicating that the wetlands were effective at removing nutrients and solids from stormwater runoff.

After 1993, an adjacent but separate swale/pond system was added to accommodate re-routed stormwater from another 38.0 acres of HOA properties southeast of the swale.

## B. Biofilter Maintenance Failure and Resulting Discharge Violations

Lacamas Shores Homeowners Association
City of Camas                              -4-                         August 12, 2021

Responsibility for maintaining the Biofilter was initially vested in the developer, but a
condition of the Shoreline Permit transferred that responsibility to the HOA, stating as follows:

> Creation of a homeowners association which will be responsible for monitoring and
> maintaining the storm drainage system when the developer's responsibility has
> been completed. These water quality safeguards will be imposed either through a
> homeowners association charter or deed restriction before conveying title to
> Lacamas Shores lot buyers.

Attachment 3, Condition 12.

Numerous authorities confirm that maintenance for a stormwater treatment facility
requires the regular removal of vegetation. For example, the Environmental Protection Agency
("EPA") warns as follows:

> Without proper maintenance, excess pollutants in ponds and wetlands may actually
> become sources of water quality issues such as poor water color/clarity/odor, low
> dissolved oxygen leading to plant die off, and prevalence of algal blooms. When
> these stormwater BMPs are "flushed" during a large rain event, the excess nutrients
> causing these problems may be transferred to the receiving waterbody.

EPA Stormwater Wet Pond and Wetland Management Guidebook at 5.

Vegetation management is a critical maintenance activity. Grasses are recognized as a
common and effective choice for vegetation, and regular cutting and trimming grasses will "help
prevent diseases, pests, and the intrusion of weeds." *Id*. at 12. Wetland plants promote biological
uptake of pollutants, and may require harvesting (i.e., removal from the wetland area on a routine
basis and applying it in an upland location) "before winter die-off to prevent nutrients from
reentering the water column and being flushed downstream." *Id*. at 12 n.3. The Washington State
Department of Ecology's stormwater treatment manual similarly recognizes that stormwater
treatment wetlands are used to capture pollutants in a managed environment so that they will not
reach natural wetlands and other ecologically important habitats, and vegetation must
occasionally be harvested. Department of Ecology 2019 SWMMWW at 902.

Additionally, the City developed specific guidelines for maintaining the Biofilter and
storm water systems, trails, and open space for the Lacamas Shores development. The storm
water system section states "[s]ince decomposing vegetation can release pollutants captured in
the wet pond, especially nutrients, it may be necessary to harvest dead vegetation annually prior
to the wet season. Otherwise, the decaying vegetation can export pollutants out of the pond and
also can cause nuisance conditions to occur." City of Camas, Lacamas Shores Homeowners
Association Interim Trail, Open Space, Wetland and Storm Drainage Maintenance Manual, at 1-
1. Recent guidance from the City for maintaining stormwater facilities includes
recommendations to mow grasses, control weeds, and remove blackberries and unplanned tree
seedlings at the bottom and on side slopes. If routine maintenance is not conducted, more
extensive activities may need to be undertaken, including removing established trees. City of
Camas, Stormwater Facility Maintenance Tips, 2018. *See also* Clark County Stormwater Manual

Lacamas Shores Homeowners Association
City of Camas                                    -5-                                    August 12, 2021

2015, Book 4, at 67 (stating that stormwater treatment wetlands perform well to remove sediment, metals, and pollutants that bind to humic or organic acids, and vegetation in treatment wetlands must occasionally be harvested).

Unfortunately, while the Biofilter was initially properly maintained and effectively removed nutrients and solids from stormwater runoff, as documented in the fifth-year monitoring report discussed above, it subsequently fell into disrepair. Specifically, the "filter" component of the biofilter—namely, the grasses and aquatic plants that sequester pollutants—has not been maintained because the HOA has not conducted the required management and harvesting of vegetation. High-filtering, tightly knit, and easily removable grasses have been crowded out by tree shadow, which prevents vegetation and contaminant removal. Leaves and dead plants in the Biofilter litter the ground every year, discharging pollutants including phosphates and nitrogen into the natural forested wetlands and Lacamas Lake.

Alarmed by the deteriorating state of the Biofilter and concomitant impacts to the water quality of Lake Lacamas and its naturally-occurring, adjacent forested wetlands, the HOA notified the City Administrator in 2016 that it intended to maintain the Biofilter, including removing vegetation. The Administrator responded that all wetlands in the area were regulated by the City, including those wetlands that were on previously-dry land. The Administrator further stated as follows:

> If clearing of the wetland area commences without permits and approvals from the City of Camas, or any other required jurisdiction then full code enforcement proceedings can and will take place including possible criminal charges for knowingly and willfully working without approvals.

> Wetland are regulated by the City of Camas, Washington State Department of Ecology, and the US Army Corps of Engineers . . . Simply clear cutting trees and vegetation is not an option. As we discussed, removal of blackberries and other invasive species is allowed, but heavy equipment cannot enter the wetland area to remove blackberries, as they will damage the wetlands vegetation.

Attachment 4 at 2. The Washington State Department of Ecology also issued a letter supporting the City's position that most vegetation within the Biofilter's wetlands cannot be removed or harvested absent a new permit and that a permit likely would not be issued or approved by Ecology.

The HOA did not subsequently submit an application to maintain the Biofilter, nor did it proceed with maintenance activities. Meanwhile, the Biofilter continued deteriorating. In 2018, a wastewater expert collected water samples at the inlets and outlets of the Biofilter and had them tested for chemical oxygen demand. These tests demonstrated that the outlets of the Biofilter had lower water quality compared to the inlets. Attachment 5 at 5-6.[2] In December 2019 and May 2020, the City tested the stormwater runoff from the Biofilter, selecting two locations downstream of the Biofilter's two outlets for sampling. These tests demonstrated water exiting

---

[2] *See also* Appendix H to Attachment 5, at:
https://lacamasshoresbiofilter.org/uploads/1/2/2/5/122588755/appendix_h_2018_cod.pdf

Lacamas Shores Homeowners Association
City of Camas                              -6-                        August 12, 2021

the Biofilter had elevated and noncompliant levels of phosphorus, total suspended solids, and
dissolved inorganic chemicals.[3] *Id.* at 5-7.[4]

In 2020, concerned citizens, including a retired botanist and university professor,
investigated water quality conditions of the water that was discharged from the Biofilter into the
naturally-occurring forested wetlands adjacent to Lacamas Lake. They analyzed whether the
Biofilter was meeting the compliance standards established in the Shoreline Permit, comparing
water quality parameters at the Biofilter's inlets to the same parameters at the outlets. The
abstract of their report summarizes their analysis and results as follows:

> In 2020, Lacamas Lake tested positive for harmful algae toxins 26 out of 29 times
> between April and October. The harmful algae blooms occurred along the
> southwest shoreline of Lacamas Lake, three-quarters of which is bordered by the
> Lacamas Shores neighborhood. Stormwater samples taken September 2020 in the
> Biofilter and the adjacent shoreline wetlands were tested for the three water quality
> parameters shown to be of concern in recent tests. Those three parameters are total
> phosphorus µg/L ("TP"), total suspended solids µg/L ("TSS") and conductivity
> uS/cm. The results indicated that the water coming into the Biofilter had better
> water quality values than the water discharged. The Biofilter was unable to slow
> the flow of water coming through the drainage system. Under fast flowing/high-
> volume conditions, the results for TP, TSS and conductivity at the outlets were
> elevated above inlet conditions. Those elevated concentrations put the stormwater
> outlets well over the compliance levels for those water quality parameters. By
> comparing the 1990 results with current results, we see that inlet/incoming
> concentrations are little changed; the efficiency of the Biofilter today is degraded.

Attachment 5 at 1.

Samples were collected on September 23, 2020 of water flowing into the Biofilter and
then discharging into Lacamas Lake via two outlets. The samples were delivered to Columbia
Laboratories for analysis and testing according to the three parameters that were non-compliant
in testing from 2019 and earlier in 2020: TP, TSS, and dissolved inorganic chemicals. *Id.* at 7.
Sample results are provided in Figure 3 of the report, showing higher levels for the three
parameters in the outlets (L1, L2, S2, and S4) compared to the inlets (B1 and B2).

---

[3] Dissolved inorganic chemicals are measured by conductivity.
[4] One sampling location had severely high total phosphorus and total suspended sediment levels for the December,
2019 test, and conductivity was extremely high for both locations in the May 2020 test. Total phosphorus was higher
in all tests (over 68 micrograms/L) than the EPA standard (50). *See also* Appendices I and J to Attachment 5, at:
https://lacamasshoresbiofilter.org/uploads/1/2/2/5/122588755/v9f0419_1_final_01_13_2020_1804.pdf and
https://lacamasshoresbiofilter.org/uploads/1/2/2/5/122588755/vde0400_1_final_06_11_2020_0947.pdf

Lacamas Shores Homeowners Association
City of Camas                                    -7-                                    August 12, 2021

### Table 3. Sample Information and Results (listed chronologically)

| | Sample Collection Taken From | Time Taken | pH | Water Tem- pera- ture | TP µg/L | CC TP [Max] | TSS µg/L | CC TSS [Max] | Con- ductiv- ity uS/cm | CC Cond. [Max] |
|---|---|---|---|---|---|---|---|---|---|---|
| **B1 In- let** | Waterflow outside the man- hole cover near athletic field (west edge of cover) | ~~13:55~~ 14.02 | 6.5 | 17°C | 145 | | 14 | | 83.5 | |
| **B2 In- let** | Water overflowing the top of the manhole by the SW Corner | 14:22 | 6.0 | 18°C | 225 | | 98 | | 71.8 | |
| **S2 Outlet** | Channel coming out of the lakeside (N) of west bridge COMPLIANCE POINT | After B2 | 6.5 | 18°C | 555* | 110 [251] | 260* | 25.8 [72] | 115 | 87 [135] |
| **L1 Outlet** | Channel downstream of S2 be- fore reaching the Lake - City sample location for Dec 2019 and May 2020 | After S2 | - | - | 319 | | 140 | | 90.5 | |
| **S4 Outlet** | Channel before entering east bridge⁶ (S) COMPLIANCE POINT | 14:44 | 6.0 | 18°C | 976* | 118 [223] | 184* | 19.4 [51.6] | 105 | 63 [97] |
| **L2 Outlet** | Channel downstream of S4 and the sediment pond outlets be- fore reaching the Lake - City sample location for Dec 2019 and May 2020 | 14:50 | - | - | 135 | | 82 | | 84.8 | |

*Indicates that the reading is higher than any reading taken at that location, including since 1988.

*Id.* at 11. As further discussed and demonstrated in the report, this contrasts with earlier analyses of the Biofilter from the 1990s, where the water quality had fewer pollutants at the Biofilter's outlets compared to its inlets. *Id.* at 14.

These results demonstrate that the HOA's lack of maintenance of the Biofilter, caused at least in part by the City's prohibition of the HOA's legal obligation to conduct that maintenance, has transformed the Biofilter from a system that removes pollutants into a system that actually adds pollutants—including phosphorus, suspended solids, and dissolved inorganic chemicals—to Lacamas Lake and the naturally occurring forested wetlands that abut it. As such, the Biofilter is further degrading a system that is already stressed, and it is likely contributing to human health concerns associated with Lacamas Lake and impairing the beneficial uses of this important resource. Indeed, in 2020, public health officials were forced to pose danger signs at public access points to Lacamas Lake and advise against recreational use of the lake after water samples revealed cyanotoxins above the threshold levels recommended by the Washington Department of

Lacamas Shores Homeowners Association
City of Camas                          -8-                    August 12, 2021

Health.[5] Health officials were forced to issue warnings of elevated cyanotoxins again in August 2021, recommending the public not swim or water ski in the lake, drink lake water, or allow animals to contact the water.[6] Blooms of cyanobacteria, also known as blue-green algae, can pose a significant health risk if the cyanobacteria or toxins are ingested, inhaled or come into contact with skin. Algae blooms are frequently caused by excess nutrients, including phosphorus and other biological materials, that are loaded into the aquatic environment from anthropogenic sources.

As detailed in the following paragraphs, these discharges of pollutants are ongoing, illegal, and in violation of Sections 301(a) and 402 of the Clean Water Act, because they constitute (1) discharges of pollutants (2) into navigable waters (3) from a point source (4) without a discharge permit. *Comm. to Save Mokelumne River*, 13 F.3d at 309.

"Discharge of a pollutant" is defined as " (A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12). "Pollutant" is defined as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). As set forth above, the Biofilter is adding, and hence discharging, pollutants in the form of biological materials and chemical wastes, including phosphorus, suspended solids, and dissolved inorganic chemicals, into the naturally occurring wetlands adjacent to the Biofilter, and then into Lacamas Lake. These discharges are occurring at the Biofilter's two outfalls.[7] Lacamas Lake and the adjoining natural wetlands are navigable waters. 33 U.S.C. § 1362(7); 40 C.F.R. §120.2. These discharges are occurring through two outlets that are artificially designed, each of which is a point source. 33 U.S.C. § 1362(14) (defining "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged").

These discharges are not authorized by a NPDES or other type of approval listed in Section 301(a), nor are they exempt from permitting requirements. Importantly, while some discharges that are composed entirely of stormwater need not obtain a NPDES permit pursuant to 33 U.S.C. § 1342(p), this exception does not apply here. Even if all of the water that entered the Biofilter's wetlands were composed entirely of stormwater, the Biofilter treatment facility is adding pollutants to this water. As described above, these pollutants are being added because the Biofilter has fallen into disrepair through lack of maintenance, causing phosphorus and other pollutants to enter into the water at the Biofilter. These pollutants are not "storm water," which is defined as "storm water runoff, snow melt runoff, and surface runoff and drainage." 40 C.F.R. §

---

[5] https://www.clarkcountytoday.com/community_news/clark-county-public-health-closes-lacamas-lake-and-round-lake-due-to-elevated-toxin-levels/
[6] https://www.clarkcountytoday.com/news/public-health-issues-warning-for-lacamas-round-lakes-due-to-elevated-toxin-levels/
[7] The specific location of the outfalls are described and illustrated in Attachment 5 and Appendices A-C to that attachment.

Lacamas Shores Homeowners Association
City of Camas          -9-          August 12, 2021

122.26(b)(13). Accordingly, the water that is polluted by the Biofilter's wetlands and discharged through its outlets is not "composed entirely of stormwater." *Residents Against Indus. Landfill Expansion v. Diversified Sys., Inc.*, 804 F. Supp. 1036, 1038 (E.D. Tenn. 1992) (33 C.F.R. § 1342(p) does not apply where two ponds store stormwater that contains pollutants from a landfill). *Cf. Wisconsin Res. Prot. Council, Ctr. for Biological Diversity v. Flambeau Min. Co.*, 903 F. Supp. 2d 690, 712 (W.D. Wis. 2012) (even if water entering a biofilter does not have elevated levels of pollutants, a discharge violation occurs when there is evidence that the biofilter itself is adding pollutants).

Both the HOA and the City are liable for the unlawful pollutant discharges. Section 301 broadly prohibits the unauthorized discharge of a pollutant by any person. 33 U.S.C. § 1311(a). Any person may be liable under Section 301(a), even if they do not actually cause a discharge, provided that they possess sufficient control over the facility and knowledge of the alleged violations. *Puget Soundkeeper All. v. Cruise Terminals of Am., LLC*, 216 F. Supp. 3d 1198, 1223 (W.D. Wash. 2015). The HOA owns the property on which the Biofilter is located, Clark County Tax Lot 84839000, and it is responsible for monitoring and maintaining the storm drainage system under the Shoreline Permit. Attachment 3, Condition 12. The City is also liable by exercising sufficient control over the Biofilter. Specifically, the City has directed the HOA to not conduct routine maintenance of the Biofilter without obtaining new permits, stated that it would not be able to obtain permits for routine maintenance activities (e.g., cutting trees and vegetation) and threatened "full code enforcement proceedings can and will take place including possible criminal charges for knowingly and willfully working without approvals." Attachment 4 at 2. Accordingly, the City has exercised direct control over maintenance of the Biofilter and, along with the HOA, is liable under Section 301(a).

Further, the HOA and the City have been on notice of these violations for years. As discussed above, the HOA was concerned about the failing Biofilter in 2016 and approached the City about the need to maintain the Biofilter to protect the water quality of Lacamas Lake. The City indicated additional permits would be needed to maintain the Biofilter, but the HOA did not pursue such permits or conduct the maintenance. Attachment 4 at 2.[8] The Biofilter continued to deteriorate, and in 2018 a wastewater expert collected water samples demonstrating water quality was lower downstream of the Biofilter's outlets compared to its inlets. Attachment 5 at 5-6. Also in 2018, the HOA's environmental consultant notified the HOA that the bubbler systems leading to the Biofilter appeared to be failing such that untreated stormwater was being discharged directly to the lake in violation of permit conditions. Attachment 6. In response to these numerous concerns, the City conducted tests in 2019 and 2020, which confirmed the Biofilter appeared to be failing and adding pollutants to Lacamas Lake. *Supra* at 5; Attachment 5 at 5-7. During this period, the wastewater expert who conducted the 2018 tests provided comments to the City Council, stating that the Biofilter was adding pollutants to the lake, in violation of permit conditions, and endangering public health and safety. Attachment 7. Despite this notice and knowledge about the Biofilter's pollutant discharges, the HOA and the City have failed to cease these illegal discharges or seek a Clean Water Act permit to authorize them.

---

[8] Given the Biofilter was required to be developed as a condition of the Shoreline Permit and is a permitted treatment facility, additional permits are not required to conduct routine maintenance. Camas Municipal Code ("CMC") 16.51.100.A.3; CMC 16.53.010.C.2.b; Camas Shoreline Master Program ("SMP") Section 1.9.5; SMP Chapter 7, Definition #190.

Lacamas Shores Homeowners Association
City of Camas                              -10-                              August 12, 2021

Finally, while the Department of Ecology issued a letter supporting the City's position that the Biofilter should not be maintained, this does not absolve the HOA or the City from these Clean Water Act violations. The Clean Water Act is a strict liability statute, and Ecology's position that the Biofilter need not be maintained to prevent these violations is not a defense to the HOA's and the City's liability. *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1015 (9th Cir. 2002) (Ecology's position that a NPDES permit is not needed for an alleged discharge violation is not a defense, and Ecology is not a necessary party to a citizen suit). *See also Olympic Forest Coal. v. Coast Seafoods Co.*, 884 F.3d 901, 909 (9th Cir. 2018) (holding that a NPDES permit is required for operation of a hatchery despite Ecology's earlier determination that a permit is not required); *Wisconsin Res. Prot. Council, Ctr. for Biological Diversity*, 903 F. Supp. 2d at 707-710 (NPDES permitting agency is not an indispensable party).

## II.     PARTY GIVING NOTICE

The name, address, and contact information for the party giving notice is:

Steven D. Bang
2701 NW Lacamas Dr.
Camas, WA 98607
Email: stevendbang@comcast.net
Phone: (360) 991-5196

## III.    COUNSEL FOR STEVEN D. BANG

Steven D. Bang is represented by:

Samuel W. (Billy) Plauché
Jesse DeNike
Plauché & Carr LLP
1218 3rd Avenue, Suite 2000
Seattle, WA 98101
Email: billy@plauchecarr.com
        jesse@plauchecarr.com
Phone: (206) 588-4188

## IV.    INTENT TO SUE AT CONCLUSION OF 60-DAY NOTICE PERIOD

The violations described in this notice of intent to sue are ongoing and violate Sections 301(a) and 402 of the Clean Water Act. Steven D. Bang intends to file a lawsuit against the HOA and the City of Camas pursuant to 33 U.S.C. § 1365 at the conclusion of the 60-day notice period. Steven D. Bang intends to sue for all of the above-described violations, including the discharge of phosphorus, suspended solids, and dissolved inorganic chemicals from both of the Biofilter's outfalls, along with any and all other pollutants from the Biofilter into the naturally occurring shoreline wetlands and/or Lacamas Lake. Steven D. Bang also intends to sue for any

Lacamas Shores Homeowners Association
City of Camas                                  -11-                                  August 12, 2021

and all other violations yet to be discovered or committed after the date of this notice. Each violation subjects the violator to a penalty of up to $54,460 per day. Violations of different parameters at the same outfall are counted separately, and violations of the same parameter at different outfalls are counted separately. Steven D. Bang will also seek injunctive relief to prevent further violations and such other relief as permitted by law, including but not limited to recovery of Steven D. Bang's attorney fees.

Steven D. Bang is willing to discuss settlement and remedies for the violations described in this letter during the 60-day notice period. If you are interested in discussing settlement, please contact our office within 14 days of receiving this letter to initiate discussions. Steven D. Bang does not intend to delay the filing of a complaint even if discussions are ongoing when the 60-day notice period ends.

Respectfully,

Samuel W. (Billy) Plauché

Jesse DeNike

cc:     Michael S. Regan, Administrator, U.S. Environmental Protection Agency
        Michelle Pirzadeh, Acting Region 10 Administrator, U.S. Environmental Protection
        Agency
        Laura Watson, Director, Washington State Department of Ecology

## CERTIFICATE OF SERVICE

I hereby certify that on August 12th, 2021, I caused a true and correct copy of the foregoing Notice of Intent to File Suit under the Clean Water Act to be served upon the parties herein by U.S. Postal Service, postage prepaid, via certified mail, return receipt requested:

DATED:  August 12th, 2021.


*s/ Sarah Fauntleroy*
Sarah Fauntleroy, Legal Assistant


Donald Trost, President
Lacamas Shores Homeowners Association
2421 NW Lacamas Drive
Camas, WA 98607

Managing Agent
Lacamas Shores Homeowners Association
12503 SE Mill Plain Blvd., Suite 260
Vancouver, WA 98684-4008

Registered Agent
Lacamas Shores Homeowners Association
12503 SE Mill Plain Blvd., Suite 260
Vancouver, WA 98684-4008

Ellen Burton, Mayor
Office of the Mayor
City Hall
616 NE 4th Avenue
Camas, WA 98607

Lacamas Shores Homeowners Association
P.O. Box 751
Camas, WA 98607

Michael S. Regan, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W., Mail Code 1101A
Washington, D.C. 20460

Michelle Pirzadeh, Acting Region 10 Administrator
U.S. Environmental Protection Agency
1200 Sixth Ave, Suite 155
Seattle, WA 98101


Laura Watson, Director
Washington State Department of Ecology
P.O. Box 47600
Olympia, WA 98504-7600

# Attachment 1

# Draft Environmental Impact Statement

# Lacamas Lake Development Proposal
# (Lacamas Shores)

## November, 1987

### Prepared for the City of Camas, Washington

### Submitted by The White Company

**DRAFT**

**ENVIRONMENTAL IMPACT STATEMENT**

Proposed Residential Development between Lake Road and
Lacamas Lake in Camas, Washington

September, 1987

Lead Agency:

City of Camas

Prepared By:

The White Company
101 E. 8th Street
Vancouver, Washington   98660
(206) 696-1338

# CONTENTS

Page

FACT SHEET......................................................    1

REFERENCE TO PRIOR EIS (FOREWORD)...............................    iii

SUMMARY.........................................................    1

DESCRIPTION OF PROPOSAL.........................................    7

EXISTING CONDITIONS, IMPACTS OF THE PROPOSAL, AND MITIGATIVE
MEASURES........................................................

   Introduction................................................    13

   Elements of Environmental Impact Requiring Further Analysis..

      Erosion/Storm Run-off Control...........................    14

      Public Access to Lacamas Lake...........................    21

      Flood Plain Considerations..............................    28

      Wetland/Intermittent Streams............................    34

      Slope Stability.........................................    37

      Traffic Impacts.........................................    40

ALTERNATIVES....................................................    50

APPENDICES......................................................

      Draft EIS Distribution List.............................

      Wetland Analysis........................................

      Geotechnical Study......................................

**FACT SHEET**

| | |
|---|---|
| **PROPONENT:** | Tom Shipler<br>c/o Vanport Manufacturing, Inc.<br>P.O. Box 97<br>Boring, Oregon  97009 |
| **NATURE OF PROPOSAL:** | Development of a 261-unit single family subdivision and a 550-bed congregate care center/ 120-bed nursing home on selected portions of 174 acres of land. |
| **LOCATION OF PROJECT:** | The project site lies between Lake Road on the south and Lacamas Lake on the north in Camas, Washington.  The 174-acre parcel runs northwest and southeast from an approximate midpoint of S.E. 237th Ave. |
| **LEAD AGENCY:** | City of Camas, Washington |
| **RESPONSIBLE OFFICIAL TO WHOM COMMENTS MAY BE SENT:** | Mel Avery<br>Director of Public Works<br>City of Camas<br>City Hall<br>Camas, Washington  98607 |
| **PREPARED BY:** | The White Company<br>101 East 8th Street<br>Suite 140<br>Vancouver, Washington  98660<br>In association with<br>MacKay & Sposito, Civil Engineers<br>110 East 17th Street<br>Vancouver, Washington  98660 |
| **PRINCIPAL AUTHORS:** | Dorothy Anderson, The White Company<br>Dick Sposito, MacKay & Sposito<br>John D. White, The White Company |

i

REQUIRED
LICENSES/APPROVALS/
PERMITS:

City of Camas
    Shorelines Conditional Use Permit
    Shorelines Substantial Development Permit
    Subdivision Approval
    Grading Permits
    Building Permits
    Conditional Use Under Zoning Ordinance

Washington State Department of Ecology
    Shorelines Management Permit

Washington Department of Wildlife
    Hydraulics Permit

U.S. Army Corps of Engineers, Seattle District
    Section 404 Permit

LOCATION OF
BACKGROUND
INFORMATION:

City of Camas
Intergovernmental Resource Center
The White Company

COST OF COPIES:

PUBLIC HEARINGS:        December 17, 1987

DATE OF ISSUE:          November 16, 1987

DEADLINE FOR            December 15, 1987
COMMENTS:

DESCRIPTION OF PROPOSAL

Project History

In 1982, Mr. Tom Shipler, proposed and received annexation of his
property to the City of Camas. Mr. Shipler's property was annexed
jointly with the properties of Crown-Zellerbach Corporation, whose
holdings were, at that time, contiguous to the city limits, and with
Mr. Ruben Bafus who owned property adjacent to Mr. Shipler. The total
amount of property annexed as a result of the 1982 proposal consisted
of 853 acres in area and was situated one mile northwest of the city
limits.

The EIS submitted in 1982 to meet the SEPA requirements for the
annexation proposal was based upon a conceptual plan for the
development of Mr. Shipler's property. The conceptual plan included a
site analysis of the physical elements, a general layout, and an
analysis of potential traffic circulation patterns and impacts. This
proposed site plan was designed to include 1,140 dwelling units on a
total 270 acre tract (4.2 units-acre), much more extensive than what is
proposed under the current plan.

The original development design has since been refined to reduce the
adverse environmental impacts. Modifications to the original
conceptual plan which are more environmentally sound include:

(a) Reduction in the average density of the single family

- page 7 -

residential development from 4.1 units-acre to 2.8 units-acre.

(b) Reduction in traffic generation/circulation problems due to the reduction in density and to the replacement of 26 acres designated as a medium density subdivision with a 550 bed congregate care center and 120-bed nursing home.

(c) Engineering designs have been modified to address the erosion and run-off issues in a source-specific manner, and to enhance the natural functions of the wetland on the property, allowing it to function in a manner similar to biological filtration system.

(d) Designation of 38.5 acres of the project site as open space, to include a 16-acre city park, a 6.5-acre natural wetland, and a pedestrian trail along the shoreline of the entire property.

Name of Proposal

The subject proposal is known as the "Lacamas Shores".

Sponsor

The sponsor of this action is Mr. Tom Shipler.

Location

The project site is located in SE Clark County, Washington, within the city limits of Camas, Washington, between S.E. Lake Road and the

- page 8 -

Impacts:

The soils are characterized as fine-grained, and, in those areas of steep topography, can present an erosion potential during development. Because of the site's proximity to Lacamas Lake, the fine-grained soils and some steep slopes, careful planning and a thoughtful execution of the planning is necessary if development of the site is to occur without degradation of the Lake's water quality.

Mitigating Measures:

The following Storm Drainage and Erosion Control Plan is a guide to the location and size of storm drainage improvements, and measures recommended to control erosion on the Shipler property. These measures include methods for controlling erosion during the construction of site improvements, during building construction, and on a long term basis after construction has been completed.

The proposed storm drainage system for the Shipler property was designed to minimize outfall locations along Lacamas Lake. Runoff flow rates for each outfall location were then determined using the HEC-1 Flood Hydrograph Package developed by the U.S. Army Corps of Engineers Hydrologic Engineering Center. (See Table 2).

Sedimentation ponds to settle sediments transported by storm water were determined to be unfeasible for the Shipler property. Because of the

- page 15 -

topography of the property, six storm outfalls to Lacamas Lake are required. Each of these would require a sedimentation pond. The ground slope at most of the outfall locations is too steep to construct a sedimentation pond. If ponds were located in more favorable terrain, a significant percentage of the property couldn't discharge storm runoff into the sedimentation ponds, and could only discharge directly into Lacamas Lake. For this reason, and for reasons of safety, maintenance, and necessarily large pond volumes required, sedimentation ponds are unfeasible and other measures are required.

Two types of outfalls are proposed for the storm system discharging into Lacamas Lake. The first outfall will be located in existing wetland areas adjacent to the lake. This type of outfall consists of several hundred feet of perforated pipe in a shallow drain rock trench parallel to the contours in the wetlands (See detail C). This outfall acts as a bubbler and releases water at velocities considerably less than the eroding velocities of the soils in the area. This outfall also recharges the wetlands area with a supply of water. The second type of outfall is a bubbler structure constructed below the water surface of Lacamas Lake. This bubbler structure will be constructed in areas where the terrain adjacent to the lake is steep and impractical for the perforated pipe outfall (See detail F). Releasing runoff through bubbler structures under the water surface will eliminate the erosion caused by water leaving an outfall and traveling overland to the lake.

Wetland/ Intermittent Springs

Existing Conditions:

The topographic nature of the project site is characterized by a series of benches separated by areas of steep slope. The lower bench, which lies immediately adjacent to the shoreline in the central portion of the project site, maintains the hydrology, vegetation, and soils of a palustrine forested wetland, as defined by the U.S. Fish and Wildlife Service.

The proponent wished to design a proposal which would avoid construction or fill of any kind in this wetland. It was therefore necessary to determine a definitive wetland boundary prior to developing the site plan. The biological consulting firm of Shapiro & Associates, experienced in wetland boundary delineation, was retained to identify and flag the wetland boundary (see Appendix B).

The major portion of the wetland is below the elevation level of 190 feet, and is characterized as a mixed forested/shrub swamp with some marsh habitat (Shapiro & Associates). Wetland soils and vegetation have developed in this areas as a result of seeps and streams flowing off the upland slopes, rather than fluctuations in the lake level.

A number of intermittent streams feed the portion of the wetland adjacent to the lake. These streams originate at the base of a steep

- page 34 -



LACAMAS LAKE

WETLANDS AS DEFINED BY
SHAPIRO AND ASSOCIATES

. CONGREGATE CARE CENTER

S.E. LAKE ROAD

**FIGURE 6**

**WETLAND DELINEATION MAP**

Prepared By:



Appendix B

**WETLAND DELINEATION OF
SHIPLER PROPERTY ON LACAMAS LAKE
IN
CAMAS, WASHINGTON**

Prepared by

**Marc E. Boule'
Shapiro and Associates, Inc.**

**September 28, 1987**

## INTRODUCTION AND SITE DESCRIPTION

A wetland delineation study was conducted for property located on the northwest shoreline of Lacamas Lake in Camas, Washington. The study entailed a site visit to identify wetland habitat types and flag the wetland boundary as defined by the Corps of Engineers for their Section 404 Program. Wetland habitat types were identified based on vegetation communities, general soil characteristics and hydrology. Due to abrupt changes in vegetation, soils and/or topography, there is a rather distinctive character of the wetlands on the site. As a result, a detailed study described by the Corps as the "Triple Parameter Approach", was not conducted. This report provides a description of the wetlands and uplands habitats identified on the site. Following the field work, the wetland delineation was located on a detailed site survey by the firm of MacKay and Sposito.

The Shipler property is a 174-acre parcel located adjacent to Lacamas Lake, and varying in elevation from approximately 180 feet above sea level at the lake shore to about 350 feet at its highest point. The site consists of a series of terraces or benches separated by areas of steep slopes. Several seeps and small stream channels flow off these slopes and across the benches. On the steep slopes these seeps and stream channels are narrow (usually less than 5 feet in width) and well defined. Where the water flows across the benches, often it spreads into a wide and much less defined channel.

## WETLAND HABITATS

The major portion of the designated wetland area is located on a long narrow bench immediately adjacent to the lake shore, and can be characterized as a mixed forested/shrub swamp with some marsh habitat. Based on the US Fish and Wildlife Service classification of wetlands (Cowardin et. al., 1979) the following three wetland types were identified:

- Palustrine, forested broad-leaved deciduous
- Palustrine, scrub/shrub
- Palustrine, emergent, persistent

Most of this wetland is found at an elevation below 190 feet, and although some of it is within the fluctuation zone of the lake, most of it is actually fed by the numerous seeps and streams flowing off of the steep slopes.

A second bench is located between 190 to 200 feet in elevation. As noted above, the flow channel broadens as it reaches the bench, and becomes wide and ill-defined. Due to the broad dispersion of flow through these areas they support wetland and riparian communities up to several hundred feet in width. The wetland communities on this bench would be classified as:

- Palustrine scrub/shrub
- Palustrine emergent.

The communities are similar to those identified on the previous page, but lack the associated forest component. The communities occurring on the subject property are described below.

**Palustrine forested.** The forested swamp adjacent to the lake shore is dominated by Oregon ash (Fraxinus latifolia), with a shrub understory of red-osier dogwood (Cornus stolonifera) and salmonberry (Rubus spectabilis). Some willow (Salix spp.), vine maple (Acer circinatum), and red alder (Alnus rubra) are also present. Due to the dense overstory of forest and shrub, there is little groundcover, however, where it is present it consists of small patches of slough sedge (Carex obnupta).

**Palustrine scrub/shrub.** The shrub swamp portion of this wetland is very similar in character, although there is no Oregon ash component. Rather the community is dominated by red-osier dogwood, salmonberry and willow. Slough sedge and lady-fern (Athyrium filix-femina) ofen are present in the understory.

**Palustrine emergent.** Where the wetland is characterized as marsh it is dominated by slough sedge, lady-fern, and patches of Pacific water-parsley (Oenanthe sarmentosa). Skunk cabbage (Lysichitum americanum) also was noted. In these areas the soils are extremely mucky and often show evidence of standing water.

At an elevation of about 200 feet, three distinct streams flow off, or seep out of the base of the steep slope. The shrub swamp wetlands associated with these areas are similar to those described above. Generally, these areas are generally characterized by willows, red-osier dogwoods and occasional scattered Oregon ash. The emergent marsh along these streams consists of different communities than along the lake shore. Reed canarygrass (Phalaris arundinacea) and soft rush (Juncus effusus) are common groundcover species. Cattails (Typha latifolia) and small-fruited bulrush (Scirpus microcarpus) are locally dominant, and in some places form monotypic stands.

## UPLAND HABITATS

Uplands adjacent to the shrub swamp are characterized as mixed forest, with Oregon ash, Western red cedar (Thuja plicata), red alder, Douglas fir (Pseudotsuga menziesii) and big-leaf maple (Acer macrophyllum) dominating the overstory. Although oceanspray (Holodiscus discolor) and wild rose (Rosa sp.) may be found in the understory, it is mostly dominated by blackberries (Rubus discolor and R. laciniatus).

On the upper bench, the upland habitats are dominated by grasslands, with orchard grass (Dactylus glomerata), fescue (Festuca spp.) and thistles (Cirsium sp) being the most common species. Bracken fern (Pteridium aquilinum) and Pacific dewberry (Rubus ursinus) also are present.

In conclusion, wetlands on the site are characterized as a mixture of forested and shrub swamp and emergent marsh. Most of the wetland habitats appear to be supported not by the lake, but seepage and perennial streams flowing from the higher portions of the property. None the less, all of these wetlands are most probably under the jurisdiction of the Corps of Engineers Section 404 process.

# Attachment 2

1
2

BEFORE THE SHORELINE HEARINGS BOARD
IN THE STATE OF WASHINGTON

3  CITIZENS TO SAVE LACAMAS LAKE, )
                                  )
4              Appellants,        )    No.  SHB 88-33
                                  )
5        v.                       )    AGREED ORDER OF REMAND
                                  )
6  CITY OF CAMAS, VANPORT         )
   MANUFACTURING,                 )
7                                 )
               Respondents.       )
8  _____
9  CITIZENS TO SAVE LACAMAS LAKE, )
                                  )
10             Appellants,        )
                                  )
11       v.                       )
                                  )
12 STATE OF WASHINGTON,           )
   DEPARTMENT OF ECOLOGY,         )
13                                )
               Respondents.       )
   _____
14

15        COMES NOW the parties to the above action and enter into this

16  Agreed Order of Remand under which it is mutually agreed that the

17  Substantial Development Permit (City of Camas Permit No. 2-87) and

18  Shoreline Conditional Use Permit (Camas Permit No. 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)

19  shall be remanded to the City of Camas to be reissued with the

20  following instructions:

21        1.   Provided that the necessary permits are issued, Vanport

22  Manufacturing, Inc. (the "Developer"), agrees to complete by

23  January 1, 1990, the construction of the public pedestrian trail

24  located over the entire length of the project's shoreline, including

25  the portion on the city park property donated by the Developer, all

26
   AGREED ORDER OF REMAND 1
27  SHB 88-33

1 | as depicted as the "public Pedestrian trail" in the site plan
2 | attached hereto and made a part hereof as Exhibit A.  If permitting
3 | problems arise, the Developer agrees to diligently pursue obtaining
4 | said permits.

5 |     2.  The Developer agrees to provide a letter of credit to the
6 | City of Camas to assure completion of the public pedestrian trail.
7 | Such financial assurance shall be in an amount agreed upon by the
8 | City of Camas and the Developer, and may be in the form of a
9 | decreasing term and revolving letter of credit based upon the portion
10 | of the trail yet to be completed.

11 |     3.  The Developer agrees to dedicate in fee to the City of Camas,
12 | should they accept it, a 100-foot conservancy zone along the
13 | shoreline of the development, excepting that portion of the con-
14 | servancy zone which enters the wetland or the private access areas.
15 | This property is designated in Exhibit A as the "conservancy zone."
16 | The homeowner's association formed in the development shall continue
17 | to maintain the public pedestrian trail in perpetuity except that
18 | portion of the trail located in the city park.

19 |     4.  The Developer agrees to commit a portion of the property
20 | now reserved for potential wetland use to be developed immediately
21 | as part of the man-made wetlands created as part of the biofilter
22 | storm drainage system on the project.  This additional property is
23 | depicted as the "newly-created wetlands" on the site plan attached
24 | as Exhibit A.  These newly-created wetlands and all other wetlands
25 | and land reserved for potential future wetlands shall continue to be

26 |

27 | AGREED ORDER OF REMAND   2
SHB 88-33

1  governed by the conditions and monitoring program set forth in the

2  existing permit conditions.

3      5.   In consideration for the additional acreage contributed to

4  the man-made wetlands, the Developer shall have the right to recon-

5  figure the lots in the existing site plan to obtain up to 218

6  residential lots in the development.

7      6.   The water quality monitoring and contingency program

8  contained within the existing permit conditions shall continue for

9  the longer of five years commencing the date of the reissuance of

10  the Substantial Development Permit and Conditional Use Permit or

11  until such time that 75% of the lots depicted as "lots within

12  biofilter drainage" on Exhibit A are developed.

13      7.   The Developer and homeowner's association shall allow the

14  members of the public to access the public trail through the private

15  access designated as the "private access/permitted public access"

16  in Exhibit A.   The public shall be allowed access through this

17  private access so long as such use does not contribute to such

18  increased traffic, parking, congestion, vandalism or other nuisance

19  that contributes an unreasonable interference with the quiet enjoyment

20  of the homeowners residing in the development.   Any signatory to

21  this Order shall have the right to petition the City of Camas to

22  present evidence that the public access is contributing to the

23  disruption of the quiet enjoyment of the homeowners.   Upon a finding

24  by the City that the public access has contributed to an unreasonable

25

26  AGREED ORDER OF REMAND   3
   SHB 88-33

27

1    disruption   of quiet enjoyment, the homeowner's association shall

2    have the right to restrict further access to the public as deemed

3    appropriate by the City of Camas or the Department of Ecology.

4    Should any party to this Order be dissatisfied with the decision of

5    the City of Camas, that party may petition the Department of Ecology,

6    whose decision shall be final.  In no event shall this private

7    access be accessible to members of the public before dawn or after

8    dusk.

9       8.   The Developer, the Department of Ecology, and the appellants

10   shall agree on a mutual press release which shall contain the factual

11   circumstances surrounding the settlement and dismissal of this matter.

12      WHEREFORE, by agreement of all the parties, IT IS ORDERED

13   that this matter be remanded to the City of Camas and that the City

14   shall reissue the Substantial Development Permit and Conditional Use

15   Permit cited above as modified by the foregoing, the entry hereto

16   establishes the approval by the Department of Ecology of the Con-

17   ditional Use Permit as modified.  The reissuance by the City of Camas

18   will result in permits within the scope and intent of the application

19   and will not require further public hearings as the remand follows

20   solely from this Order.

21      As a result of this Order appellants agree that the appeal of

22   this matter and all rights pertaining to it are dismissed with

23   prejudice.

24

25   AGREED ORDER OF REMAND   4
     SHB 88-33

26

27

1    DONE at Lacey, Washington, this _15th_ day of September, 1988.

2                                    SHORELINES HEARINGS BOARD

3

4

5

6

7

8

9

10   WILLIAM A. HARRISON
     Administrative Appeals Judge
11

12   Presented by:

13   HELLER, EHRMAN, WHITE & McAULIFFE

14   By
        Duane C. Woods
15      Attorney for Defendant
        Vanport Manufacturing
16

17   By
        John Karpinski
18   Attorney for Citizens to Save Lacamas Lake

19   By
        Roger D. Knapp
20      Attorney for City of Camas

21

22   By
        Allen T. Miller
23      Attorney for Department of Ecology

24

25

26

27

AGREED ORDER OF REMAND - 5



NEWLY CREATED WETLANDS

WETLANDS AS DEFI
SHAPIRO & ASSOC!

CONTINGENCY RESER

# Attachment 3

SHORELINE MANAGEMENT ACT OF 1971
PERMIT FOR SHORELINE MANAGEMENT SUBSTANTIAL DEVELOPMENT,
CONDITIONAL USE, OR VARIANCE

Application No. C-2-87 Resubmittal

Administering Agency ___CITY OF CAMAS___

Date Received _5/24/88_

Approved ___x___     Denied _____

Date _____

Type of Action(s)

__x__ Substantial Development Permit
__x__ Conditional Use Permit
_____ Variance Permit

Pursuant to chapter 90.58 RCW, a permit is hereby granted/denied to:
_Vanport Manufacturing, Inc. P.O. Box 97, Boring, Or. 97009_

to undertake the following development:
_Lakeshore  Development_

upon the following property:
_Southwest Shore of Lacamas Lake_

within ___Lacamas Lake_____ and/or its
associated wetlands.

The project xxxxxxxg/not be within shorelines of state-wide
significance (RCW 90.58.030). The project will be located within
a _Consevancy_____ designation. The following master
program provisions are applicable to this development:
—Clark-County-

Development pursuant to this permit shall be undertaken pursuant
to the following terms and conditions:
—Attached_____

This permit is granted pursuant to the Shoreline Management Act
of 1971 and nothing in this permit shall excuse the applicant
from compliance with any other federal, state or local statutes,

ordinances or regulations applicable to this project, but not inconsistent with the Shoreline Management Act (chapter 90.58 RCW).

This permit may be rescinded pursuant to RCW 90.58.140(8) in the event the permittee fails to comply with the terms or conditions hereof.

CONSTRUCTION PURSUANT TO THIS PERMIT WILL NOT BEGIN OR IS NOT AUTHORIZED UNTIL THIRTY DAYS FROM THE DATE OF FILING, AS DEFINED IN RCW 90.58.140(6) AND WAC 173-14-090, OR UNTIL ALL REVIEW PROCEEDING INITIATED WITHIN THIRTY DAYS FROM THE DATE OF SUCH FILING HAVE TERMINATED; EXCEPT AS PROVIDED IN RCW 90.58.140(5)(a)(b)(c).

| 6/15/88 | | |
|---|---|---|
| Date | Signature of Authorized Local Government Official | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

THIS SECTION FOR DEPARTMENT USE ONLY IN REGARD TO A CONDITIONAL USE OR VARIANCE PERMIT.

Date received by the department _____

Approved _____ Denied _____

This conditional use/variance permit is approved/denied by the department pursuant to chapter 90.58 RCW.

Development shall be undertaken pursuant to the following additional terms and conditions:
_____

_____

_____

| Date | Signature of Authorized Department Official |
|---|---|

[Statutory Authority: RCW 90.58.200. 78-07-011 (Order DE 78-7), S 173-14-120, filed 6/14/78; Order DE 76-17, S 173-14-120, filed 7/27/76; Order DE 75-22, S 173-14-120, filed 10/16/75; Order 71-18, S 173-14-120, filed 12/16/71.]

WS#30:SHORLINE.PMT

EXHIBIT "B"
to
Vanport Manufacturing Shorelines Permit

ADDITIONAL CONDITIONS

The following are imposed as additional conditions to the
Substantial Development Permit (City of Camas - Permmit No. 2-87)
and the Shoreline Conditional Use Permit (Camas Permit No. 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)
issued to Vanport Manufacturing.  Said conditions result from an
Agreed Order of Remand issued by the Shoreline Hearings Board in
Cause No. SHB 88-33.

1.  Provided that the necessary permits are issued, Vanport
Manufacturing, Inc. (the "Developer"), shall complete by January
1, 1990, the construction of the public pedestrian trail located
over the entire length of the project's shoreline, including the
portion of the trail on the City park property donated by the
Developer, all as depicted as the "public pedestrian trail" in
the site plan attached hereto and made a part hereof as Exhibit "A".
If permitting problems arise, Developer shall diligently pursue
obtaining such permits.

2.  The Developer shall provide a letter of credit to the
City of Camas to assure completion of the public pedestrian trail.
Such financial assurance shall be in an amount agreed upon by the
City of Camas and the Developer, and may be in the form of a
decreasing term and revolving letter of credit based upon the
portion of the trail yet to be completed.

3.  Developer shall dedicate in fee to the City of Camas,
should the City accept it, a 100 foot conservancy zone along the
shoreline of the development, excepting that portion of the
conservancy zone which enters the wetland or the private access
areas.  This property is designated in Exhibit "A" as the
"conservancy zone."  The homeowner's association formed in the
development shall continue to maintain the public pedestrian trail
in perpetuity except that portion of the trail located in the
city park.

4.  The Developer shall commit a portion of the property now
reserved for potential wetland use to be developed immediately
as part of the man-made wetlands created as part of the biofilter
storm drainage system on the project.  This additional property
is depicted as the "newly created wetlands" on the site plan
attached as Exhibit "A".  These newly created wetlands and all
other wetlands and land reserved for potential future wetlands
shall continue to be governed by the conditions and monitoring
program set forth in the existing permit conditions.

5.  The Developer shall have the right to reconfigure the
lots in the existing site plan to obtain up to 218 residential
lots in the development.

6.  The water quality monitoring and contingency program
contained within the existing permit conditions shall continue for
the longer of five (5) years commencing with the date of the
reissuance of the Substantial Development Permit and the Conditional
Use Permit or until such time that seventy-five (75%) percent of
the lots depicted as "lots within biofilter drainage" on Exhibit "A"
are developed.

7.  The Developer and homeowner's association shall allow
the members of the public to access the public trail through the
private access designated as the "private access/permitted public
access" in Exhibit "A".  The public shall be allowed access through

this private access so long as such use does not contribute to
such increased traffic, parking, congestion, vandalism or other
nuisance that contributes to an unreasonable interference with
the quiet enjoyment of the homeowners residing in the develop-
ment.  Any signatory to the Agreed Order of Remand issued in
Shorelines Hearing Board, Cause No. SHB 88-33 shall have the
right to petition the City of Camas to present evidence that
the public access is contributing to the disruption of the
quiet enjoyment of the homeowners.  Upon a finding by the City
that the public access has contributed to an unreasonable dis-
ruption of quiet enjoyment, the homeowner's association shall
have the right to restrict further access to the public as
deemed appropriate by the City of Camas or the Department of
Ecology.  Should any party to the aforedescribed Agreed Order
of Remand be dissatisfied with the decision of the City of Camas,
that party may petition the Department of Ecology, whose decision
shall be final.  In no event shall the private access be accessible
to members of the public before dawn or after dusk.

PERMIT CONDITIONS

LAKE SHORE

SHORELINE PERMIT

Vanport Manufacturing Inc., developer of the Lacamas Shores
Development, proposes that the Conditional Use Permit and
Substantial Development Permit for the project be approved with
the conditions set forth below:

1.   The developer shall implement the wetlands biofilter
     monitoring program set forth in the April 1988 Addendum to
     the project Environmental Impact Statement, as amended and
     expanded by the May 23, 1988 letter from Dorothy Anderson to
     Nora Jewett, Department of Ecology and the May 25, 1988
     letter from Scientific Resources Inc. to Nora Jewett;

2.   The developer shall be responsible for constructing the
     public access trail over the entire length of the property's
     shoreline, including the portion on City park property;

3.   All permits necessary for constructing the parking area and
     driveway on the City Park adjacent to the development shall
     be obtained by the City of Camas; If the permits necessary
     for constructing the parking area at the City park property
     are not forthcoming, alternate parking arrangements shall be
     determined between the city, developer, and Department of
     Ecology;

4.   Interior access to the shoreline trail will be provided to
     the residents of Lacamas Shores by the addition of up to
     five (5) private access easements;

5.   The existing forested wetlands adjacent to the shoreline
     should be retained intact as a functioning natural wetland.
     The site plan shall delineate this wetland as separate from
     the surrounding wetland area.

6.   The vegetative surveys described in the monitoring plan
     shall use permanent transects through the wetlands;

7.   Manipulation of the emergent wetlands adjacent to and
     upslope of the forested wetlands will be allowed should
     future monitoring show such a need.  Any such wetland
     manipulation would require a separate shoreline permit.
     Manipulation techniques could involve:

     o    Replanting the upper wetland;
     o    Partial filling of drainage conduits between the upper
          wetland and the lower forested wetland to slow drainage
          into the lake and increase retention time;
     o    Designing the pedestrian trail to function as a berm
          between the upper wetland and the lower forested
          wetland.
     o    The developer shall have the option of utilizing an

approved sedimentation pond for stormwater treatment if
it is more cost effective than an "expanded" biofilter.

8.    The area below the 200-foot elevation adjoining the wetland
area shall be held in reserve for future wetland/detention
area, should the monitoring program demonstrate such a need.
The portion of this reserve area occupied by a road and five
lots shall be designated as the final phase of the
residential development and shall not be considered for
approval for one year subsequent to issuance of the
Conditional Use Permit.  No construction in this phase shall
occur until monitoring data indicates that the portion of
the reserve area designed for homes will not be needed for
use as a contingency.

9.    The following monitoring and contingency criteria developed
by Stan Geiger shall be instigated upon shorelines permit
approval:

a.    Set no trigger criteria during the first year but
develop water quality background data as a basis for
negotiating such levels.

b.    During the first year, discuss appropriate use of the
background data to produce maximum contaminant levels.
Most likely, these will have to use concentration
values (mg/l).  Develop the "formula" to convert
concentrations into implementation trigger.  This will
be done in conjunction with Ecology.

c.    Implement the trigger criteria at the end of the first
year.

11.   The first year of sampling for the monitoring plan shall
include phosphorus sampling in relatively undisturbed small
streams entering the lake;

12.   Creation of a homeowners association which will be
responsible for monitoring and maintaining the storm
drainage system when the developer's responsibility has been
completed.  These water quality safeguards will be imposed
either through a homeowners association charter or deed
restriction before conveying title to Lacamas Shores lot
buyers.

13. The portion of the pedestrian trail which traverses the wetland will be the last portion of the trail to be constructed. This provision allows the wetlands area to be monitored over a longer period of time and insures that the appropriate contingencies can be implemented without obstruction. The trail fronting the development will therefore not be complete until 1995.

14. The developer shall provide reasonable financial assurance to insure completion of the access trail fronting the development and not traversing the wetland area. Such financial assurance shall be in an amount to be agreed upon by the City and the developer, and may be in the form of a decreasing term and revolving letter of credit based upon the proportion of the trail yet to be completed.

# Attachment 4

**Ron Boyce**

| | |
|---|---|
| **From:** | Peter Capell <PCapell@cityofcamas.us> |
| **Sent:** | Friday, August 12, 2016 3:05 PM |
| **To:** | Ron Boyce |
| **Subject:** | RE: Follow-up to our meeting of August 4, 2016 |

Thanks Ron

**From:** Ron Boyce [mailto:ron@boycefinancialgroup.com]
**Sent:** Friday, August 12, 2016 2:54 PM
**To:** Peter Capell
**Subject:** Re: Follow-up to our meeting of August 4, 2016

Pete,

I appreciate your reply and I am not trying to cause any more bickering but the opposite. I am being approached by members asking for proof and your email will help me when trying to explain the situation. The homeowners have a lot at stake with the decreased values on what was once view property and they want there views back ( I am one of those).

Getting the information requested will help the committee when building a maintenance plan for our common area.

I definitely want to keep a good relationship with you and Anita as you are the pathway to helping us get things resolved for everyone.

I value you friendship and I have always thought of you as a great administrator.

Regards,

Ron

Sent from my iPhone

On Aug 12, 2016, at 12:22 PM, Peter Capell <PCapell@cityofcamas.us> wrote:

> Ron,
>
> I was very disappointed by the tone of your email in response to our meeting. You stated in the meeting that you wanted to end the bickering that has occurred putting the city between two factions of Lacamas Shores homeowners. The fact that you and other members feel it is not a wetland, does not matter. The records have shown that it is a wetland and was recently reconfirmed by a site visit from ecology. The documentation has been provided in the past, and we will pull it out and provide it again. Currently Anita is busy with two projects. She will go to our archives and retrieve the information, but it will be late next week.
>
> The original application for the Lacamas Shores subdivision does have wetland delineations that do place wetlands in what is now the common area. The developer worked to consolidate stormwater facilities with the wetlands to have an on-site bio-filtration type facility for the area. Wetlands can change over time, so even if there was land that was once dry, but has become wet it can now be

consider a jurisdictional wetland. It is also important to note that given the proximity of the shoreline the wetland complex on site is also under shoreline jurisdiction as well.

In terms of burden of proof, the burden absolutely lies with the applicant in this case, which is the HOA. Camas Municipal Code Chapters 16.51 and 18.55 clearly outline applicable criteria for proposed actions and require that the burden of proof lies with the applicant. If clearing of the wetland area commences without permits and approvals from the City of Camas, or any other required jurisdiction then full code enforcement proceedings can and will take place including possible criminal charges for knowingly and willfully working without approvals.

Wetlands are regulated by the City of Camas, Washington State Department of Ecology, and the US Army Corps of Engineers. The scope of work will dictate what type of permits you will need before commencing any work. The very first step in this process is to prepare a proposal and have a pre-application meeting with City staff so they can advise on permit specifics and invite other applicable agencies. At a minimum a full and detailed wetland delineation will be required and a proposal for any mitigation based on the work proposed. Simply clear cutting trees and vegetation is not an option. As we discussed, removal of blackberries and other invasive species is allowed, but heavy equipment cannot enter the wetland area to remove blackberries, as they will damage the wetlands vegetation.

We will make best effort to get the original documentation from the development files before your meeting on the 22nd. As discussed above the connection of the wetlands that were present at the time of development to the stormwater facility has caused the wetlands to increase in size, so a wetlands delineation is going to be necessary, if you choose to do more work than removing blackberries.

Pete

Peter Capell
City Administrator
<image003.jpg>
616 NE 4th Avenue
Camas, WA 98607
360.834.6864
pcapell@cityofcamas.us

**From:** Ron Boyce [mailto:ron@boycefinancialgroup.com]
**Sent:** Tuesday, August 09, 2016 10:52 AM
**To:** Peter Capell
**Subject:** Follow-up to our meeting of August 4, 2016

Pete,

Thanks for the meeting it was very helpful in getting an idea what has been transpiring regarding our HOA.

You will find I have attached a brief memo regarding issues, questions, concerns and a request for more information.

**Ronald C.. Boyce, CFP**
Boyce Financial Group, LLC.
President/CEO

15597 SE Mill Plain Blvd
Vancouver, WA 98684
office: (360) 695-0981
fax: (360) 695-1329
email: ron@boycefinancialgroup.com
web: www.boycefinancialgroup.com

By industry regulation we cannot accept orders to execute trades via email or voice mail. If you would like to place a trade or have time sensitive information for me, please call my office at 360 695-0981. Securities and advisory services are offered through Cetera Advisor Networks LLC, Member FINRA/SIPC. Cetera Advisor Networks LLC and Boyce Financial Group, LLC are not affiliated companies.

NOTICE OF PUBLIC DISCLOSURE: This e-mail account is public domain. Any correspondence from or to this e-mail account may be a public record. Accordingly, this e-mail, in whole or in part may be subject to disclosure pursuant to RCW 42.56, regardless of any claim of confidentiality or privilege asserted by an external party.

Pete,

Thank you again for meeting with me last week and it was very nice to meet Anita Ashton also.

There are some issues, questions and concerns I have that were raised at the meeting that I would like clarification on.

The classification of the land in question (open space west of the parking lot encompassing the soccer field, South of the gravel path on the North side and North of the gravel path on the South side) as a "wetland" is a very important description or characterization in determining the type and scope of maintenance that can be done by the Lacamas Shores HOA on this property.

That said, **I challenge the classification** of this common space that you and Anita seem to share as a "wetland" classification. In fact, Anita stated in the meeting that it has always been a wet land and if it was not originally a wetland and is a man-made wetland it makes no difference as she said "it is still a wetland".

When I shared with you the City of Camas maps (wetland map and open space map) that clearly shows the area in question is not considered a "wetland" but homeowners "open space" it was said that a wetland map that shows the area as a "wetland" was given to Steve Bang and Steve Marrinan. I have talked to both of them and they do not have such a map.

From my research (City maps, study performed in 1988 for The White Company, and our own CC&R's) I find the area in question to be part of our HOA common area and not a "wetland".

Since the Steve's do not have the map that illustrates that the area in question is a "wetland" and always has been a "wetland", it would be appreciated if you would send me a copy (or tell me how I might get a copy) of such proof that this area in fact has been classified as a "wetland" before the next board meeting held Monday August 22nd.

Unless the City of Camas can prove that the area in question (not heresy) is a "Wetland" *my recommendation to our board will be to go ahead and develop a common area maintenance plan for this area that may involve cutting down trees and using heavy equipment.* It is our duty as homeowners to maintain these common areas per CC & R's to maintain and enhance the value our property.

The burden of proof is on the city to prove to our HOA that the area in question is a "wetland" through maps or documentation (no more Heresy) as our maps and documents show otherwise. I expect to receive this information before our next board meeting mentioned above.

I would like to put the controversy to rest regarding this issue and factual documentation is the only way this will happen.

# Attachment 5

# 2020 Lacamas Shores Biofilter Status Report

by Marie Tabata-Callerame and Rodger Hauge

## Purpose

1) To investigate the water quality of the stormwater draining from the Lacamas Shores Biofilter ("Biofilter") into the shoreline wetlands of the Conservancy Zone of Lacamas Lake.

2) To determine whether the Biofilter is meeting "compliance criteria", i.e., compliance standards set for the site via City permit.

3) To determine the efficiency of Biofilter by comparing water quality parameters at the inlets against the outlets.

4) To form a shared understanding of the current state of the Biofilter that could allow for repair, restoration and/or enhancement of the Biofilter as needed.

## Abstract

In 2020, Lacamas Lake tested positive for harmful algae toxins 26 out of 29 times between April and October.  The harmful algae blooms occurred along the southwest shoreline of Lacamas Lake, three-quarters of which is bordered by the Lacamas Shores neighborhood.  Stormwater samples taken September 2020 in the Biofilter and the adjacent shoreline wetlands were tested for the three water quality parameters shown to be of concern in recent tests.  Those three parameters are total phosphorus µg/L ("TP"), total suspended solids µg/L ("TSS") and conductivity uS/cm.  The results indicated that the water coming into the Biofilter had better water quality values than the water discharged.  The Biofilter was unable to slow the flow of water coming through the drainage system.  Under fast flowing/high-volume conditions, the results for TP, TSS and conductivity at the outlets were elevated above inlet conditions.  Those elevated concentrations put the stormwater outlets well over the compliance levels for those water quality parameters.  By comparing the 1990 results with current results, we see that inlet/incoming concentrations are little changed; the efficiency of the Biofilter today is degraded.

04/10/2021

## Background

Built in 1988, the Biofilter consists of 5.62 acres of stormwater treatment wetlands owned solely by the Lacamas Shores Homeowners Association ("LSHOA").[1]  The Biofilter works by collecting stormwater runoff from LSHOA properties[2] and routing the runoff into a bubbler system where it is released below ground into the treatment wetlands. The Biofilter was designed to process the stormwater from approximately 36.4 acres of the Lacamas Shores development[3] before reaching the Lake and its shoreline wetlands.

Excerpts from a 1993 national magazine article about the Biofilter[4] summarize its intended design:

> "The Washington Department of Ecology required that the quality and quantity of stormwater runoff from the [Lacamas Shores] development could not exceed predevelopment conditions.  Therefore, runoff discharged to the lake had to be treated and detained in an on-site facility [i.e., the Biofilter] before discharge."

> "French drains, or 'bubblers,' were designed to direct runoff below grade and create a sheet flow several centimeters deep that enters the upgradient edge of the emergent [treatment] wetlands.  The wetlands then 'treat' the inflowing stormwater before it enters Lacamas Lake."

The only surface water connection between the Biofilter's treatment wetlands and the shoreline wetlands of Lacamas Lake (the "Lake") is under two concrete bridges embedded in the Heritage Trail.  Aerial maps of the Biofilter are contained in Appendices A, B, and C. Storm drainage facilities of the Biofilter are shown in red.

The largest part of the Biofilter is the filtering biology and sediments.  The Stormwater Partners of SW Washington explains that stormwater treatment wetlands ". . . treat stormwater through the biological processes associated with aquatic plants. These facilities use dense wetland vegetation and settling to filter sediment and oily materials out of stormwater."[5]  Their webpage as also states that "As stormwater passes through the

---

[1] For this report, the "Biofilter" means the stormwater treatment wetland/facility on the LSHOA common property adjacent to the shoreline along Lacamas Lake.  It is next to but separate from the 0.25-acre Lacamas Shores Bioswale and Sediment Settling Pond system.  The "Swale/Pond" system is not part of the testing in this report.

[2] Approximately 65 of the 254 LSHOA lots drain into the Biofilter according to the map in Appendix E.

[3] Appendix E shows the sections that drain into the Biofilter: J, K and an unlabeled area. J+K=32.0 acres. The unlabeled area drains 4.4 acres according to a 1991 "Shipler Property Bio-Filter Basins Map" (p. 19) where it is labeled as "K".  Therefore, as designed, the Biofilter should have a total drainage basin of 36.4 acres.  Mackay & Sposito, 9 July 1996, *Modifications to Lacamas Shores Stormwater Disposal System: Drainage Calculation*, p. 19.

[4] See Appendix F, pages 50 and 52.

[5] Stormwater Partners. *Stormwater Facilities.* Accessed 03/28/2021. https://www.stormwaterpartners.com/facilities-treatment-wetland and https://www.stormwaterpartners.com/facilities-biofiltration-swale.  The density of the plants' root systems is important to effective filtration.

plants, pollutants are removed by the combined effects of filtration, infiltration, and settling." (Fig.1 [6])

Figure 1. Key Principals of Stormwater Biofiltration.



Properly dense and well rooted vegetation is key. Vegetation "[s]erves multiple roles in water treatment via uptake, transformation to organic forms, carbon provision to microbes, transpiration reducing stormwater volume, stabilising media surface, helping to maintaining infiltration rates, provides cooling to surrounding environment, amenity and aesthetics. The microbial community associated with plant roots facilitates uptake, decomposition and transformation of stormwater pollutants and plant litter."[7]

Pollutants collected from filtered stormwater leave a biofilter in only three major ways: use by plants and the attached microbes for biochemical processes; physical removal of dead or dying/seasonal plant matter and sediments; or flowing into the lake in dissolved form or attached to solids.

All filtration systems require maintenance to their filters. For biofilters, that means removal of dead or seasonal plant matter and sediment. According to Clark County, "Proper maintenance helps ensure that facilities operate as they were designed and that trapped pollutants, such as sediment and oils, are cleaned out _so that the facilities do not become pollutant sources_."[8] [emphasis mine] Maintenance was considered important enough that the City permit for the property required the creation of the LSHOA specifically to ". . . be responsible for monitoring and maintaining the storm drainage system . . .",[9] at Ecology's directive (Appendix K).

---

[6] Payne, E.G.I., Hatt, B.E., Deletic, A., Dobbie, M.F., McCarthy, D.T. and Chandrasena, G.I., 2015. _Adoption Guidelines for Stormwater Biofiltration Systems_ - _Summary Report_, Australian Government, Department of Industry and Science, Melbourne, Australia: Cooperative Research Centre for Water Sensitive Cities. p.3 "_Figure 1. Key Principles of Stormwater Biofiltration_"

[7] _Adoption Guidelines For Stormwater Biofiltration Systems_, Table 1. Key components of stormwater biofilters and their functional roles from p. 7.

[8] _Clark County Stormwater Manual 2015, Book 4 – Stormwater Facility Operations and Maintenance_, Clark County, Washington, November 24, 2015, p. 1. https://clark.wa.gov/sites/default/files/dept/files/environmental-services/Stormwater/Code/ccsm2015-book-4.pdf.

[9] City of Camas. 15 June 1988. _City of Camas Permit No. 2-87 (C-2-87) and Shoreline Conditional Use Permit, Camas Permit No. 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_. https://www.lacamasshoresbiofilter.org/uploads/1/2/2/5/122588755/ls_hoa_approved_permit_june_1988.pdf See bullet #12.

In a 1993 letter from Doug Quinn of the City of Camas[10] ("City"), it was noted that the Biofilter's treatment wetlands worked to reduce pollutants. Quinn quoted the firm that conducted the 5-year Monitoring Program required by permit[11]: "In cases where the in-flowing concentrations of the monitored water quality parameters are greater than the established site-specific levels, there is always a decrease in these parameters after passing over the wetlands."

The Monitoring Program was designed specifically to measure the efficiency of the Biofilter and set compliance standards to protect the water quality ("WQ") entering the Lake. The Program and the standards were required by the 1988 SDP/CUP Permit and 1988 Agreed Order. The Order was entered by the Shoreline Hearings Board with the agreement of the City and Washington Department of Ecology.

Specifically, the permit required "triggers" (i.e., "compliance criteria" or "compliance standards") to be created after the first year of the Monitoring Program.[12] Those criteria were published in the annual reports for the Monitoring Program and sent to Ecology.[13] They were also published in a 1993 article about this innovative Biofilter in a national water technology magazine. See Table 1 from Appendix F and Appendix G.

Table 1. Compliance Standards Required and Set by City of Camas Permit (Appendix F)

| Compliance Criteria Determined from Site Monitoring | | | |
|---|---|---|---|
| | | Compliance level* | |
| Parameter | Units | Bubbler, wetland 1 (S4) | Bubbler, wetland 2 (S2) |
| **Primary** | | | |
| TP | mg/L | 0.118 [0.223] | 0.110 [0.251] |
| PO₄ | mg/L | 0.061 [0.131] | 0.042 [0.090] |
| NO₃ | mg/L | 0.159 [0.565] | 0.188 [0.607] |
| **Secondary** | | | |
| pH | | 6.3 [4.7–7.9] | 6.1 [4.4–7.8] |
| Conductivity | µmho/cm | 63 [97] | 87 [135] |
| TSS | mg/L | 19.4 [51.6] | 25.8 [72.0] |
| Oil and grease | mg/L | 1.5 [4.2] | 1.8 [4.5] |
| Chromium | mg/L | Wash. wq stds.* | Wash. wq stds. |
| Copper | mg/L | Wash. wq stds. | Wash. wq stds. |
| Lead | mg/L | Wash. wq stds. | Wash. wq stds. |
| Zinc | mg/L | Wash. wq stds. | Wash. wq stds. |
| Organophos-phate pesticides | µg/L | detection limit | detection limit |
| Chlorinated pesticides | µg/L | detection limit | detection limit |
| Chlorinated herbicides | µg/L | detection limit | detection limit |

*Numbers in brackets are the compliance concentration plus twice the standard deviation.
*Wash. wq stds. = Washington state water quality standards.

After 1993, an adjacent but separate "swale/pond system" was added to accommodate re-routed stormwater from another 38.0 acres of LSHOA properties southeast of the swale.[14]

---

[10] Quinn, D. Letter re: "Lacamas Shores Shoreline Permit", Received by the "Shoreline Committee Members", 22 June 1993, page 6. This letter was included in the 1993 Permit Revisions packet. Quinn was the Director of Public Works and City Engineering.

[11] City of Camas Permit. See bullet 9b. "During the first year, discuss appropriate use of the background data to produce maximum contaminant levels. Most likely, these will have to use concentration values (mg/L). Develop the 'formula' to convert concentrations into implementation trigger. This will be done in conjunction with Ecology."

[12] City of Camas Permit. See bullet 9c. "Implement the trigger criteria at the end of the first year. "

[13] Final year report: SRI/Shapiro, Five-Year Stormwater Runoff and Wetland Biofilter Monitoring Program for the Lacamas Shores Development: Fifth Year Report, March 11, 1994. See also the appendices in Appendix G below.

[14] Mackay & Sposito, 9 July 1996, *Modifications to Lacamas Shores Stormwater Disposal System: Drainage Calculation*, p. 19. Shipler Property Bio-Filter Basins Map

During the Biofilter's first years, the property, named "Meadowlands Park" by the developer, was a mix of grassland and wetmeadow with a few scattered trees. Now, the Biofilter's wetlands are a mature stand of pacific willow, red alder, and other riparian species.

## Historical Scientific Data

One way to test the efficiency of any filtration system is to compare what goes into it against what comes out of it. The majority of data about the Biofilter's efficiency comes from 1988-1993, as listed in the 5-Year Monitoring Program's last annual report in Appendix A, Table 1.[15] (Appendix G)

Between 1993 and last September, there had been no tests comparing the major water quality parameters at the inlets to those at the outlets. The only known tests of the Biofilter since 1993 are:

- 04/2018 - Chemical Oxygen Demand ("COD") grab samples testing inlets and outlets (Appendix H).
- 12/2019 - City of Camas/Otak/BSK Outlet Samples testing outlets for organic and inorganic parameters (Appendix I).
- 05/2020 - City of Camas/Otak/BSK Outlet Samples testing outlets for organic and inorganic parameters (Appendix J).
- 09/2020 – Current sampling ("Current") testing inlets and outlets for the three major parameters, the main topic of this report (Table 3).

In 2019, the City committed to testing the stormwater runoff from the Biofilter. Using the sampling locations in the Monitoring Program, the City selected the two outlet locations closest to the Lake for sampling. The City did not include the compliance points, although it is unclear whether the City knew of the compliance locations at the time of the testing. The City did not include inlet points in their testing, so there was no determination of the Biofilter's effectiveness. While the City contracted for quarterly testing of the two points, only two tests were conducted between Dec 2019 and Dec 2020.

---

[15] The full report is here: Bautista, Mark and Geiger, Stan (11 March 1994) *Fifth Year Report: 5-year Stormwater Runoff and Wetland Biofilter Monitoring Program for the Lacamas Shores Residential Development*. SRI/Shapiro, Lake Oswego, OR.

The City's December 2019 test and the 2018 chemical oxygen demand ("COD") sample results indicated that there may be a problem with the Biofilter's efficiency[16]. However, the 5.62-acres of the filtering biology and sediments of the Biofilter have not been maintained or modified since inception. The reason was the understanding explained in a letter written in 2018 by Ecology stating that "In this case, Ecology is unlikely to approve the CUP Permit" to allow vegetation removal other than invasive species.[17] The City's response to that letter was, as before, to disallow all maintenance that might require tree removal. While the City has required the LSHOA to complete some maintenance to pipes and the adjacent biofiltration system,[18] there are no plans to require maintenance to the largest part of the Biofilter - the filtering plant biology and sediments (Fig. 2 [19]). While there are plans to work with Clark County and the State to address Lacamas Lake's toxic algae problem,[20] there are currently no commitments to test/monitor any other Lake inlets nor the effectiveness of any biofilters in treating stormwater.

Figure 2. The "Filter" of the Biofilter Remains Unmaintained

**Lacamas Shores HOA Biofilter Maintenance since 1993**



as of 2020

● Maintained area
● Neglected area

---

[16] The 2018 COD Grab sample testing of inlets and outlets shows that the outlets had worse WQ than the inlets (Appendix H). The December 2019 WQ testing by the City of Camas showed all three parameters were out of compliance and above the maximum allowable levels (Appendix I).

[17] Rothwell, Rebecca. Letter to R. Maul and S. MacPherson. *Re: Lacamas Shores Wetlands.* 22 Feb 2018. https://www.lacamasshoresbiofilter.org/index.html#6. p. 3. The author of the 2018 Ecology letter qualified her conclusion, stating that she "had found no evidence that the wetland was constructed from upland for the purpose of stormwater treatment or detention." It is likely that the author was unaware of a letter Ecology wrote in 1988 (Appendix K) showing their clear expectation that the Biofilter property was to be used and tested as a "wetland filtering" system that was "on the periphery" of what they knew about biofiltering efficiency at that time. The 1988 letter and the compliance standards were brought to light by M. Tabata-Callerame in a 2020 email to Steve Wall. Tabata-Callerame, M. "Re: RE: Lacamas Shores failed biofilter test plan/results". Email to Steve Wall. 05/26/2020.

[18] The HOA has maintained the following: the nearby bioswale and sediment settling pond system ("swale/pond system") via annually removing the vegetation and periodically dredging; the Biofilter bubblers pipes in 2019 for the first time by cleaning them out from the inside; and the manholes coming from the City's storm vaults.

[19] *The Promise of the Lacamas Shores Biofilter: The Meadowlands Biofilter "Rediscovered" - FAQs.* (n.d.) https://www.lacamasshoresbiofilter.org/faqs.html, Accessed 2/11/2021.

[20] In 2020, Lacamas Lake tested positive for harmful algae toxins 26 out of 29 times between April and October, per the Dept. of Ecology's website. Wa Dept of Ecology, 2020, *Washington State Toxic Algae: Freshwater Toxic Algae Bloom Monitoring Program [Lacamas Lake]*, https://www.nwtoxicalgae.org/Data.aspx?SiteID=94. Reports of toxic algae blooms substantially increased from two in 2018, to three or four in 2019 (one test officially recorded on the toxic algae website in June, others were reported by residents in September and October after funds for the testing program had depleted), to the near-continual toxic algae blooms in 2020. Reports for Round Lake are similar.

## Citizen Testing

On September 23, 2020, samples were collected of runoff flowing into the Biofilter and from the outlets flowing into the Lake. These samples were delivered to Columbia Laboratories for analysis. The purpose of this testing was to provide a snapshot in time of the Biofilter's effectiveness. This snapshot only addressed the parameters that were non-compliant in the 2019 and 2020 testing: total phosphorus ("TP"), total suspended solids ("TSS") and conductivity.

## The Collection Process

Sample locations were selected based on the inlets and outlets sampled in the Monitoring Report. The City's sampling locations L1 and L2,[21] also chosen from the Monitoring Report, were added to allow for comparison to the City's December and May samplings. Samples were taken as listed chronologically in the Table 3. Sample locations were documented on Columbia Laboratories ("Lab") Environmental Chain of Custody Record by Marie Tabata-Callerame before sampling. The collection process was video recorded by reporter John Ley.

Optimal timing for sampling would have been during the first flush of the month, which occurred September 18th and 19th, when it rained 2.16 inches after several dry days. However, due to the unusually large amount of wildfire smoke before the first flush, the decision was made to use the second flush, which occurred September 23rd. On that day, sampling was accomplished in a moderate rain.

All sample containers were delivered from the Columbia Laboratories by the vendor to Todd Schoenlein's house in a cooler. There were 250 ml plastic bottles containing 2 ml of dilute sulfuric acid for each Total Phosphorus ("TP") sample and 1-liter plastic bottles without acid preservative, i.e., empty, for each total suspended solids ("TSS")/ conductivity sample.

Containers were labeled by Schoenlein. Tabata-Callerame verified the sampling locations and proper labeling. Samples for B1, B2, S2, and S4 were taken by Prof. Rodger Hauge. Samples for L1 and L2 were taken by Schoenlein. Only Schoenlein and/or Hauge handled open collection containers and put them in the storage cooler. Samples were transported from site to car by Schoenlein and Hauge, then to the Lab by Schoenlein and Ley.

---

[21] The City's sampling locations were shown in a document provided by the City's Director of Public Works Steve Wall. "Exhibit A: City of Camas, Quarterly Sampling of Outfalls, Scope of Work, Otak Project #19447, November 13, 2019." was attached to: Wall, Steve. *RE: Lacamas Shores failed biofilter test plan/results.* Message to Steven D. Bang. 05/15/2020. Email.

## Standard Operating Procedures

The samplers wore gloves to avoid sample contamination. Onsite, Hauge tested water temperature in-stream using an aquatic thermometer. He tested pH using a broad range LaMotte pH test kit.

All samples for TP, TSS and conductivity were processed and reported by Columbia Laboratories (Appendix D).

## Sampling Observations

Please see the maps in Appendices A-C and/or Fig. 3 for reference.

1. Inlet B2 was overflowing on the day/time it was sampled (Fig. 4). The water was flowing vigorously out the top of the manhole and flowing down a channel through the Biofilter towards the Lake.[22] No measure of flow was made.

2. Inlet B1 was also overflowing but with less volume than B2. There was evidence that there had been excavation around B1.[23]

Figure 3. Diagram of Biofilter Waterflow



Figure 4. B2 Inlet manhole cover after 20 min. of rain



3. The volume of the stream at S4 was much smaller than any other inlet or outlet tested.

4. The separate sediment settling pond system ("swale/pond system") was functioning. The swale has stormwater running through it and was flowing into the swale/pond system as designed (Appendix E). The swale vegetation was short and well maintained. The pond was discharging through two black outlets into the shoreline wetlands upstream of the L2 location.

---

[22] It was noted two weeks later, after a rain, that stormwater was seen flowing from the bottom of the B2 manhole riser down a channel into the Biofilter.

[23] It was noted two weeks later, after a rain, that the B1 manhole cover was observed as underwater. On 02/28/2021, the manhole was observed to be fully submerged.

5. The stormwater running from S4 (the Biofilter outlet) converged with water from the black outlets of the swale/pond to run through L2 and into the Lake. The volume coming from the two black swale/pond outlets was much greater than the volume coming from S4.

6. Stormwater at the Biofilter outlets showed visible suspended solids. Stormwater at the Biofilter inlets appeared clearer in comparison, indicating erosion of sediment as it flowed across the Biofilter.

7. The only surface water connection between the Biofilter and the shoreline wetlands are underneath two concrete bridges on the Heritage Trail, one located at S2 and the other at S4. All water exiting the Biofilter as surface water must go through one or the other of these two points.

8. The S outlet locations are compliance points at the Biofilter's exits. The L outlet locations are 16-30m downstream of the S locations and are within the shoreline wetlands near the Lake waterbody.

Tables 2a, 2b, and 2c. Precipitation Results for Recent Sample Dates from the NOAA Database for Station # US1WACK0029, located in Camas, WA, (45.584519, -122.373998).

| Date 2019 | Precipitation (inches) | Samples taken | Date 2020 | Precipitation (inches) | Samples taken | Date 2020 | Precipitation (inches) | Samples taken |
|---|---|---|---|---|---|---|---|---|
| 12/15 | 0 | | 5/10 | 0 | | 9/15 | 0 | |
| 12/16 | 0 | | 5/11 | 0 | | 9/16 | 0 | |
| 12/17 | 0 | | 5/12 | 0.33 | | 9/17 | 0 | |
| 12/18 | 0 | | 5/13 | 0.07 | | 9/18 | 1.96 | 1st flush |
| 12/19 | 0.9 | X | 5/14 | 0.17 | | 9/19 | 0.2 | |
| 12/20 | 0.1 | | 5/15 | 0.19 | | 9/20 | 0 | |
| 12/21 | 0.88 | | 5/16 | 0.02 | | 9/21 | 0 | |
| 12/22 | 0.06 | | 5/17 | 0.36 | | 9/22 | 0 | |
| 12/23 | 0.24 | | 5/18 | 0.47 | | 9/23 | 0.69 | X |
| 12/24 | 0.02 | | 5/19 | 0.36 | | 9/24 | 0.77 | |
| 12/25 | 0 | | 5/20 | 0.03 | | 9/25 | 0.77 | |
| 12/26 | 0 | | 5/21 | 0.64 | X | 9/26 | 0.25 | |
| | | | 5/22 | 0.09 | | 9/27 | 0 | |
| | | | 5/23 | 0 | | 9/28 | 0 | |

9. See the precipitation information in Tables 2a-c showing the amount of rain for the recent datasets. Sampling during the first 12-hours of a storm event is the proper protocol for stormwater sampling, according to Ecology.[24] For the Current

---

[24] Stormwater sampling standards require sampling during ". . . the first fall storm event each year. The [NPDES] permit defines the first fall storm event as the first time after October 1st that precipitation occurs and results in a stormwater discharge from the facility." It is also stated that one should "Collect samples within the first 12 hours

sampling (as with the Dec 2019 sampling), the prior 3 days were rainless.  Note that the May 2020 sampling was taken outside that protocol.

10. Biofilter vegetation was consistent with typical riparian species, including red alder and pacific willow.

## The Test Results

## September 23, 2020 Data ("Current")

The dataset resulting from the 09/23/2020 sampling ("Current") is summarized in Table 3, illustrated in Appendices A, B and C. and is compared to datasets from the 1990's and the more recent 2019 and 2020 datasets ("Recent") in Tables 4-8.  The Current dataset (Table 3) shows that:

- The results for the inlets are high for most parameters,
- The results for the outlet compliance points are higher than the inlets, i.e., the water is more contaminated going out of the Biofilter than it was coming into the Biofilter.
- The results for the points that the City tested (L locations) have values lower than their respective upstream compliance points (S locations).
- All inlets and outlets are above the acceptable levels set by City permit.

Note: To understand these observations better, reference Figure 3 or the maps in Appendices A, B, and C. each of which illustrate the locations from which the samples and measurements were taken.

---

of stormwater discharge. If you are not able to collect a sample within the first 12 hours, collect the sample as soon as possible. In the sampling records, keep documentation explaining why you could not collect samples within the first 12 hours." Washington State Department of Ecology. "Stormwater Sampling Manual: A guide for the Industrial Stormwater General Permit". December 2015. Olympia, WA. Publication No. 15-03-044. p. 16

04/10/2021

## Table 3. Sample Information and Results (listed chronologically)

| | Sample Collection Taken From | Time Taken | pH | Water Tempera-ture | TP µg/L | CC TP [Max] | TSS µg/L | CC TSS [Max] | Con-ductiv-ity uS/cm | CC Cond. [Max] |
|---|---|---|---|---|---|---|---|---|---|---|
| **B1 In-let** | Waterflow outside the man-hole cover near athletic field (west edge of cover) | ~~13:55~~ 14.02 | 6.5 | 17°C | 145 | | 14 | | 83.5 | |
| **B2 In-let** | Water overflowing the top of the manhole by the SW Corner | 14:22 | 6.0 | 18°C | 225 | | 98 | | 71.8 | |
| **S2 Outlet** | Channel coming out of the lakeside (N) of west bridge COMPLIANCE POINT | After B2 | 6.5 | 18°C | 555* | 110 [251] | 260* | 25.8 [72] | 115 | 87 [135] |
| **L1 Outlet** | Channel downstream of S2 be-fore reaching the Lake - City sample location for Dec 2019 and May 2020 | After S2 | - | - | 319 | | 140 | | 90.5 | |
| **S4 Outlet** | Channel before entering east bridge[6] (S) COMPLIANCE POINT | 14:44 | 6.0 | 18°C | 976* | 118 [223] | 184* | 19.4 [51.6] | 105 | 63 [97] |
| **L2 Outlet** | Channel downstream of S4 and the sediment pond outlets be-fore reaching the Lake - City sample location for Dec 2019 and May 2020 | 14:50 | - | - | 135 | | 82 | | 84.8 | |

*Indicates that the reading is higher than any reading taken at that location, including since 1988.

Note that the maximum standard allowed ("max allowed") is calculated as the compliance level plus two standard deviations. It was set to require maintenance action and/or to indicate a violation of the permit.[25]

---

[25] "In general, water quality values outside the range of *two standard deviations* from the baseline were consid-ered of concern and warranting further consideration as to origin and impacts. . . . Exceeding the criteria would provide a signal that the particular monitored parameter was varying outside of the annual baseline conditions and that it may be necessary to implement contingencies." 5-Year Monitoring Program Report. p. 5. Per Ecology, such "contingencies" could include ". . . the development of a tightlined offsite stormwater facility." Appendix K, p.3

At the compliance locations, Current TP and TSS are the highest ever recorded for those points.  For S2:

- All three parameters are over the compliance level.
- TP is 5x the compliance level and over double the max allowed,
- TSS is 10x the compliance level and over 3 times the max allowed.

The S4 results show similarly noncompliant WQ levels:

- All three parameters are over the compliance level.
- TP is 8x the compliance level and over 4x the maximum allowed,
- TSS is 9x the compliance level and also over 3 times the maximum allowed (about the same as S2).
- Conductivity is also over the maximum allowed.

The L2-S4 difference is explained by dilution with the swale/pond outlet.  The stream coming from S4 merges with the much larger volume from the swale/pond system.  It is likely that any eroded sediments from the adjacent swale gets settled out into the pond. That would be expected, since the City has required that system to be annually mowed with the clippings taken away, as well as periodically excavated.  The swale/pond system was not sampled.

The L1 point (downstream of S2) seems to have been either diluted or filtered between the two points, but no surface water source is visible.

04/10/2021

**Compared to Prior Datasets**

Is the Current stormwater sample better or worse than in the past? Are there more pollutants in the water now than when the Biofilter was created?

Comparing the Current parameter readings with the maximum readings at either compliance point shows that the Biofilter is not working as it was in the 1980-90's (Table 4). Note the low maximum and minimum readings for TSS, indicating a low rate of erosion in the system and/or a high sediment settling rate.

Table 4. 1988-93 Minimum and Maximum Levels Recorded at the Compliance Locations

| S2 and/or S4 | Min Recorded | Max Recorded | Sept 2020 S2 | Sept 2020 S4 |
|---|---|---|---|---|
| Conductivity uS/cm | 33 | 162 | 115 | 105 |
| TP µg/L | 28 | 243 | 555 | 976 |
| TSS µg/L | 0.5 | 66 | 260 | 184 |

To easily compare the Current results from Table 3 to prior datasets, Tables 5 and 6 are configured to show the flow of water. The applicable compliance criteria were added for reference.

Table 5 compares the inlet on the westside of the Biofilter (B2) with the compliance point outlet on the same side (S2). It also shows the most recent datasets from the 1990's taken within 14 days of the same date of each of the recent datasets (Appendix G). There are some interesting observations. Specifically, the TP, TSS and conductivity concentrations coming into the Biofilter are relatively the *same* as they were in the 1990's. Flow rate was not measured to determine total load.

Table 5.  Westside of Biofilter Comparison: Inlets vs. Outlets and Current vs. 1990's

| B2 ⇨ S2 | Inlet B2 | | | | Outlet at Compliance Point S2 | | | | Determined 1989-90 S2 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 10/03 1990 | 09/24 1992 | 09/22 1993 | 09/23 2020 | 10/03 1990 | 09/24 1992 | 09/22 1993 | 09/23 2020 | Compliance levels | Max Level allowed |
| Water Temp °C | 14.0 | 14.1 | 12.6 | 18°C | 13.5 | 13.1 | 8.8 | 18°C | | |
| pH | 6.5 | 6.50 | 6.02 | 6.0 | 6.61 | 5.70 | 6.21 | 6.5 | 6.1 | 4.4 - 7.8 |
| Conductivity uS/cm | 48 | 75 | 90 | 71.8 | 118 | 100 | 105 | 115 | 87 | 135 |
| TP µg/L | 303 | 287 | 70 | 225 | 140 | 124 | 23 | 555* | 110 | 251 |
| TSS µg/L | 114.0 | 84.0 | 0.6 | 98 | 46.0 | 13.3 | 7.0 | 260* | 25.8 | 72.0 |

Refer to Figure 3 for waterflow diagram

Some observations:

- The water was 2-4 degrees colder in the 1990's.
- The water entering the Biofilter in the 1990's was not dissimilar in WQ to the water entering the Biofilter now in Conductivity, TP, and TSS; the 3 major parameters.
- The WQ at the outlets was much improved over the inlets in the 1990's for all three major parameters.
- The contrast in WQ results show the deterioration of the Biofilter's effectiveness.
- While the 1990's results were sometimes over the compliance levels, the TP and TSS levels were not recorded to be over the max allowed.
- The Current results were well over the max allowed for both TP and TSS, by multiple factors.

The eastside of the Biofilter is captured in Table 6.  The results were similar to the westside - the incoming stormwater concentrations were similar between the 1990's and

the Current dataset, but the difference between the outgoing concentrations were considerable. The 1990's outlet parameters decreased for each whereas the Current outlet parameters markedly increased (x6 for TP and x13 for TSS).

Table 6. Eastside of Biofilter Comparison: Inlets vs. Outlets and Current vs. 1990's

| B1 ⇨ S4 | Inlets B1 | | | | Outlets at Compliance Point S4 | | | | Determined 1989-90 S4 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 10/03 1990 | 09/24 1992 | 09/22 1993 | 09/23 2020 | 10/03 1990 | 09/24 1992 | 09/22 1993 | 09/23 2020 | Compliance levels | Max Level allowed |
| Water Temp °C | 14.0 | 11.8 | 11.1 | 17 C | 14.0 | 13.0 | 9.6 | 18 C | | |
| pH | 6.15 | 6.00 | 5.88 | 6.5 | 6.93 | 5.40 | 6.16 | 6.0 | 6.3 | 4.7 – 7.9 |
| Conductivity uS/cm | 66 | 93 | 74 | 83.5 | 58 | 83 | 72 | 105 | 63 | 97 |
| TP µg/L | 1200 | 129 | 84 | 145 | 121 | 99 | 88 | 976* | 118 | 223 |
| TSS µg/L | 225 | 2.7 | 0.6 | 14 | 12.7 | 5.8 | 10.0 | 184* | 19.4 | 51.6 |

Refer to Figure 3 for waterflow diagram

Like Table 5, Table 6 shows that in the 1990's, the water was similar to the Current stormwater coming into the Biofilter, and was again much cleaner exiting.

Note the 10/3/1990 dataset for TP. Even though inlet concentration was abnormally high (1200 µg/L), the Biofilter brought it down to 121µg/L, well below the max level, showing the power of an efficient biofilter system.

Because the only locations that were tested three times within the last two years were the outlet points L1 and L2, Tables 7 and 8 were created to compare those "Recent" results to the 1990's results, next to their upstream compliance levels.

Table 7.  Historical Comparison: L1 Westside Biofilter Outlet to Lake

| L1 | 5-yr Monitoring Program | | | City/Otak | | Current | Upstream Standard | |
|---|---|---|---|---|---|---|---|---|
| | 12/20/91 | 04/30/92 | 09/22/93 | 12/19/19 | 05/21/20 | 09/23/20 | Compliance levels for S2 | Max Level allowed S2 |
| Water Temp °C | 7.0 | 15.5 | 16.3 | - | - | (18°C up-stream at S2) | | |
| pH | 5.78 | 6.14 | 6.55 | 7.2 | 7.4 | (6.5 up-stream at S2) | 6.1 | 4.4 - 7.8 |
| Conductivity uS/cm | 71 | 61 | 108 | 94 | 120 | 90.5 | 87 | 135 |
| TP µg/L | 74 | 68 | 42 | 270 | 71 | 319 | 110 | 251 |
| TSS µg/L | 7.0 | 11.0 | 10.8 | 140 | 11 | 140 | 25.8 | 72.0 |

Refer to Figure 3 for waterflow diagram

Table 7 shows that when comparing the recent datasets to the1990's datasets taken at the same time of the year, the water now is:
- hotter,
- pH is higher,
- the conductivity is generally higher (meaning there are now more dissolved solids in the water),
- TP is much higher (doubled, similar, and x8, respectively), and
- TSS is much higher (x20, same, x13, respectively).
- While there was one non-compliant reading in the 1990's dataset, there were no violations over the max allowed.  The Current dataset has three non-compliant readings, two of which are also over the max allowed.
- The Dec 2019 dataset and the Current dataset are consistent with each other.

Both TP and TSS were above the upstream compliance levels (x3 and x5, respectively) and above the maximum levels (127% and 194% of those max levels, respectively)

04/10/2021

The anomaly for L1 in the recent datasets is the May 2020 set, which looks more like the 1990's datasets than the recent ones. While it is shows a higher concentration for conductivity, it is lower than all other recent datasets for TP and TSS. This is likely due to being taken after 9 days of rain (Table 2b).[26]

When looking at Table 8, it is important to note that the swale/pond system was added sometime after 1993. Therefore, while the L2 results from the 1980's and 1990's were measuring only the Biofilter, the L2 from the recent datasets measured a mix of stormwater from the Biofilter and a larger volume of stormwater from the swale/pond system.

Table 8.  Historical Comparison: L2 Eastside Biofilter Outlet to Lake

| L2 | 5-yr Monitoring Program | | | City/Otak | | Current | Upstream Standard | |
| | 12/20/91 | 04/30/92 | 09/22/93 | 12/19/19 | 05/21/20 | 09/23/20 | Compliance levels for S4 | Max Level allowed S4 |
|---|---|---|---|---|---|---|---|---|
| Temp °C | 5.0 | 14.9 | 14.7 | - | - | (18°C upstream at S4) | | |
| pH | 6.19 | 6.42 | 7.60 | 7.2 | 7.6 | (6.0 upstream at S4) | 6.3 | 4.7-7.9 |
| Conductivity uS/cm | 71 | 57 | 83 | Not Detected | 79 | 84.8 | 63 | 97 |
| TP µg/L | 104 | 79 | 30 | 62 | 71 | 135 | 118 | 223 |
| TSS µg/L | 7.3 | 11.0 | 3.3 | 19 | 6.8 | 82 | 19.4 | 51.6 |

Refer to Figure 3 for waterflow diagram

---

[26] The City's May 2020 sampling day was on the 10th consecutive day of rain.  While the May 2020 TP samples were not above the Biofilter's site-specific compliance levels of 110 µg/L and 188 µg/L, the west outlet result of 71 µg/L was above the EPA's recommended level of 50 µg/L as well as above the 2007 baseline levels for Lacamas Lake of 32-50 µg/L.  Schnabel, Jeff and Hutton, Robert.  "Monitoring Report: Lacamas Lake Annual Data Summary for 2007", *Clark County Public Resources.* June 2008.  After 9 days of rain, a lower concentration should have been expected, closer the minimum levels recorded in Table 3.

04/10/2021

The trends in Table 8 are in line with those in Table 7, i.e., the stormwater is still non-compliant for all three parameters.  However, only TSS is found above the maximum level (160%), despite the upstream S4 compliance point concentrations being above maximum for all parameters.  This is explained by visible dilution with the swale/pond system.  In hindsight, the outlets from the swale/pond should have also been sampled to confirm this hypothesis.

Also different in Table 8 is that the Dec 2019 L2 result is not similar to the Current L2 result.  It could be that since Dec 2019 had a high volume of rain, a higher volume coming from the swale/pond may have better diluted the S4 water before reaching the L2 outlet point.   Note that for L2, the Current dataset is the most deviated from the other two recent datasets, although it is similar to the 1991 dataset in TP and conductivity.

The graphs in Figures 5-7 give a visual comparison of the 1990 datasets to the Current dataset for the eastside locations, showing how different the changes in stormwater WQ parameters are now between entry and exit of the Biofilter.

Figure 5. Comparative Stormwater TP Concentrations: 1990s vs. Current for Inlet, Compliance Outlet, and Lake Outlet



Fig. 5 shows the comparison between the Current dataset, where TP elevates significantly after traveling through the Biofilter, and the 1990's datasets, where TP drops, even when the stormwater is already relatively "clean".  Note that the Current TP level is typical at the inlet compared to the inlets of the 1990's, i.e., the TP concentration is not higher now than it was recorded in the past.  The Biofilter did not lower the same TP concentration in the Current stormwater that it had treated in the 1990's.

The results for TSS are similar (Fig. 6).

Figure 6. Comparative Stormwater TSS Concentrations: 1990s vs. Current for Inlet, Compliance Outlet, and Lake Outlet



Figure 7 shows that the Biofilter does not appear effective to decrease conductivity, neither now nor in the 1990's.  Instead, it increases conductivity in the stormwater.  Conductivity only decreases for each dataset between the S and L locations, perhaps due to dilution.

Figure 7. Comparative Stormwater Conductivity Concentrations: 1990s vs. Current for Inlet, Compliance Outlet, and Lake Outlet



04/10/2021

## Discussion

The WQ of the stormwater going into the Biofilter for the Current dataset is above the compliance criteria set for the Biofilter. This is consistent with the 1990's datasets.

The Current dataset, similar to the Dec 2019 dataset, shows that the TP and TSS concentrations for the stormwater coming out of the Biofilter at the compliance locations were the highest ever recorded for those points.[27]   Those results were more than 2x the maximum levels allowed for the Biofilter, as set by permit. This is divergent from the 1990 levels, which consistently decreased between Biofilter inlet versus outlet for all parameters, even the abnormally high ones.

All three WQ concentrations lowered _after_ leaving the Biofilter (the compliance S locations) and before reaching the downstream L outlet points (tested by the City) in the shoreline wetlands. Though lowered, those concentrations were still higher than the maximum allowed for TP and TSS.

The reason for the decrease in concentrations on the eastside (from S4 to L2) is dilution with the swale/pond outlets. This is confirmed by visual observation of a large amount of stormwater coming from the swale/pond system merging with the relatively small stream from the Biofilter a few meters upstream of the L2 point. This difference indicates that the stormwater from the swale/pond system is relatively clean and therefore able to dilute the high pollutant concentrations coming from the Biofilter. This also indicates that the swale/pond system is working to clean stormwater coming from the 38.0 acres of the LSHOA's east-side properties.

The westside (S2 to L1) has no visible surface water dilution source to explain the decrease between the two points, so the reason for the change in concentrations is unclear. There is a 1.25m rocky rooted waterfall where a groundwater source could be entering the stream. Based on our available data, the difference could be due to dilution with groundwater, waterfall aeration or that the shoreline wetlands are acting as a second biofilter. Note that the latter is specifically what Ecology wanted to avoid by having stormwater treated with a filtration wetland - they did not want the shoreline wetlands exposed to pollutants.[28]

The Current dataset indicated that the WQ coming out of the Biofilter is worse than the WQ going into it. The Biofilter has violated the permit standards set for it. The TP load coming from the Biofilter is contributing to the total TP load for the Lake and feeding harmful algae blooms where they have been appearing with increasing frequency.

---

[27] The Current and Dec 2019 TP readings are higher than the median TP levels for industrial land use of 171μg/L, i.e., the Biofilter is at times putting more TP in the stormwater than most industrial sites in western Washington. Hobbs, W., B. Lubliner, N. Kale, and E. Newell. 2015. "Western Washington NPDES Phase 1. Stormwater Permit: Final Data Characterization 2009-2013". Washington State Department of Ecology, Olympia, WA. Publication No. 15-03-001.

[28] Appendix K. "With this policy in mind, we want to see the resulting permit with conditions to provide additional protection to the shoreline environment." (p. 1)  "The stormwater monitoring plan now includes contingencies to divert flows should this wetland show signs of stress from the increased water regime." p. 2.

04/10/2021

**Conclusions**

1. The Current snapshot test results during the moderate to heavy rain, yielded Bio-filter inlets concentrations for TP, TSS, and conductivity higher than the compliance standards.

2. The stormwater parameter concentrations increased between each inlet and its respective outlet, i.e., the Biofilter was adding TP, TSS and dissolved solids into the stormwater instead of filtering them out.

3. The concentrations for both compliance point outlets were higher than the maximum allowed via permit for TP and TSS.

4. The Biofilter "plumbing" leading to the bubbler pipes was overcapacity after minimal rain. Two weeks later, water looked like it was exiting from the bottom of the elevated B2 manhole, creating a channelized stream. This indicates that the bubbler may not be working properly to spread the stormwater.

5. Alternatives to handling the large amounts of flow, possibly due to additional hard surfaces of new neighborhoods/areas uphill of B2, should be investigated.

6. The erosional processes of the overflowing stormwater creating free-flowing streams through the Biofilter should be addressed.

7. The Biofilter's sediments have been trapping phosphates from prior stormwaters for years. Now, the stormwater is eroding and mixing those phosphate-heavy sediments back into the outflow. The sediments have become a vehicle for putting phosphates into the Lake.

The question then becomes, is the drainage part of the system broken or the filtering part of the system broken? It seems likely to be both. The water should not have been as visually fast flowing after 15-60 minutes of rain, nor should stormwater be channelized from the inlets all the way to the outlets. Even so, the combination of all stormwater exiting the Biofilter as surface water, both the channelized and dispersed, at either of the two outlet points (S2 and S4), should still have had lower concentrations of TP and TSS than was found. The age of the Biofilter, the length of time without maintenance, and the amount of accumulated sediment over the last 3 decades may be contributing to the inefficiency exhibited in this Biofilter.

The Biofilter, as it is currently configured, cannot handle the TP concentrations coming into it. Too much untreated stormwater runoff is reaching the Lake. In fact, the Lacamas Shores Biofilter is not doing the Lake any good at all at this time. Even if the stormwater runoff poured from the inlets directly into the lake, TP would still be too high according to the City permit standards. The Biofilter needs repair, restoration, and/or improvement in order to ensure that future stormwater WQ meets the compliance criteria set at the compliance locations and stops contributing to future harmful algae blooms.

04/10/2021

**Recommendations**

While there are multiple ways to use the same Biofilter footprint to properly filter the stormwater coming into the Biofilter, the current situation is harmful to Lacamas Lake water quality and is, per City permit, not acceptable.   Options include:
- Returning the Biofilter to the original designed standard,
- Following the 1999 maintenance manual for the system,[29]
- Adding the "checkdams" proposed in the Monitoring Report,[30]
- Inclusion of the Biofilter inlets and outlets as part of any Lacamas Lake source assessment by the City or County.

---

[29] City of Camas. Lacamas Shores HOA Interim Trail, Open Space, Wetland and Storm Drainage Maintenance Manual. Camas, WA. (n.d.)  This manual was written/commissioned by the City of Camas for the LSHOA sometime after 1998 with specific directions for maintenance.  Many of those directives (such as removing debris, sediment buildup, dead vegetation, and trees that interfere with maintenance) do not appeared to have been followed.

[30] SRI/Shapiro. "5-year Stormwater Runoff and Wetland Biofilter Monitoring Program for the Lacamas Shores Residential Development Camas, WA - Fifth Year Report", p. 8. March 11, 1994.  The 5th Annual report for the Monitoring Program suggested on page 8 that: "Small checkdams [AKA level spreaders] using downed logs could remedy the situation [of channelization]."  Adding checkdams to the original Biofilter design would serve to slow and spread the stormwater, decreasing channelization and allowing for more infiltration. This action was not taken.

**List of Appendices**

A, B and C)  09/23/2020 Lacamas Shores Biofilter Efficiency Monitoring Maps
    A) Total Phosphorus
    B) Total Suspended Solids
    C) Conductivity

D)  Columbia Laboratory Report #20-010257/D02.R01, Dated 10/07/2020.

E)  1998 Drainage Basin Map for the "Modifications to Lacamas Shores Stormwater Disposal System". This map shows the $Q_2$ capacity of the bubblers to be at 11.0 cfs for B2 and 5.0 cfs for B1. "$Q_2$" is the estimated design discharge (Q) capacity needed to handle a 2-year storm event, i.e., the type of storm that happens every two years.

F)  Bautista, Mark F. and Geiger, N. Stan "Wetlands for Stormwater Treatment." *Water Environment & Technology*, July 1993, pp. 50-55. This national magazine article was written exclusively about the innovative design of the Biofilter, with maps and a chart of the "Compliance Criteria".

G)  Bautista, Mark and Geiger, Stan (11 March 1994), Appendices to the Five-Year Stormwater Runoff and Wetland Biofilter Monitoring Program for the Lacamas Shores Development – Fifth Year Report. SRI/Shapiro, Lake Oswego, OR. Datasets are in Appendix A, Table 1 - "Lacamas Shores Water Quality Data, 1988-1993." The compliance standards are shown in Tables 12-15.

H)  April 2018 COD Grab Sample Info Sheet

I)  City 12/2019 Results: BSK Associates (1/13/2020). Certificate of Analysis for V9L0419. Samples submitted 12/19/2019.

J)  City 05/2020 Results: BSK Associates (6/11/2020). Certificate of Analysis for VDE0400. Samples submitted 05/21/2020.

K)  Jewett, Nora. Lacamas Shores Development Permit Additions. Received by Mel Avery. 22 June 1988. Washington Department of Ecology. Mel Avery was the Director of Public Works for the City of Camas.

04/10/2021

Appendix A

# Lacamas Shores Biofilter Efficiency Monitoring
## 9/23/2020 Test Results
### Total Phosphorus (in µg/L)

For reference: In May-Oct 2007, the average surface TP level for
Lacamas Lake = 42µg/L; range = 30 to 50 ug/L.  *Monitoring Report:
Lacamas Lake Annual Data Summary for 2007*

**TP Compliance Criteria** (in µg/L)

| Compliance Locations | S2 | S4 |
|---|---|---|
| Location Description | North of N/W Outlet | South of S/E Outlet |
| Compliance Criteria | 110 | 118 |
| Maximum allowed* | 251 | 223 |
| Test Results | 555 | 976 |
| Out of Compliance by | +445 | +858 |



**OUTLETS TO LAKE**

Lacamas Lake

L1
319

S2
555

S4
976

L2
135

Shoreline Wetlands

WATERFLOW

LS Bioswale and Pond

Lacamas Shores Wetland Biofilter

B1
145

B2
225

Red = Man-made parts of stormwater biofilter
Blue = General direction of water flow
Yellow = Man-made trail
Grey Box = Location label and test results in µg/L
* = Compliance level + twice the standard deviation

**INLETS FROM STORMWATER DRAINAGE SYSTEM**

12/27/2020

Appendix B

# Lacamas Shores Biofilter Efficiency Monitoring
## 9/23/2020 Test Results
## Total Suspended Solids (in µg/L)

For reference: "For the five-year period beginning in 1999, the annual mean TSS concentration in Lacamas Creek has ranged from 4.1 to 12.5 mg/L." *Lacamas Lake: Nutrient Loading and In-lake Conditions*, April 2004

### TSS Compliance Criteria (in µg/L)

| Compliance Locations | S2 | S4 |
|---|---|---|
| Location Description | North of N/W Outlet | South of S/E Outlet |
| Compliance Criteria | 25.8 | 19.4 |
| Maximum allowed* | 72 | 51.6 |
| Test Results | 260 | 184 |
| Out of Compliance by | +234.2 | +164.6 |



**OUTLETS TO LAKE**

Lacamas Lake

L1 — 140
L2 — 82
S2 — 260
S4 — 184

Shoreline Wetlands

LS Bioswale and Pond

Lacamas Shores Wetland Biofilter

WATERFLOW

B1 — 14
B2 — 98

**INLETS FROM STORMWATER DRAINAGE SYSTEM**

Red = Man-made parts of stormwater biofilter
Blue = General direction of water flow
Yellow = Man-made trail
Grey Box = Location label and test results in µg/L
* = Compliance level + twice the standard deviation

12/27/2020

Appendix C

# Lacamas Shores Biofilter Efficiency Monitoring
## 9/23/2020 Test Results
## Conductivity (in µmhos/cm)

For reference: "Values ranged from 46 uS/cm to 101 uS/cm during WY 2000 and 62 us/cm to 97 uS/cm during WY 2001." *Lacamas Lake Restoration Program: WY 2000 and WY 2001 Water Quality Monitoring*

### Conductivity Compliance Criteria
(in µmhos/cm, which is equal to uS/cm)

| Compliance Locations | S2 | S4 |
|---|---|---|
| Location Description | North of N/W Outlet | South of S/E Outlet |
| Compliance Criteria | 87 | 63 |
| Maximum allowed* | 135 | 97 |
| Test Results | 115 | 105 |
| Out of Compliance by | +28 | +42 |



OUTLETS TO LAKE

Lacamas Lake

**L1** 90.5

**L2** 84.8

**S2** 115

**S4** 105

Shoreline Wetlands

WATERFLOW

LS Bioswale and Pond

Lacamas Shores Wetland Biofilter

**B1** 83.5

**B2** 71.8

Red = Man-made parts of stormwater biofilter
Blue = General direction of water flow
Yellow = Man-made trail
Grey Box = Location label and test results in µg/L
* = Compliance level + twice the standard deviation

INLETS FROM STORMWATER DRAINAGE SYSTEM

12/27/2020

# Attachment 6

**Environmental Technology Consultants**
*A Division of Sisul Enterprises, Inc.*
PO Box 821185, Vancouver, WA  98682
(360) 696-4403  Fax: (503) 657-5779
WA Landscape Contractors License #: ENVIRTCO23RB
Web:  www.etcEnvironmental.net
Email:  John@etcEnvironmental.net

*"Creating Tomorrow's Environment - Today"*

February 16, 2018

Tom Kelly, President
Lacamas Shores Home Owners Association
PO Box 751
Camas, WA  98607

RE:  Possibly failing stormwater system at Lacamas Shores HOA, (Meadowlands Park, Property Identification Number 84839000)

Dear Mr. Kelly,

While mapping wetlands for the LSHOA in Meadowlands Park, I noticed that one of the bubbler systems and filtration fields appears to be failing.  It is shown as Bubbler #2 on the attached drawing.

I am not a stormwater engineer, and so my opinion should be considered that of as a lay person for this matter.  I observed a lot of water gushing up from under the manhole below the B-2 vault, I presume this manhole distributes stormwater to the two underground French Drain pipes shown in the drawing. My guess is that the pipes are plugged or broken, explaining why the water appears to be coming from under the manhole.

This water flows in a narrow channel downslope to Lacamas Lake, whereas the design of the facility is for the flow to be spread out and flow through a bed of herbaceous plants.  In my opinion the system is effectively discharging untreated stormwater directly to the lake rather than filtering it through gravel, soil, and herbaceous plants as intended.

This may be in violation of the permits governing the system.  My intent is only to inform so that the LSHOA may take appropriate actions to avoid being out of compliance with it's permits and responsibilities to maintain the stormwater system.

Sincerely,

John McConnaughey, PWS
Wetland Scientist

Attachment:  Page 54 from: Water Environment & Technology, July 1993.



**Sampling Sites and Drainage Patterns for Lacamas Lake Stormwater Wetland Treatment**

- ■ Storm sewer sediment facility
- △ Stream sample site
- ● Water well
- ▲ Lake sample site
- ⊪ Bubbler (french drain)
- □ Vegetation transect
- — — Drainage basin boundary

## Wetland Stormwater Treatment Site Description

**The residential development is located on the southwestern shore of Lacamas Lake. The southern two-thirds of the site is occupied by residential home lots. The northern third is composed of wetlands and grassy areas. The area directly adjacent to the lake is a forested wetland 15.2 to 30.4 m (50 to 100 ft) wide. From this forested area, areas of emergent wetlands extend southeast 121.6 to 182.4 m (400 to 600 ft).**

**The development site is steep. Surface elevation drops from 106.4 m (350 ft) at the south edge of the project to 57.8 m (190 ft) at the lakeshore. Before development, the area had five major surface-drainage features. As the site has been developed, stormwater runoff from paved surfaces and the flow in four streams has been collected by pipes and catch basins and discharged into the French drains ("bubblers") located along the upgradient edge of the wetlands. The four northern streams are spring-fed and usually flow during dry weather. The fifth stream adjacent to the road and the boat ramp is intermittent and flows only during periods of significant rainfall.**

• • • • • • • • • • • •

Total phosphorus in surface water flowing out of the wetlands (the limiting nutrient in the lake) was consistently below established compliance levels.

No herbicides or pesticides were detected in the first flush samples for 1991 and 1992. Dissolved metals (chromium and zinc) were detected in selected samples, but at levels equal to or less than EPA drinking water standards.

Compliance levels, excluding TP, were exceeded on two of the six monitoring dates during the third year of monitoring. The nitrate concentration at station S4 (below the bubbler in wetland 1) was slightly above the upper compliance level. The soluble phosphorus and nitrate criteria were also exceeded at S2 and S4, respectively. These two parameters were in compliance for the remainder of the monitoring season. Increased nitrate values during the winter warranted closer scrutiny during the fourth year of monitoring to see whether the trend continued.

During the fourth year, the compliance level for nitrate was exceeded on two of the four monitoring dates. As in the third monitoring year, the levels were exceeded in the winter sampling months, and nitrate values for the two transects were in compliance for the remainder of the monitoring season.

# Attachment 7

## City Council Meeting comments

### Susan Oatney <camaskidsrun@yahoo.com>

Mon 7/20/2020 4:59 PM

To: Marie Tabata-Callerame <aikotabcal@hotmail.com>; Steve Bang <stevendbang@comcast.net>

📎 1 attachments (14 KB)
Lacamas shores Biofilter.docx;

Marie, Steve,

I have attached the comments I made to the City Council

Hi, my name is Susan Oatney, and my family and I have lived in Camas since 2008. I have been working for 35 years in the industrial WW treatment industry, solving waste treatment issues for my customers. Many of my customers have direct discharge permits, meaning they do not discharge to a city system, they discharge to a body of water, like a lake, stream, river, ocean, etc. Their permits are exceedingly strict and as part of the "Waters of the US ACT", they, along with the guidance of Federal EPA, are continually trying to improve and better their own discharge to what is now called "Navigatable Waters".

The number of nights I have spent on customer sites fighting to keep them in compliance are incalculable. The number of sleepless nights my customers have endured are again incalculable. Not violating their discharge permits is not only important—it is the most important thing they do. Production will shut down, personnel will go without sleep, 100,000's of thousands will be spent on consultants and outside support to keep industry in compliance. Why—the stakes are very high. Not only for the environment, but for plant management itself. Continued violation of the Clean Waters Act, which as of June 22 was amended to be the "Navigatable Waters Protection Act" can result in a felony and jail time for management. Based on the information shared by Marie Callerame, we have not only exceeded permit guidance for the Lacamas Shores biofilter, but we have violated the maximum threshold for Phosphate and TSS in December and the City Council was notified verbally in June. This is an incredibly serious situation. As mentioned above, industrial customers knowlingly violating this act can and do go to jail!

Those permit guidelines were set for a reason—the Total Suspended Solids, Phosphate, and Conductivity levels are set by determining the safe amount that particular stream can contribute to the lake without harming biology. Health advisers currently warn about using our lake. —we can't let our dogs swim and play in it, we are advised not to swim in it, fish from it must be cleaned a certain way. I myself, along with others, have gotten sick after accidently ingesting water from the lake. It is the crown jewel of our community; yet day in and day out, the Lacamas Shores biofilter and other contributors are allowed to continue polluting it. I know that many within Lacamas shores have been pleading for nearly a decade to get the biofilter fixed. However there is a very loud, yet minority, contingent in the HOA and the city that continually refers to the biofilter as a Wetland. It is not—it cannot be both and is excluded from the navigatable waters protection act. That undeniable factual exculsion is as a storm water control feature. The biofilter is an award winning engineered storm water system that disparately needs maintenance.

I know these are crazy times, but we can do something about this!

# COMPLAINT -EXHIBIT 2



# PLAUCHÉ & CARR
### LLP

*Pacific Northwest Office*
1218 3rd Ave., Suite 2000
Seattle, WA 98101-3235
TEL: (206) 588-4188
FAX: (206) 588-4255

*Gulf Coast Office*
1110 S River Rd., Suite 200
Baton Rouge, LA 70802
TEL: (225) 256-4028
FAX: (206) 588-4255

www.plauchecarr.com

## MEMORANDUM OF TRANSMITTAL

**TO:**    **Lacamas Shores Homeowners Association**
**Donald Trost, President, Lacamas Shores Homeowners Association**
**Ellen Burton, Mayor, City of Camas**

**CC:**    **Michael S. Ragan, Administrator, U.S. Environmental Protection Agency**
**Michelle Pirzadeh, Acting Region 10 Administrator, U.S. Environmental Protection Agency**
**Laura Watson, Director, Washington State Department of Ecology**

**DATE:**    **August 17, 2021**

**RE:**    **Revised Attachment 5 to Steven D. Bang's 60-Day Notice of Intent to File Suit under the Clean Water Act**

---

☐    For your information.

☐    For your signature and return to this office.

☐    Please file original, acknowledge receipt on copy (face sheets only), and return acknowledged copy in enclosed self-addressed envelope.

☑    Other:    Attached please find a revised version of Attachment 5 to Steven D. Bang's August 12, 2021, 60-day notice of intent to file suit under the Clean Water Act. This revised version contains updated units of measurements for TSS, which were reported in µg/L instead of mg/L in the original report (dated April 10, 2021). No other data or other substantive changes were made to the original report. This revised version supersedes the original version of the report, including Table 3 of the report, which is presented on page 7 of the 60-day notice of intent to sue.

TRANSMITTED BY:  Jesse DeNike/Tammy Weisser

Enclosure

# Attachment 5

# 2020 Lacamas Shores Biofilter Status Report

by Marie Tabata-Callerame and Rodger Hauge

## Purpose

1) To investigate the water quality of the stormwater draining from the Lacamas Shores Biofilter ("Biofilter") into the shoreline wetlands of the Conservancy Zone of Lacamas Lake.

2) To determine whether the Biofilter is meeting "compliance criteria", i.e., compliance standards set for the site via City permit.

3) To determine the efficiency of Biofilter by comparing water quality parameters at the inlets against the outlets.

4) To form a shared understanding of the current state of the Biofilter that could allow for repair, restoration and/or enhancement of the Biofilter as needed.

## Abstract

In 2020, Lacamas Lake tested positive for harmful algae toxins 26 out of 29 times between April and October.  The harmful algae blooms occurred along the southwest shoreline of Lacamas Lake, three-quarters of which is bordered by the Lacamas Shores neighborhood.  Stormwater samples taken September 2020 in the Biofilter and the adjacent shoreline wetlands were tested for the three water quality parameters shown to be of concern in recent tests.  Those three parameters are total phosphorus µg/L ("TP"), total suspended solids mg/L ("TSS") and conductivity uS/cm.  The results indicated that the water coming into the Biofilter had better water quality values than the water discharged.  The Biofilter was unable to slow the flow of water coming through the drainage system.  Under fast flowing/high-volume conditions, the results for TP, TSS and conductivity at the outlets were elevated above inlet conditions.  Those elevated concentrations put the stormwater outlets well over the compliance levels for those water quality parameters.  By comparing the 1990 results with current results, we see that inlet/incoming concentrations are little changed; the efficiency of the Biofilter today is degraded.

## Background

Built in 1988, the Biofilter consists of 5.62 acres of stormwater treatment wetlands owned solely by the Lacamas Shores Homeowners Association ("LSHOA").[1]  The Biofilter works by collecting stormwater runoff from LSHOA properties[2] and routing the runoff into a bubbler system where it is released below ground into the treatment wetlands.  The Biofilter was designed to process the stormwater from approximately 36.4 acres of the Lacamas Shores development[3] before reaching the Lake and its shoreline wetlands.

Excerpts from a 1993 national magazine article about the Biofilter[4] summarize its intended design:

> "The Washington Department of Ecology required that the quality and quantity of stormwater runoff from the [Lacamas Shores] development could not exceed pre-development conditions.  Therefore, runoff discharged to the lake had to be treated and detained in an on-site facility [i.e., the Biofilter] before discharge."

> "French drains, or 'bubblers,' were designed to direct runoff below grade and create a sheet flow several centimeters deep that enters the upgradient edge of the emergent [treatment] wetlands.  The wetlands then 'treat' the inflowing stormwater before it enters Lacamas Lake."

The only surface water connection between the Biofilter's treatment wetlands and the shoreline wetlands of Lacamas Lake (the "Lake") is under two concrete bridges embedded in the Heritage Trail.  Aerial maps of the Biofilter are contained in Appendices A, B, and C.  Storm drainage facilities of the Biofilter are shown in red.

The largest part of the Biofilter is the filtering biology and sediments.  The Stormwater Partners of SW Washington explains that stormwater treatment wetlands ". . . treat stormwater through the biological processes associated with aquatic plants. These facilities use dense wetland vegetation and settling to filter sediment and oily materials out of stormwater."[5]  Their webpage as also states that "As stormwater passes through the

---

[1] For this report, the "Biofilter" means the stormwater treatment wetland/facility on the LSHOA common property adjacent to the shoreline along Lacamas Lake.  It is next to but separate from the 0.25-acre Lacamas Shores Bioswale and Sediment Settling Pond system.  The "Swale/Pond" system is not part of the testing in this report.

[2] Approximately 65 of the 254 LSHOA lots drain into the Biofilter according to the map in Appendix E.

[3] Appendix E shows the sections that drain into the Biofilter: J, K and an unlabeled area.  J+K=32.0 acres. The unlabeled area drains 4.4 acres according to a 1991 "Shipler Property Bio-Filter Basins Map" (p. 19) where it is labeled as "K".  Therefore, as designed, the Biofilter should have a total drainage basin of 36.4 acres.  Mackay & Sposito, 9 July 1996, *Modifications to Lacamas Shores Stormwater Disposal System: Drainage Calculation*, p. 19.

[4] See Appendix F, pages 50 and 52.

[5] Stormwater Partners. *Stormwater Facilities.* Accessed 03/28/2021. https://www.stormwaterpartners.com/facilities-treatment-wetland and https://www.stormwaterpartners.com/facilities-biofiltration-swale.  The density of the plants' root systems is important to effective filtration.

plants, pollutants are removed by the combined effects of filtration, infiltration, and settling."  (Fig.1 [6])

Figure 1. Key Principals of Stormwater Biofiltration.



Properly dense and well rooted vegetation is key. Vegetation "[s]erves multiple roles in water treatment via uptake, transformation to organic forms, carbon provision to microbes, transpiration reducing stormwater volume, stabilising media surface, helping to maintaining infiltration rates, provides cooling to surrounding environment, amenity and aesthetics. The microbial community associated with plant roots facilitates uptake, decomposition and transformation of stormwater pollutants and plant litter."[7]

Pollutants collected from filtered stormwater leave a biofilter in only three major ways: use by plants and the attached microbes for biochemical processes; physical removal of dead or dying/seasonal plant matter and sediments; or flowing into the lake in dissolved form or attached to solids.

All filtration systems require maintenance to their filters.  For biofilters, that means removal of dead or seasonal plant matter and sediment.  According to Clark County, "Proper maintenance helps ensure that facilities operate as they were designed and that trapped pollutants, such as sediment and oils, are cleaned out _so that the facilities do not become pollutant sources_."[8] [emphasis mine]  Maintenance was considered important enough that the City permit for the property required the creation of the LSHOA specifically to ". . . be responsible for monitoring and maintaining the storm drainage system . . .",[9] at Ecology's directive (Appendix K).

---

[6] Payne, E.G.I., Hatt, B.E., Deletic, A., Dobbie, M.F., McCarthy, D.T. and Chandrasena, G.I., 2015. _Adoption Guidelines for Stormwater Biofiltration Systems_ - Summary Report, Australian Government, Department of Industry and Science, Melbourne, Australia: Cooperative Research Centre for Water Sensitive Cities. p.3 "_Figure 1.  Key Principles of Stormwater Biofiltration_"

[7] _Adoption Guidelines For Stormwater Biofiltration Systems_, Table 1. Key components of stormwater biofilters and their functional roles from p. 7.

[8] _Clark County Stormwater Manual 2015, Book 4 – Stormwater Facility Operations and Maintenance_, Clark County, Washington, November 24, 2015, p. 1.  https://clark.wa.gov/sites/default/files/dept/files/environmental-services/Stormwater/Code/ccsm2015-book-4.pdf.

[9] City of Camas. 15 June 1988. _City of Camas Permit No. 2-87 (C-2-87) and Shoreline Conditional Use Permit, Camas Permit No. 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._  https://www.lacamasshoresbiofilter.org/uploads/1/2/2/5/122588755/ls_hoa_approved_permit_june_1988.pdf  See bullet #12.

08/16/2021

In a 1993 letter from Doug Quinn of the City of Camas[10] ("City"), it was noted that the Biofilter's treatment wetlands worked to reduce pollutants.  Quinn quoted the firm that conducted the 5-year Monitoring Program required by permit[11]: "In cases where the in-flowing concentrations of the monitored water quality parameters are greater than the established site-specific levels, there is always a decrease in these parameters after passing over the wetlands."

The Monitoring Program was designed specifically to measure the efficiency of the Biofilter and set compliance standards to protect the water quality ("WQ") entering the Lake.  The Program and the standards were required by the 1988 SDP/CUP Permit and 1988 Agreed Order.  The Order was entered by the Shoreline Hearings Board with the agreement of the City and Washington Department of Ecology.

Specifically, the permit required "triggers" (i.e., "compliance criteria" or "compliance standards") to be created after the first year of the Monitoring Program.[12]  Those criteria were published in the annual reports for the Monitoring Program and sent to Ecology.[13]  They were also published in a 1993 article about this innovative Biofilter in a national water technology magazine. See Table 1 from Appendix F and Appendix G.

Table 1.  Compliance Standards Required and Set by City of Camas Permit (Appendix F)

| Compliance Criteria Determined from Site Monitoring | | | |
|---|---|---|---|
| | | Compliance level* | |
| Parameter | Units | Bubbler, wetland 1 (S4) | Bubbler, wetland 2 (S2) |
| **Primary** | | | |
| TP | mg/L | 0.118 [0.223] | 0.110 [0.251] |
| PO₄ | mg/L | 0.061 [0.131] | 0.042 [0.090] |
| NO₃ | mg/L | 0.159 [0.565] | 0.188 [0.607] |
| **Secondary** | | | |
| pH | | 6.3 [4.7–7.9] | 6.1 [4.4–7.8] |
| Conductivity | µmho/cm | 63 [97] | 87 [135] |
| TSS | mg/L | 19.4 [51.6] | 25.8 [72.0] |
| Oil and grease | mg/L | 1.5 [4.2] | 1.8 [4.5] |
| Chromium | mg/L | Wash. wq stds.ᵇ | Wash. wq stds. |
| Copper | mg/L | Wash. wq stds. | Wash. wq stds. |
| Lead | mg/L | Wash. wq stds. | Wash. wq stds. |
| Zinc | mg/L | Wash. wq stds. | Wash. wq stds. |
| Organophos-phate pesticides | µg/L | detection limit | detection limit |
| Chlorinated pesticides | µg/L | detection limit | detection limit |
| Chlorinated herbicides | µg/L | detection limit | detection limit |

*Numbers in brackets are the compliance concentration plus twice the standard deviation.
ᵇWash. wq stds. = Washington state water quality standards.

After 1993, an adjacent but separate "swale/pond system" was added to accommodate re-routed stormwater from another 38.0 acres of LSHOA properties southeast of the swale.[14]

---

[10] Quinn, D.  Letter re: "Lacamas Shores Shoreline Permit", Received by the "Shoreline Committee Members", 22 June 1993, page 6.  This letter was included in the 1993 Permit Revisions packet.  Quinn was the Director of Public Works and City Engineering.

[11] City of Camas Permit. See bullet 9b. "During the first year, discuss appropriate use of the background data to produce maximum contaminant levels.  Most likely, these will have to use concentration values (mg/L). Develop the 'formula' to convert concentrations into implementation trigger. This will be done in conjunction with Ecology."

[12] City of Camas Permit.  See bullet 9c. "Implement the trigger criteria at the end of the first year. "

[13] Final year report: SRI/Shapiro, Five-Year Stormwater Runoff and Wetland Biofilter Monitoring Program for the Lacamas Shores Development: Fifth Year Report, March 11, 1994.  See also the appendices in Appendix G below.

[14] Mackay & Sposito, 9 July 1996, Modifications to Lacamas Shores Stormwater Disposal System: Drainage Calculation, p. 19.  Shipler Property Bio-Filter Basins Map

During the Biofilter's first years, the property, named "Meadowlands Park" by the developer, was a mix of grassland and wetmeadow with a few scattered trees. Now, the Biofilter's wetlands are a mature stand of pacific willow, red alder, and other riparian species.

### Historical Scientific Data

One way to test the efficiency of any filtration system is to compare what goes into it against what comes out of it. The majority of data about the Biofilter's efficiency comes from 1988-1993, as listed in the 5-Year Monitoring Program's last annual report in Appendix A, Table 1.[15] (Appendix G)

Between 1993 and last September, there had been no tests comparing the major water quality parameters at the inlets to those at the outlets. The only known tests of the Biofilter since 1993 are:

- 04/2018 - Chemical Oxygen Demand ("COD") grab samples testing inlets and outlets (Appendix H).
- 12/2019 - City of Camas/Otak/BSK Outlet Samples testing outlets for organic and inorganic parameters (Appendix I).
- 05/2020 - City of Camas/Otak/BSK Outlet Samples testing outlets for organic and inorganic parameters (Appendix J).
- 09/2020 – Current sampling ("Current") testing inlets and outlets for the three major parameters, the main topic of this report (Table 3).

In 2019, the City committed to testing the stormwater runoff from the Biofilter. Using the sampling locations in the Monitoring Program, the City selected the two outlet locations closest to the Lake for sampling. The City did not include the compliance points, although it is unclear whether the City knew of the compliance locations at the time of the testing. The City did not include inlet points in their testing, so there was no determination of the Biofilter's effectiveness. While the City contracted for quarterly testing of the two points, only two tests were conducted between Dec 2019 and Dec 2020.

---

[15] The full report is here: Bautista, Mark and Geiger, Stan (11 March 1994) *Fifth Year Report: 5-year Stormwater Runoff and Wetland Biofilter Monitoring Program for the Lacamas Shores Residential Development*. SRI/Shapiro, Lake Oswego, OR.

The City's December 2019 test and the 2018 chemical oxygen demand ("COD") sample results indicated that there may be a problem with the Biofilter's efficiency[16].  However, the 5.62-acres of the filtering biology and sediments of the Biofilter have not been maintained or modified since inception.  The reason was the understanding explained in a letter written in 2018 by Ecology stating that "In this case, Ecology is unlikely to approve the CUP Permit" to allow vegetation removal other than invasive species.[17] The City's response to that letter was, as before, to disallow all maintenance that might require tree removal.  While the City has required the LSHOA to complete some maintenance to pipes and the adjacent biofiltration system,[18] there are no plans to require maintenance to the largest part of the Biofilter - the filtering plant biology and sediments (Fig. 2 [19]).  While there are plans to work with Clark County and the State to address Lacamas Lake's toxic algae problem,[20] there are currently no commitments to test/monitor any other Lake inlets nor the effectiveness of any biofilters in treating stormwater.

Figure 2.  The "Filter" of the Biofilter Remains Un-maintained



Lacamas Shores HOA Biofilter Maintenance since 1993

as of 2020

● Maintained area
● Neglected area

---

[16] The 2018 COD Grab sample testing of inlets and outlets shows that the outlets had worse WQ than the inlets (Appendix H).  The December 2019 WQ testing by the City of Camas showed all three parameters were out of compliance and above the maximum allowable levels (Appendix I).

[17] Rothwell, Rebecca. Letter to R. Maul and S. MacPherson. *Re: Lacamas Shores Wetlands.* 22 Feb 2018. https://www.lacamasshoresbiofilter.org/documents.html. p. 3.  The author of the 2018 Ecology letter qualified her conclusion, stating that she "had found no evidence that the wetland was constructed from upland for the purpose of stormwater treatment or detention."  It is likely that the author was unaware of a letter Ecology wrote in 1988 (Appendix K) showing their clear expectation that the Biofilter property was to be used and tested as a "wetland filtering" system that was "on the periphery" of what they knew about biofiltering efficiency at that time.  The 1988 letter and the compliance standards were brought to light by M. Tabata-Callerame in a 2020 email to Steve Wall.  Tabata-Callerame, M. "Re: RE: Lacamas Shores failed biofilter test plan/results". Email to Steve Wall. 05/26/2020.

[18] The HOA has maintained the following: the nearby bioswale and sediment settling pond system ("swale/pond system") via annually removing the vegetation and periodically dredging; the Biofilter bubblers pipes in 2019 for the first time by cleaning them out from the inside; and the manholes coming from the City's storm vaults.

[19] *The Promise of the Lacamas Shores Biofilter: The Meadowlands Biofilter "Rediscovered" - FAQs.*  (n.d.) https://www.lacamasshoresbiofilter.org/faqs.html, Accessed 2/11/2021.

[20] In 2020, Lacamas Lake tested positive for harmful algae toxins 26 out of 29 times between April and October, per the Dept. of Ecology's website. Wa Dept of Ecology, 2020, *Washington State Toxic Algae: Freshwater Toxic Algae Bloom Monitoring Program [Lacamas Lake]*, https://www.nwtoxicalgae.org/Data.aspx?SiteID=94.  Reports of toxic algae blooms substantially increased from two in 2018, to three or four in 2019 (one test officially recorded on the toxic algae website in June, others were reported by residents in September and October after funds for the testing program had depleted), to the near-continual toxic algae blooms in 2020.  Reports for Round Lake are similar.

**Citizen Testing**

On September 23, 2020, samples were collected of runoff flowing into the Biofilter and from the outlets flowing into the Lake. These samples were delivered to Columbia Laboratories for analysis. The purpose of this testing was to provide a snapshot in time of the Biofilter's effectiveness. This snapshot only addressed the parameters that were non-compliant in the 2019 and 2020 testing: total phosphorus ("TP"), total suspended solids ("TSS") and conductivity.

**The Collection Process**

Sample locations were selected based on the inlets and outlets sampled in the Monitoring Report. The City's sampling locations L1 and L2,[21] also chosen from the Monitoring Report, were added to allow for comparison to the City's December and May samplings. Samples were taken as listed chronologically in the Table 3. Sample locations were documented on Columbia Laboratories ("Lab") Environmental Chain of Custody Record by Marie Tabata-Callerame before sampling. The collection process was video recorded by reporter John Ley.

Optimal timing for sampling would have been during the first flush of the month, which occurred September 18th and 19th, when it rained 2.16 inches after several dry days. However, due to the unusually large amount of wildfire smoke before the first flush, the decision was made to use the second flush, which occurred September 23rd. On that day, sampling was accomplished in a moderate rain.

All sample containers were delivered from the Columbia Laboratories by the vendor to Todd Schoenlein's house in a cooler. There were 250 ml plastic bottles containing 2 ml of dilute sulfuric acid for each Total Phosphorus ("TP") sample and 1-liter plastic bottles without acid preservative, i.e., empty, for each total suspended solids ("TSS")/ conductivity sample.

Containers were labeled by Schoenlein. Tabata-Callerame verified the sampling locations and proper labeling. Samples for B1, B2, S2, and S4 were taken by Prof. Rodger Hauge. Samples for L1 and L2 were taken by Schoenlein. Only Schoenlein and/or Hauge handled open collection containers and put them in the storage cooler. Samples were transported from site to car by Schoenlein and Hauge, then to the Lab by Schoenlein and Ley.

---

[21] The City's sampling locations were shown in a document provided by the City's Director of Public Works Steve Wall. "Exhibit A: City of Camas, Quarterly Sampling of Outfalls, Scope of Work, Otak Project #19447, November 13, 2019." was attached to: Wall, Steve. *RE: Lacamas Shores failed biofilter test plan/results.* Message to Steven D. Bang. 05/15/2020. Email.

08/16/2021

## Standard Operating Procedures

The samplers wore gloves to avoid sample contamination. Onsite, Hauge tested water temperature in-stream using an aquatic thermometer. He tested pH using a broad range LaMotte pH test kit.

All samples for TP, TSS and conductivity were processed and reported by Columbia Laboratories (Appendix D).

Figure 3. Diagram of Biofilter Waterflow



## Sampling Observations

Please see the maps in Appendix A-C and/or Fig. 3 for reference.

Figure 4. B2 Inlet manhole cover after 20 min. of rain

1. Inlet B2 was overflowing on the day/time it was sampled (Fig. 4). The water was flowing vigorously out the top of the manhole and flowing down a channel through the Biofilter towards the Lake.[22] No measure of flow was made.

2. Inlet B1 was also overflowing but with less volume than B2. There was evidence that there had been excavation around B1.[23]

3. The volume of the stream at S4 was much smaller than any other inlet or outlet tested.

4. The separate sediment settling pond system ("swale/pond system") was functioning. The swale has stormwater running through it and was flowing into the swale/pond system as designed (Appendix E). The swale vegetation was short and well maintained. The pond was discharging through two black outlets into the shoreline wetlands upstream of the L2 location.

---

[22] It was noted two weeks later, after a rain, that stormwater was seen flowing from the bottom of the B2 manhole riser down a channel into the Biofilter.

[23] It was noted two weeks later, after a rain, that the B1 manhole cover was observed as underwater. On 02/28/2021, the manhole was observed to be fully submerged.

5. The stormwater running from S4 (the Biofilter outlet) converged with water from the black outlets of the swale/pond to run through L2 and into the Lake. The volume coming from the two black swale/pond outlets was much greater than the volume coming from S4.

6. Stormwater at the Biofilter outlets showed visible suspended solids. Stormwater at the Biofilter inlets appeared clearer in comparison, indicating erosion of sediment as it flowed across the Biofilter.

7. The only surface water connection between the Biofilter and the shoreline wetlands are underneath two concrete bridges on the Heritage Trail, one located at S2 and the other at S4. All water exiting the Biofilter as surface water must go through one or the other of these two points.

8. The S outlet locations are compliance points at the Biofilter's exits. The L outlet locations are 16-30m downstream of the S locations and are within the shoreline wetlands near the Lake waterbody.

Tables 2a, 2b, and 2c. Precipitation Results for Recent Sample Dates from the NOAA Database for Station # US1WACK0029, located in Camas, WA, (45.584519, -122.373998).

| Date 2019 | Precipitation (inches) | Samples taken | Date 2020 | Precipitation (inches) | Samples taken | Date 2020 | Precipitation (inches) | Samples taken |
|---|---|---|---|---|---|---|---|---|
| 12/15 | 0 | | 5/10 | 0 | | 9/15 | 0 | |
| 12/16 | 0 | | 5/11 | 0 | | 9/16 | 0 | |
| 12/17 | 0 | | 5/12 | 0.33 | | 9/17 | 0 | |
| 12/18 | 0 | | 5/13 | 0.07 | | 9/18 | 1.96 | 1st flush |
| 12/19 | 0.9 | X | 5/14 | 0.17 | | 9/19 | 0.2 | |
| 12/20 | 0.1 | | 5/15 | 0.19 | | 9/20 | 0 | |
| 12/21 | 0.88 | | 5/16 | 0.02 | | 9/21 | 0 | |
| 12/22 | 0.06 | | 5/17 | 0.36 | | 9/22 | 0 | |
| 12/23 | 0.24 | | 5/18 | 0.47 | | 9/23 | 0.69 | X |
| 12/24 | 0.02 | | 5/19 | 0.36 | | 9/24 | 0.77 | |
| 12/25 | 0 | | 5/20 | 0.03 | | 9/25 | 0.77 | |
| 12/26 | 0 | | 5/21 | 0.64 | X | 9/26 | 0.25 | |
| | | | 5/22 | 0.09 | | 9/27 | 0 | |
| | | | 5/23 | 0 | | 9/28 | 0 | |

9. See the precipitation information in Tables 2a-c showing the amount of rain for the recent datasets. Sampling during the first 12-hours of a storm event is the proper protocol for stormwater sampling, according to Ecology.[24] For the Current

---

[24] Stormwater sampling standards require sampling during ". . . the first fall storm event each year. The [NPDES] permit defines the first fall storm event as the first time after October 1st that precipitation occurs and results in a stormwater discharge from the facility." It is also stated that one should "Collect samples within the first 12 hours

sampling (as with the Dec 2019 sampling), the prior 3 days were rainless.  Note that the May 2020 sampling was taken outside that protocol.

10. Biofilter vegetation was consistent with typical riparian species, including red alder and pacific willow.


## The Test Results

## September 23, 2020 Data ("Current")

The dataset resulting from the 09/23/2020 sampling ("Current") is summarized in Table 3, illustrated in Appendices A, B and C, and is compared to datasets from the 1990's and the more recent 2019 and 2020 datasets ("Recent") in Tables 4-8.  The Current dataset (Table 3) shows that:

- The results for the inlets are high for most parameters,
- The results for the outlet compliance points are higher than the inlets, i.e., the water is more contaminated going out of the Biofilter than it was coming into the Biofilter.
- The results for the points that the City tested (L locations) have values lower than their respective upstream compliance points (S locations).

- All inlets and outlets are above the acceptable levels set by City permit.


Note: To understand these observations better, reference Figure 3 or the maps in Appendices A, B, and C, each of which illustrate the locations from which the samples and measurements were taken.

---

of stormwater discharge. If you are not able to collect a sample within the first 12 hours, collect the sample as soon as possible. In the sampling records, keep documentation explaining why you could not collect samples within the first 12 hours." Washington State Department of Ecology.  "Stormwater Sampling Manual: A guide for the Industrial Stormwater General Permit". December 2015. Olympia, WA. Publication No. 15-03-044. p. 16

## Table 3. Sample Information and Results (listed chronologically)

| | Sample Collection Taken From | Time Taken | pH | Water Temperature | TP µg/L | CC TP [Max] | TSS mg/L [25] | CC TSS [Max] | Conductivity uS/cm | CC Cond. [Max] |
|---|---|---|---|---|---|---|---|---|---|---|
| **B1 Inlet** | Waterflow outside the manhole cover near athletic field (west edge of cover) | ~~13:55~~ 14.02 | 6.5 | 17°C | 145 | | 14 | | 83.5 | |
| **B2 Inlet** | Water overflowing the top of the manhole by the SW Corner | 14:22 | 6.0 | 18°C | 225 | | 98 | | 71.8 | |
| **S2 Outlet** | Channel coming out of the lakeside (N) of west bridge COMPLIANCE POINT | After B2 | 6.5 | 18°C | 555* | 110 [251] | 260* | 25.8 [72] | 115 | 87 [135] |
| **L1 Outlet** | Channel downstream of S2 before reaching the Lake - City sample location for Dec 2019 and May 2020 | After S2 | - | - | 319 | | 140 | | 90.5 | |
| **S4 Outlet** | Channel before entering east bridge[6] (S) COMPLIANCE POINT | 14:44 | 6.0 | 18°C | 976* | 118 [223] | 184* | 19.4 [51.6] | 105 | 63 [97] |
| **L2 Outlet** | Channel downstream of S4 and the sediment pond outlets before reaching the Lake - City sample location for Dec 2019 and May 2020 | 14:50 | - | - | 135 | | 82 | | 84.8 | |

*Indicates that the reading is higher than any reading taken at that location, including since 1988.

Note that the maximum standard allowed ("max allowed") is calculated as the compliance level plus two standard deviations.  It was set to require maintenance action and/or to indicate a violation of the permit.[26]

[25] This report and Appendix B were edited 8/16/2021 to correct the units of measurements for TSS, which were consistently and erroneously reported in µg/L instead of mg/L in the initial report (dated 4/10/2021).  No other changes to data nor substance of the report were made.  The TSS <u>values</u> throughout the 4/10/2021 report were correct for mg/L.  Ex: A TSS of 14 reported in µg/L should have been reported as a TSS of 14 in mg/L.

[26] "In general, water quality values outside the range of *two standard deviations* from the baseline were considered of concern and warranting further consideration as to origin and impacts. . . . Exceeding the criteria would

At the compliance locations, Current TP and TSS are the highest ever recorded for those points.  For S2:
- All three parameters are over the compliance level.
- TP is 5x the compliance level and over double the max allowed,
- TSS is 10x the compliance level and over 3 times the max allowed.

The S4 results show similarly noncompliant WQ levels:
- All three parameters are over the compliance level.
- TP is 8x the compliance level and over 4x the maximum allowed,
- TSS is 9x the compliance level and also over 3 times the maximum allowed (about the same as S2).
- Conductivity is also over the maximum allowed.

The L2-S4 difference is explained by dilution with the swale/pond outlet.  The stream coming from S4 merges with the much larger volume from the swale/pond system.  It is likely that any eroded sediments from the adjacent swale gets settled out into the pond.  That would be expected, since the City has required that system to be annually mowed with the clippings taken away, as well as periodically excavated.  The swale/pond system was not sampled.

The L1 point (downstream of S2) seems to have been either diluted or filtered between the two points, but no surface water source is visible.

---

provide a signal that the particular monitored parameter was varying outside of the annual baseline conditions and that it may be necessary to implement contingencies."  5-Year Monitoring Program Report. p. 5. Per Ecology, such "contingencies" could include ". . . the development of a tightlined offsite stormwater facility." Appendix K, p.3

08/16/2021

**Compared to Prior Datasets**

Is the Current stormwater sample better or worse than in the past?  Are there more pollutants in the water now than when the Biofilter was created?

Comparing the Current parameter readings with the maximum readings at either compliance point shows that the Biofilter is not working as it was in the 1980-90's (Table 4).  Note the low maximum and minimum readings for TSS, indicating a low rate of erosion in the system and/or a high sediment settling rate.

Table 4. 1988-93 Minimum and Maximum Levels Recorded at the Compliance Locations

| S2 and/or S4 | Min Recorded | Max Recorded | Sept 2020 S2 | Sept 2020 S4 |
|---|---|---|---|---|
| Conductivity uS/cm | 33 | 162 | 115 | 105 |
| TP µg/L | 28 | 243 | 555 | 976 |
| TSS mg/L | 0.5 | 66 | 260 | 184 |

To easily compare the Current results from Table 3 to prior datasets, Tables 5 and 6 are configured to show the flow of water.  The applicable compliance criteria were added for reference.

Table 5 compares the inlet on the westside of the Biofilter (B2) with the compliance point outlet on the same side (S2).  It also shows the most recent datasets from the 1990's taken within 14 days of the same date of each of the recent datasets (Appendix G).  There are some interesting observations.  Specifically, the TP, TSS and conductivity concentrations coming into the Biofilter are relatively the *same* as they were in the 1990's.  Flow rate was not measured to determine total load.

Table 5.  Westside of Biofilter Comparison: Inlets vs. Outlets and Current vs. 1990's

| B2 ⇨ S2 | Inlet B2 | | | | Outlet at Compliance Point S2 | | | | Determined 1989-90 S2 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 10/03 1990 | 09/24 1992 | 09/22 1993 | 09/23 2020 | 10/03 1990 | 09/24 1992 | 09/22 1993 | 09/23 2020 | Compliance levels | Max Level allowed |
| Water Temp °C | 14.0 | 14.1 | 12.6 | 18°C | 13.5 | 13.1 | 8.8 | 18°C | | |
| pH | 6.5 | 6.50 | 6.02 | 6.0 | 6.61 | 5.70 | 6.21 | 6.5 | 6.1 | 4.4 - 7.8 |
| Conductivity uS/cm | 48 | 75 | 90 | 71.8 | 118 | 100 | 105 | 115 | 87 | 135 |
| TP µg/L | 303 | 287 | 70 | 225 | 140 | 124 | 23 | 555* | 110 | 251 |
| TSS mg/L | 114.0 | 84.0 | 0.6 | 98 | 46.0 | 13.3 | 7.0 | 260* | 25.8 | 72.0 |

Refer to Figure 3 for waterflow diagram

Some observations:

- The water was 2-4 degrees colder in the 1990's.
- The water entering the Biofilter in the 1990's was not dissimilar in WQ to the water entering the Biofilter now in Conductivity, TP, and TSS; the 3 major parameters.
- The WQ at the outlets was much improved over the inlets in the 1990's for all three major parameters.
- The contrast in WQ results show the deterioration of the Biofilter's effectiveness.
- While the 1990's results were sometimes over the compliance levels, the TP and TSS levels were not recorded to be over the max allowed.
- The Current results were well over the max allowed for both TP and TSS, by multiple factors.

The eastside of the Biofilter is captured in Table 6.  The results were similar to the westside - the incoming stormwater concentrations were similar between the 1990's and

08/16/2021

the Current dataset, but the difference between the outgoing concentrations were considerable.  The 1990's outlet parameters decreased for each whereas the Current outlet parameters markedly increased (x6 for TP and x13 for TSS).

Table 6. Eastside of Biofilter Comparison: Inlets vs. Outlets and Current vs. 1990's

| B1 ⇨ S4 | Inlets B1 | | | | Outlets at Compliance Point S4 | | | | Determined 1989-90 S4 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 10/03 1990 | 09/24 1992 | 09/22 1993 | 09/23 2020 | 10/03 1990 | 09/24 1992 | 09/22 1993 | 09/23 2020 | Compliance levels | Max Level allowed |
| Water Temp °C | 14.0 | 11.8 | 11.1 | 17 C | 14.0 | 13.0 | 9.6 | 18 C | | |
| pH | 6.15 | 6.00 | 5.88 | 6.5 | 6.93 | 5.40 | 6.16 | 6.0 | 6.3 | 4.7 – 7.9 |
| Conductivity uS/cm | 66 | 93 | 74 | 83.5 | 58 | 83 | 72 | 105 | 63 | 97 |
| TP µg/L | 1200 | 129 | 84 | 145 | 121 | 99 | 88 | 976* | 118 | 223 |
| TSS mg/L | 225 | 2.7 | 0.6 | 14 | 12.7 | 5.8 | 10.0 | 184* | 19.4 | 51.6 |

Refer to Figure 3 for waterflow diagram

Like Table 5, Table 6 shows that in the 1990's, the water was similar to the Current stormwater coming into the Biofilter, and was again much cleaner exiting.

Note the 10/3/1990 dataset for TP.  Even though inlet concentration was abnormally high (1200 µg/L), the Biofilter brought it down to 121µg/L, well below the max level, showing the power of an efficient biofilter system.

Because the only locations that were tested three times within the last two years were the outlet points L1 and L2, Tables 7 and 8 were created to compare those "Recent" results to the 1990's results, next to their upstream compliance levels.

Table 7.  Historical Comparison: L1 Westside Biofilter Outlet to Lake

| L1 | 5-yr Monitoring Program | | | City/Otak | | Current | Upstream Standard | |
|---|---|---|---|---|---|---|---|---|
| | 12/20/91 | 04/30/92 | 09/22/93 | 12/19/19 | 05/21/20 | 09/23/20 | Compliance levels for S2 | Max Level allowed S2 |
| Water Temp °C | 7.0 | 15.5 | 16.3 | - | - | (18°C up-stream at S2) | | |
| pH | 5.78 | 6.14 | 6.55 | 7.2 | 7.4 | (6.5 up-stream at S2) | 6.1 | 4.4 - 7.8 |
| Conductivity uS/cm | 71 | 61 | 108 | 94 | 120 | 90.5 | 87 | 135 |
| TP µg/L | 74 | 68 | 42 | 270 | 71 | 319 | 110 | 251 |
| TSS mg/L | 7.0 | 11.0 | 10.8 | 140 | 11 | 140 | 25.8 | 72.0 |

Refer to Figure 3 for waterflow diagram

Table 7 shows that when comparing the recent datasets to the1990's datasets taken at the same time of the year, the water now is:
- hotter,
- pH is higher,
- the conductivity is generally higher (meaning there are now more dissolved solids in the water),
- TP is much higher (doubled, similar, and x8, respectively), and
- TSS is much higher (x20, same, x13, respectively).
- While there was one non-compliant reading in the 1990's dataset, there were no violations over the max allowed.  The Current dataset has three non-compliant readings, two of which are also over the max allowed.
- The Dec 2019 dataset and the Current dataset are consistent with each other.

Both TP and TSS were above the upstream compliance levels (x3 and x5, respectively) and above the maximum levels (127% and 194% of those max levels, respectively)

08/16/2021

The anomaly for L1 in the recent datasets is the May 2020 set, which looks more like the 1990's datasets than the recent ones. While it is shows a higher concentration for conductivity, it is lower than all other recent datasets for TP and TSS. This is likely due to being taken after 9 days of rain (Table 2b).[27]

When looking at Table 8, it is important to note that the swale/pond system was added sometime after 1993.  Therefore, while the L2 results from the 1980's and 1990's were measuring only the Biofilter, the L2 from the recent datasets measured a mix of stormwater from the Biofilter and a larger volume of stormwater from the swale/pond system.

Table 8.  Historical Comparison: L2 Eastside Biofilter Outlet to Lake

| L2 | 5-yr Monitoring Program | | | City/Otak | | Current | Upstream Standard | |
|---|---|---|---|---|---|---|---|---|
| | 12/20/91 | 04/30/92 | 09/22/93 | 12/19/19 | 05/21/20 | 09/23/20 | Compliance levels for S4 | Max Level allowed S4 |
| Temp °C | 5.0 | 14.9 | 14.7 | - | - | (18°C upstream at S4) | | |
| pH | 6.19 | 6.42 | 7.60 | 7.2 | 7.6 | (6.0 upstream at S4) | 6.3 | 4.7-7.9 |
| Conductivity uS/cm | 71 | 57 | 83 | Not Detected | 79 | 84.8 | 63 | 97 |
| TP µg/L | 104 | 79 | 30 | 62 | 71 | 135 | 118 | 223 |
| TSS mg/L | 7.3 | 11.0 | 3.3 | 19 | 6.8 | 82 | 19.4 | 51.6 |

Refer to Figure 3 for waterflow diagram

---

[27] The City's May 2020 sampling day was on the 10th consecutive day of rain.  While the May 2020 TP samples were not above the Biofilter's site-specific compliance levels of 110 µg/L and 188 µg/L, the west outlet result of 71 µg/L was above the EPA's recommended level of 50 µg/L as well as above the 2007 baseline levels for Lacamas Lake of 32-50 µg/L.   Schnabel, Jeff and Hutton, Robert.  "Monitoring Report: Lacamas Lake Annual Data Summary for 2007", *Clark County Public Resources.* June 2008.  After 9 days of rain, a lower concentration should have been expected, closer the minimum levels recorded in Table 3.

08/16/2021

The trends in Table 8 are in line with those in Table 7, i.e., the stormwater is still non-compliant for all three parameters.  However, only TSS is found above the maximum level (160%), despite the upstream S4 compliance point concentrations being above maximum for all parameters.  This is explained by visible dilution with the swale/pond system.  In hindsight, the outlets from the swale/pond should have also been sampled to confirm this hypothesis.

Also different in Table 8 is that the Dec 2019 L2 result is not similar to the Current L2 result.  It could be that since Dec 2019 had a high volume of rain, a higher volume coming from the swale/pond may have better diluted the S4 water before reaching the L2 outlet point.   Note that for L2, the Current dataset is the most deviated from the other two recent datasets, although it is similar to the 1991 dataset in TP and conductivity.

The graphs in Figures 5-7 give a visual comparison of the 1990 datasets to the Current dataset for the eastside locations, showing how different the changes in stormwater WQ parameters are now between entry and exit of the Biofilter.

Figure 5. Comparative Stormwater TP Concentrations: 1990s vs. Current for Inlet, Compliance Outlet, and Lake Outlet



Fig. 5 shows the comparison between the Current dataset, where TP elevates significantly after traveling through the Biofilter, and the 1990's datasets, where TP drops, even when the stormwater is already relatively "clean".  Note that the Current TP level is typical at the inlet compared to the inlets of the 1990's, i.e., the TP concentration is not higher now than it was recorded in the past.  The Biofilter did not lower the same TP concentration in the Current stormwater that it had treated in the 1990's.

The results for TSS are similar (Fig. 6).

Figure 6. Comparative Stormwater TSS Concentrations:
1990s vs. Current for Inlet, Compliance Outlet, and Lake Outlet



Figure 7 shows that the Biofilter does not appear effective to decrease conductivity, neither now nor in the 1990's.  Instead, it increases conductivity in the stormwater.  Conductivity only decreases for each dataset between the S and L locations, perhaps due to dilution.

Figure 7. Comparative Stormwater Conductivity Concentrations:
1990s vs. Current for Inlet, Compliance Outlet, and Lake Outlet



**Discussion**

The WQ of the stormwater going into the Biofilter for the Current dataset is above the compliance criteria set for the Biofilter.  This is consistent with the 1990's datasets.

The Current dataset, similar to the Dec 2019 dataset, shows that the TP and TSS concentrations for the stormwater coming out of the Biofilter at the compliance locations were the highest ever recorded for those points.[28]   Those results were more than 2x the maximum levels allowed for the Biofilter, as set by permit.  This is divergent from the 1990 levels, which consistently decreased between Biofilter inlet versus outlet for all parameters, even the abnormally high ones.

All three WQ concentrations lowered <u>after</u> leaving the Biofilter (the compliance S locations) and before reaching the downstream L outlet points (tested by the City) in the shoreline wetlands. Though lowered, those concentrations were still higher than the maximum allowed for TP and TSS.

The reason for the decrease in concentrations on the eastside (from S4 to L2) is dilution with the swale/pond outlets.  This is confirmed by visual observation of a large amount of stormwater coming from the swale/pond system merging with the relatively small stream from the Biofilter a few meters upstream of the L2 point.  This difference indicates that the stormwater from the swale/pond system is relatively clean and therefore able to dilute the high pollutant concentrations coming from the Biofilter.  This also indicates that the swale/pond system is working to clean stormwater coming from the 38.0 acres of the LSHOA's east-side properties.

The westside (S2 to L1) has no visible surface water dilution source to explain the decrease between the two points, so the reason for the change in concentrations is unclear.  There is a 1.25m rocky rooted waterfall where a groundwater source could be entering the stream.  Based on our available data, the difference could be due to dilution with groundwater, waterfall aeration or that the shoreline wetlands are acting as a second biofilter.  Note that the latter is specifically what Ecology wanted to avoid by having stormwater treated with a filtration wetland - they did not want the shoreline wetlands exposed to pollutants.[29]

The Current dataset indicated that the WQ coming out of the Biofilter is worse than the WQ going into it.  The Biofilter has violated the permit standards set for it.  The TP load coming from the Biofilter is contributing to the total TP load for the Lake and feeding harmful algae blooms where they have been appearing with increasing frequency.

---

[28] The Current and Dec 2019 TP readings are higher than the median TP levels for industrial land use of 171µg/L, i.e., the Biofilter is at times putting more TP in the stormwater than most industrial sites in western Washington. Hobbs, W., B. Lubliner, N. Kale, and E. Newell. 2015. "Western Washington NPDES Phase 1, Stormwater Permit: Final Data Characterization 2009-2013". Washington State Department of Ecology, Olympia, WA. Publication No. 15-03-001.

[29] Appendix K. "With this policy in mind, we want to see the resulting permit with conditions to provide additional protection to the shoreline environment." (p. 1)  "The stormwater monitoring plan now includes contingencies to divert flows should this wetland show signs of stress from the increased water regime." p. 2.

## Conclusions

1. The Current snapshot test results during the moderate to heavy rain, yielded Biofilter inlets concentrations for TP, TSS, and conductivity higher than the compliance standards.

2. The stormwater parameter concentrations increased between each inlet and its respective outlet, i.e., the Biofilter was adding TP, TSS and dissolved solids into the stormwater instead of filtering them out.

3. The concentrations for both compliance point outlets were higher than the maximum allowed via permit for TP and TSS.

4. The Biofilter "plumbing" leading to the bubbler pipes was overcapacity after minimal rain. Two weeks later, water looked like it was exiting from the bottom of the elevated B2 manhole, creating a channelized stream. This indicates that the bubbler may not be working properly to spread the stormwater.

5. Alternatives to handling the large amounts of flow, possibly due to additional hard surfaces of new neighborhoods/areas uphill of B2, should be investigated.

6. The erosional processes of the overflowing stormwater creating free-flowing streams through the Biofilter should be addressed.

7. The Biofilter's sediments have been trapping phosphates from prior stormwaters for years. Now, the stormwater is eroding and mixing those phosphate-heavy sediments back into the outflow. The sediments have become a vehicle for putting phosphates into the Lake.

The question then becomes, is the drainage part of the system broken or the filtering part of the system broken? It seems likely to be both. The water should not have been as visually fast flowing after 15-60 minutes of rain, nor should stormwater be channelized from the inlets all the way to the outlets. Even so, the combination of all stormwater exiting the Biofilter as surface water, both the channelized and dispersed, at either of the two outlet points (S2 and S4), should still have had lower concentrations of TP and TSS than was found. The age of the Biofilter, the length of time without maintenance, and the amount of accumulated sediment over the last 3 decades may be contributing to the inefficiency exhibited in this Biofilter.

The Biofilter, as it is currently configured, cannot handle the TP concentrations coming into it. Too much untreated stormwater runoff is reaching the Lake. In fact, the Lacamas Shores Biofilter is not doing the Lake any good at all at this time. Even if the stormwater runoff poured from the inlets directly into the lake, TP would still be too high according to the City permit standards. The Biofilter needs repair, restoration, and/or improvement in order to ensure that future stormwater WQ meets the compliance criteria set at the compliance locations and stops contributing to future harmful algae blooms.

08/16/2021

## Recommendations

While there are multiple ways to use the same Biofilter footprint to properly filter the stormwater coming into the Biofilter, the current situation is harmful to Lacamas Lake water quality and is, per City permit, not acceptable.   Options include:
- • Returning the Biofilter to the original designed standard,
- • Following the 1999 maintenance manual for the system,[30]
- • Adding the "checkdams" proposed in the Monitoring Report,[31]
- • Inclusion of the Biofilter inlets and outlets as part of any Lacamas Lake source assessment by the City or County.

---

[30] City of Camas. Lacamas Shores HOA Interim Trail, Open Space, Wetland and Storm Drainage Maintenance Manual. Camas, WA. (n.d.)  This manual was written/commissioned by the City of Camas for the LSHOA sometime after 1998 with specific directions for maintenance.  Many of those directives (such as removing debris, sediment buildup, dead vegetation, and trees that interfere with maintenance) do not appeared to have been followed.

[31] SRI/Shapiro. "5-year Stormwater Runoff and Wetland Biofilter Monitoring Program for the Lacamas Shores Residential Development Camas, WA - Fifth Year Report", p. 8. March 11, 1994.  The 5th Annual report for the Monitoring Program suggested on page 8 that: "Small checkdams [AKA level spreaders] using downed logs could remedy the situation [of channelization]."  Adding checkdams to the original Biofilter design would serve to slow and spread the stormwater, decreasing channelization and allowing for more infiltration. This action was not taken.

**List of Appendices**

A) 09/23/2020 Lacamas Shoes Biofilter Efficiency Monitoring – Map of Total Phosphorus

B) 09/23/2020 Lacamas Shoes Biofilter Efficiency Monitoring – Map of Total Suspended Solids

C) 09/23/2020 Lacamas Shoes Biofilter Efficiency Monitoring – Map of Conductivity

D) Columbia Laboratory Report #20-010257/D02.R01, Dated 10/07/2020.

E) 1998 Drainage Basin Map for the "Modifications to Lacamas Shores Stormwater Disposal System". This map shows the $Q_2$ capacity of the bubblers to be at 11.0 cfs for B2 and 5.0 cfs for B1. "$Q_2$" is the estimated design discharge (Q) capacity needed to handle a 2-year storm event, i.e., the type of storm that happens every two years.

F) Bautista, Mark F. and Geiger, N. Stan "Wetlands for Stormwater Treatment." *Water Environment & Technology*, July 1993, pp. 50-55. This national magazine article was written exclusively about the innovative design of the Biofilter, with maps and a chart of the "Compliance Criteria".

G) Bautista, Mark and Geiger, Stan (11 March 1994), Appendices to the Five-Year Stormwater Runoff and Wetland Biofilter Monitoring Program for the Lacamas Shores Development – Fifth Year Report. SRI/Shapiro, Lake Oswego, OR. Datasets are in Appendix A, Table 1 - "Lacamas Shores Water Quality Data, 1988-1993." The compliance standards are shown in Tables 12-15.

H) April 2018 COD Grab Sample Info Sheet

I) City 12/2019 Results: BSK Associates (1/13/2020). Certificate of Analysis for V9L0419. Samples submitted 12/19/2019.

J) City 05/2020 Results: BSK Associates (6/11/2020). Certificate of Analysis for VDE0400. Samples submitted 05/21/2020.

K) Jewett, Nora. Lacamas Shores Development Permit Additions. Received by Mel Avery. 22 June 1988. Washington Department of Ecology. Mel Avery was the Director of Public Works for the City of Camas.

Appendix A

# Lacamas Shores Biofilter Efficiency Monitoring

## 9/23/2020 Test Results

### Total Phosphorus (in µg/L)

For reference: In May-Oct 2007, the average surface TP level for Lacamas Lake = 42µg/L; range = 30 to 50 ug/L.  *Monitoring Report: Lacamas Lake Annual Data Summary for 2007*

### TP Compliance Criteria (in µg/L)

| Compliance Locations | S2 | S4 |
|---|---|---|
| Location Description | North of N/W Outlet | South of S/E Outlet |
| Compliance Criteria | 110 | 118 |
| Maximum allowed* | 251 | 223 |
| Test Results | 555 | 976 |
| Out of Compliance by | +445 | +858 |



**OUTLETS TO LAKE**

Lacamas Lake

L1 **319**

L2 **135**

S2 **555**

S4 **976**

Shoreline Wetlands

WATERFLOW

LS Bioswale and Pond

Lacamas Shores Wetland Biofilter

B1 **145**

B2 **225**

**INLETS FROM STORMWATER DRAINAGE SYSTEM**

**Red =** Man-made parts of stormwater biofilter
**Blue =** General direction of water flow
**Yellow =** Man-made trail
**Grey Box =** Location label and test results in µg/L
**\* =** Compliance level + twice the standard deviation

12/27/2020

Appendix B

# Lacamas Shores Biofilter Efficiency Monitoring
## 9/23/2020 Test Results
## Total Suspended Solids (in mg/L)

For reference: "For the five-year period beginning in 1999, the annual mean TSS concentration in Lacamas Creek has ranged from 4.1 to 12.5 mg/L." *Lacamas Lake: Nutrient Loading and In-lake Conditions*, April 2004

### TSS Compliance Criteria (in mg/L)

| Compliance Locations | S2 | S4 |
| --- | --- | --- |
| Location Description | North of N/W Outlet | South of S/E Outlet |
| Compliance Criteria | 25.8 | 19.4 |
| Maximum allowed* | 72 | 51.6 |
| Test Results | 260 | 184 |
| Out of Compliance by | +234.2 | +164.6 |



**OUTLETS TO LAKE**

L1 **140**

Lacamas Lake

S2 **260**

S4 **184**

L2 **82**

Shoreline Wetlands

WATERFLOW

LS Bioswale and Pond

Lacamas Shores Wetland Biofilter

B1 **14**

B2 **98**

**INLETS FROM STORMWATER DRAINAGE SYSTEM**

**Red** = Man-made parts of stormwater biofilter
**Blue** = General direction of water flow
**Yellow** = Man-made trail
**Grey Box** = Location label and test results in mg/L
**\*** = Compliance level + twice the standard deviation

8/16/2021

Appendix C

# Lacamas Shores Biofilter Efficiency Monitoring
## 9/23/2020 Test Results
### Conductivity (in µmhos/cm)

For reference: "Values ranged from 46 uS/cm to 101 uS/cm during WY 2000 and 62 us/cm to 97 uS/cm during WY 2001." *Lacamas Lake Restoration Program: WY 2000 and WY 2001 Water Quality Monitoring*

**Conductivity Compliance Criteria**
(in µmhos/cm, which is equal to uS/cm)

| Compliance Locations | S2 | S4 |
|---|---|---|
| Location Description | North of N/W Outlet | South of S/E Outlet |
| Compliance Criteria | 87 | 63 |
| Maximum allowed* | 135 | 97 |
| Test Results | 115 | 105 |
| Out of Compliance by | +28 | +42 |



**OUTLETS TO LAKE**

Lacamas Lake

L1 **90.5**

L2 **84.8**

S2 **115**

S4 **105**

Shoreline Wetlands

W A T E R F L O W

LS Bioswale and Pond

Lacamas Shores Wetland Biofilter

B1 **83.5**

B2 **71.8**

**INLETS FROM STORMWATER DRAINAGE SYSTEM**

Red = Man-made parts of stormwater biofilter
Blue = General direction of water flow
Yellow = Man-made trail
Grey Box = Location label and test results in µg/L
* = Compliance level + twice the standard deviation

12/27/2020

## CERTIFICATE OF SERVICE

I hereby certify that on August 17th, 2021, I caused a true and correct copy of the foregoing Revised Attachment 5 to Steven D. Bang's 60-Day Notice of Intent to File Suit under the Clean Water Act to be served upon the parties herein by U.S. Postal Service, postage prepaid, via certified mail, return receipt requested:

DATED:  August 17, 2021.


*s/ Tammy Weisser*
Tammy Weisser, Legal Assistant


Donald Trost, President
Lacamas Shores Homeowners Association
2421 NW Lacamas Drive
Camas, WA 98607

Managing Agent
Lacamas Shores Homeowners Association
12503 SE Mill Plain Blvd., Suite 260
Vancouver, WA 98684-4008

Registered Agent
Lacamas Shores Homeowners Association
12503 SE Mill Plain Blvd., Suite 260
Vancouver, WA 98684-4008

Ellen Burton, Mayor
Office of the Mayor
City Hall
616 NE 4th Avenue
Camas, WA 98607

Michael S. Regan, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W., Mail Code 1101A
Washington, D.C. 20460

Michelle Pirzadeh, Acting Region 10 Administrator
U.S. Environmental Protection Agency
1200 Sixth Ave, Suite 155
Seattle, WA 98101

Laura Watson, Director
Washington State Department of Ecology
P.O. Box 47600
Olympia, WA 98504-7600